1  Bruce D. Praet SBN 119430
   FERGUSON, PRAET & SHERMAN
2  A Professional Corporation
   1631 East 18th Street
3  Santa Ana, California  92705
   (714) 953-5300  telephone
4  (714) 953-1143 facsimile
   bpraet@aol.com
5

6  Attorneys for Defendants

7

8              UNITED STATES DISTRICT COURT

9            EASTERN DISTRICT OF CALIFORNIA

10

11 THE ESTATE OF CASIMERO          )   No.: 1:16-cv-01042 AWI SAB
   CASILLAS, et al,                )
12                                 )
                  Plaintiffs,      )   **DEFENDANTS' NOTICE OF**
13                                 )   **MOTION FOR DIRECTED**
          vs.                      )   **VERDICT OR, IN THE**
14                                 )   **ALTERNATIVE FOR NEW**
   CITY OF FRESNO, The FRESNO      )   **TRIAL**
15 POLICE DEPARTMENT, Officer      )
   TREVOR SHIPMAN, and DOES 1-30,  )   **DATE: May 6, 2019**
16 inclusive,                      )   **TIME: 1:30 p.m.**
                                   )   **CTRM: 2, 8th Fl.**
17                Defendants.      )
   ────────────────────────────────)
18

19 TO: PLAINTIFFS AND THEIR COUNSEL OF RECORD:

20       PLEASE TAKE NOTICE that on May 6, 2019, at 1:30 p.m., in Courtroom 2

21 of the U.S. District Court located at 2500 Tulare Street, Fresno, California,

22 Defendants, City of Fresno and Trevor Shipman, will and do move the Court for a

23 Directed Verdict pursuant to *F.R.Civ.P., Rule 50(b)* or, in the alternative, for a

24 New Trial pursuant to *F.R.Civ.P., Rule 59(a)* with respect to the jury verdict

25 reached on March 6, 2019, and judgment entered on March 7, 2019.

26       Defendants' motion for a Directed Verdict is a renewed motion from the

27 timely *Rule 50(a)* motion during trial and is based upon a lack of legally sufficient

28 evidence for the jury to have ruled against these Defendants.

1    Defendants' motion for a New Trial pursuant to *Rule 59(a)* is based upon

2  juror misconduct, an inconsistent special verdict [*Rule 49(b)*], an improper special

3  verdict form, the failure to give proper jury instructions [*Rule 51*] and Officer

4  Shipman's right to qualified immunity.

5    This motion is based upon this notice and motion as well as all points and

6  authorities, exhibits, pleadings and oral argument to be presented at hearing on

7  this motion.

8  DATED:  March 21, 2019                    FERGUSON, PRAET & SHERMAN
                                            A Professional Corporation
9

10                                 By:  _/s/ Bruce D. Praet_____
                                        Bruce D. Praet,
11                                      Attorney for Defendants

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

1.      PREFATORY STATEMENT.......................................... 1

2.      PURSUANT TO *F.R.Civ.P., Rule 59*, A NEW TRIAL IS REQUIRED
        ON SEVERAL GROUNDS............................................ 4

        A.      THE FAILURE OF TWO JURORS TO DISCLOSE CRITICAL
                BIAS MUST RESULT IN A NEW TRIAL.......................... 5

        B.      THE JURY AWARD OF $2 MILLION FOR DECEDENT'S
                LOSS OF ENJOYMENT OF LIFE MUST BE VOIDED.............. 7

        C.      THE JURY AWARD OF $250,000 FOR DECEDENT'S PAIN
                AND SUFFERING IS CONTRARY TO THE EVIDENCE............ 8

        D.      THE UNDENIABLY INCONSISTENT VERDICT WARRANTS
                A NEW TRIAL................................................... 9

        E.      IMPROPER JURY INSTRUCTIONS AND JURY QUESTIONS
                WARRANT A NEW TRIAL..................................... 10

3.      DEFENDANTS ARE ENTITLED TO A DIRECTED VERDICT
        UNDER RULE 59 AND ON A RENEWED RULE 50(b) MOTION.......... 13

        A.      OFFICER SHIPMAN IS STILL ENTITLED TO QUALIFIED
                IMMUNITY................................................... 13

        B.      A NEW TRIAL IS REQUIRED UNDER BOTH RULE
                50(b) AND RULE 59 UNDER THE EVIDENCE AT TRIAL.......... 16

4.      CONCLUSION................................................... 19

1

**TABLE OF AUTHORITIES**

2

3 <u>**CASES**</u>

4 *Chaudry v. Los Angeles (9th Cir. 2014)*
   751 F3d 1096 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8
5

6 *District of Columbia v. Wesby (2018)*
   138 S.Ct. 577 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

7 *Duhn Oil Tool v. Cooper Cameron (E.D. Cal. 2011)*
   818 F.Supp.2d 1193 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
8

9 *Dyer v. Calderon (9th Cir. 1998)*
   151 F3d 970 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

10 *Floyd v. Laws (9th Cir. 1991)*
   929 F2d 1390 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
11

12 *Galdamez v. Porter (9th Cir. 2005)*
   415 F3d 1015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

13 *Graham v. Connor (1989)*
   490 U.S. 386 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
14

15 *Hayes v. County of San Diego (2013)*
   57 Cal.4th 622 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

16 *Hernandez v. Pomona (2009)*
   46 Cal 4th 501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12
17

18 *Joseph v. Pac. Bell (9th Cir. 2006)*
   443 F3d 1050 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

19 *Kisela v. Hughes (2018)*
   138 S.Ct. 1148 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
20

21 *Landes Constr. Co. v. Royal Bank of Canada (9th Cir. 1987)*
   833 F2d 1365 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

22 *McDonough Power Equip. v. Greenwood (1984)*
   464 U.S. 548 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6
23

24 *Morales v. Fry (9th Cir. 2017)*
   873 F3d 817 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

25 *Mullenix v. Luna (2015)*
   136 S.Ct. 305 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16
26

27 *Norwood v. Vance (9th Cir. 2010)*
   591 F3d 1062 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

28 *///*

*Reed v. Hoy (9th Cir. 1989)*
*909 F2d 324* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Robertson v. Wegmann (1978)*
*436 U.S. 584* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Romero v. Kitsap County (9th Cir. 1991)*
*931 F2d 624* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Saucier v. Katz (2001)*
*533 U.S.194* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Shafter v. Santa Barbara Co. (9th Cir. 2017)*
*868 F3d 1110* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Silver Stage Partners v. City of Desert Hot Springs (9th Cir. 2001)*
*251 F3d 814* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Smith v. Summer (9th Cir. 1993)*
*994 F2d 1401* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Tortu v. Las Vegas Metro Police Dept. (9th Cir. 2009)*
*556 F3d 1075* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Trans-world v. Smith Hemion (C.D.Cal 1996)*
*952 F.Supp. 667* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*U.S. v. Allsup (9th Cir. 1977)*
*556 F2d 68* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States 4.0 Acres of Land (9th Cir. 1999)*
*175 F3d 1133* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*White v. Pauly (2017)*
*580 U.S.*
*137 S.Ct. 548* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Wilkinson v. Torres (9th Cir. 2010)*
*610 F3d 546* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Willis v. City of Fresno (E.D. Cal. 2017)*
*2017 U.S. Dist. LEXIS 195321* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

**Federal Rules of Civil Procedure**

*Rule 50(a)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Rule 50(b)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 13, 16, 18

*Rule 59* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 13, 16, 18

*Rule 59(a)(1)(A)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Federal Rules of Evidence**

*Rule 606(b)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**9th Circuit Model Jury Instructions**

Instruction 9.25. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

**CACI Jury Instructions**

Instruction 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Instruction 407 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Instruction 430 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Instruction 1305 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-13

Instruction 3700 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Code of Civil Procedure**

*Section 377.34* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Penal Code**

*Section 835a* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-13

## MEMORANDUM OF POINTS AND AUTHORITIES

### 1. PREFATORY STATEMENT.

Given the overwhelming evidence supporting a defense verdict, it appeared that even Plaintiffs were candidly surprised when the jury delivered a verdict in their favor. Although Plaintiffs will now undoubtedly claim otherwise, the question becomes how and why would a jury reach such an unexpected finding.

While the erroneous verdict is undoubtedly the result of multiple factors outlined below, the most compelling need for a new trial arises with respect to the extreme bias of two jurors who withheld critical information during voir dire which would have absolutely disqualified both of them from sitting on this jury. Those jurors were Joseph Carlini (aka: Juror 015) and, worse yet, the influential jury foreperson, Carrie Crawford (aka: Juror 017). While the common thread of bias between these two jurors is hopefully coincidental, it all stems from the following background:

March 12, 2018 - in an officer-involved shooting (OIS) eerily similar to the instant case, nearby Tulare police shot and killed a black man, Jontell Reedom, when he attempted to attack the officers with a club.

Week following Tulare PD OIS - the Reedom OIS received a substantial amount of negative publicity [See: exh "1" attached] and brought large numbers of protestors to the City of Tulare. Defendants are informed and believe that Jury Foreperson Carrie Crawford was not only a personal acquaintance of decedent Reedom and his family, but likely also participated in these protests.

March 20, 2018 - then Tulare City Manager, Joseph Carlini (aka: Juror 015) abruptly fired Tulare Police Chief Wes Hensley just eight days after the controversial OIS under the pretext of "no confidence". Just one hour later, Mr. Carlini was fired. [Note: Chief Hensley has since been reinstated while an obviously disgruntled Mr. Carlini was not.]

/ / /

March 20, 2018 - Mr. Carlini immediately contacted his close friend, then Tulare Mayor Carlton Jones (a City of Fresno Firefighter) for advice.  Carlton Jones has publicly condemned the Tulare OIS, has criticized City of Fresno process fees and has sued the City of Fresno, and remains an outspoken critic of law enforcement.  As a close friend of the Reedom family, Carlton Jones publicly declared that they should be awarded millions of dollars and Mr. Jones is coincidentally a "friend" of Jury Foreman Carrie Crawford on Facebook.

During voir dire, both of these jurors were asked a series of questions which called for disclosure of these close ties to a remarkably similar OIS and the relatively recent adverse action taken by Mr. Carlini against a neighboring police chief.  For example:

- The Court asked all prospective jurors to reveal whether "(they), a family member, or a close friend" had "any exposure to law enforcement that you would consider to be negative, adverse, or whatever"[Day 1, RT:85][1].  To further clarify, the Court asked "Any situation relating to law enforcement that you would consider to be negative or adverse in any way?" [Day 1, RT:86]

    - Despite having fired the Tulare Police Chief less than a year prior and then himself getting terminated, Mr. Carlini failed to even mention this very serious and obviously negative situation.  Having lost his own job just one hour after firing a police chief on the heels of a highly publicized OIS is certainly an issue which would

---

[1]Defendants have attached relevant portions of the official Reporter's Transcript [RT] from the trial as exhibit "2", designated by trial Day number.  Due to filing deadlines and burden on court staff to prepare the entire trial transcript, Defendants have not yet obtained the entire transcript, but will supplement this motion if any proceedings or testimony are in question.

have resulted in excusing Mr. Carlini for cause in this case involving a remarkably similar OIS.

- While Ms. Crawford did mention two incidents, one initially involving Fresno PD (later corrected to CHP) and another involving Tulare PD [Day 1, RT:86], the Court went on to extensively inquire about Ms. Crawford's complaint against a CHP officer and never inquired further about the Tulare PD incident given that Ms. Crawford never mentioned that it in fact involved the fatal police shooting of a close friend.  While neither the Court nor the parties would have known to inquire further about the Tulare incident in view of Ms. Crawford's emphasis on the CHP complaint, disclosure of such a closely related OIS would have undeniably resulted in her being excused from the jury for cause.

- The Court then asked the entire jury pool "Have any of you had any dealings or exposure with the City of Fresno, not just the Police Department, but the City of Fresno itself, any of its employees, or whatever?" [Day 1, RT:88]

  - Despite being Facebook friends with City of Fresno firefighter Carlton Jones (a Fresno employee who has sued the City of Fresno and is an outspoken critic of law enforcement in the Reedom OIS), Ms. Crawford said absolutely nothing.  After firing the Tulare Police Chief and then himself getting fired, Mr. Carlini also made no mention of his close ties to a controversial City of Fresno employee.

///

1       Whether either or both of these jurors intentionally withheld this critical

2   information in order to satisfy some sort of personal agenda or whether this rather

3   obvious information was somehow inadvertently withheld, the inherent bias with

4   respect to officer-involved shootings and the extreme prejudice to the City of

5   Fresno and Officer Shipman simply cannot be ignored.

6       Not only was Ms. Crawford placed in the influential position of being the

7   foreperson, but the Court will undoubtedly recall that when the jury was brought

8   back into the courtroom at the beginning of the first day of deliberation to address

9   their first question [Doc. 80], it was Ms. Crawford and Mr. Carlini who

10  simultaneously turned back to Juror Magdelena Garcia as if to ask if she was

11  satisfied with the Court's response.  Although no one will know the meaning of

12  this obvious gesture, it does demonstrate the bond between Ms. Crawford and Mr.

13  Carlini and their apparent influence on any juror not in line with their positions.

14      As more fully set forth below, complete and honest responses by both of

15  these jurors during voir dire would have unquestionably resulted in their dismissal

16  for cause.  Officer Shipman and the City of Fresno were constitutionally entitled to

17  a fair and impartial jury unencumbered by preconceived biases against law

18  enforcement and unavoidably influenced by close ties to the family of an

19  individual recently shot and killed by Tulare police in a remarkably similar

20  incident.  For all the reasons stated herein, it is unfortunate, but necessary that the

21  verdict in this case must be set aside.

22      **2.**     **PURSUANT TO *F.R.Civ.P., Rule 59*, A NEW TRIAL IS**

23                 **REQUIRED ON SEVERAL GROUNDS.**

24      Although Defendants separately renew their motion for a directed verdict

25  under *F.R.Civ.P., Rule 50(b)* (infra.), several equal, if not more compelling, issues

26  warrant a grant of a new trial under *F.R.Civ.P., Rule 59(a)(1)(A).*  Unlike the

27  standards for a directed verdict under *Rule 50(b)*, a trial court may grant a new

28  trial even if substantial evidence supports the jury's verdict as long as the basis for

the new trial has been historically recognized or to prevent a miscarriage of justice.  *Silver Stage Partners v. City of Desert Hot Springs, 251 F3d 814, 819 (9th Cir. 2001)*.  As such, Defendants will initially address those grounds under *Rule 59* and then address the *Rule 50(b)* issues.

### A.  THE FAILURE OF TWO JURORS TO DISCLOSE CRITICAL BIAS MUST RESULT IN A NEW TRIAL.

While it is unfortunate the jurors Carlini and Crawford withheld critical information during voir dire, the Constitution guarantees all defendants a verdict by impartial and indifferent jurors and "the bias of even a single juror would violate [Defendants'] right to a fair trial."  *Dyer v. Calderon, 151 F3d 970, 973 (9th Cir. 1998) (en banc)*.  The presence of a biased juror is a structural error not subject to the harmless error analysis; the error requires a new trial without a showing of actual prejudice.  *Id., fn.2.*  Although *FRE, Rule 606(b)* likely precludes ever knowing the full amount of influence these two jurors imposed upon other jurors during deliberations, their undisclosed connection to the recent, very similar Tulare PD officer-involved shooting and to outspoken Fresno firefighter Carlton Jones overwhelmingly demonstrates that the City of Fresno and Officer Shipman were not judged by "impartial and indifferent jurors".

In *McDonough Power Equip. v. Greenwood, 464 U.S. 548, 556 (1984)*, the Supreme Court held that a new trial must be granted if (1) a juror failed to answer honestly a material question on voir dire, and (2) a correct response would have provided a valid basis for a challenge for cause.  While Defendants sincerely hope that neither Mr. Carlini nor Ms. Crawford were intentionally dishonest or lacking in candor with their responses, even entirely honest or inadvertently inaccurate responses will warrant a new trial.  As Justice Brennan noted:

> "Because the bias of a juror will rarely be admitted by the juror
> himself, 'partly because the juror may have an interest in concealing
> his own bias and partly because the juror may be unaware of it, it

necessarily must be inferred from the surrounding facts and circumstances."

*Id., 464 U.S. at 558.*

While an expressed admission of actual bias will almost always result in excusing a juror, more frequently jurors are reluctant to admit actual bias and the reality of their biased attitudes must be revealed by circumstantial evidence. *U.S. v. Allsup, 556 F2d 68, 71 (9th Cir. 1977)* ["That men will be prone to favor that side of a cause with which they identify themselves either economically, socially, or emotionally is a fundamental fact of human character."]

Whether intentional or inadvertent, both Mr. Carlini and Ms. Crawford clearly failed to (1) reveal their respective connections to the remarkably similar officer-involved shooting in Tulare less than a year prior to this trial, and (2) their associations with a City of Fresno employee, more particularly a Fresno employee who has been outspoken about the same Tulare OIS and who has actually taken adverse action against the City of Fresno.

Although the disclosure of either of these facts would have resulted in both of these jurors being appropriately challenged and excused for cause, the combination of these undisclosed critical facts simply could not have permitted either juror to remain:

- While Mr. Carlini and Ms. Crawford might have fairly served on juries in other types of cases, the fact that Mr. Carlini (wrongfully) fired the Tulare Police Chief just eight days after protests over a  remarkably similar OIS and then himself was fired an hour later from his position as City Manager could not be overlooked and would have required that he be excused for cause.  Similarly, if Ms. Crawford had revealed her personal familiarity with the family of the individual killed in the recent Tulare PD officer-involved shooting, she simply could not have been permitted to remain on this jury.

- While mere friendship with any Fresno employee would not likely result in a challenge for cause, Mr. Carlini and Ms. Crawford failed to reveal their close ties to Fresno Firefighter Carlton Jones who has not only been outspoken about the Tulare PD shooting, but who has taken adverse action against the City of Fresno.  Given that the City of Fresno is a named Defendant in this case, neither of these jurors could have been permitted to remain on this jury.

Defendants do not take a request for a new trial based upon juror misconduct lightly.  However, while prejudice need not be proved, these Defendants were entitled to a fair and impartial jury and the inherent bias of Mr. Carlini and Ms. Crawford must be remedied in only one way - a new trial.

## B.   THE JURY AWARD OF $2 MILLION FOR DECEDENT'S LOSS OF ENJOYMENT OF LIFE MUST BE VOIDED.

As the Court will recall during discussions regarding the scope of damages to be provided for decedent's "survival action" in the special verdict form, Plaintiffs promised to provide authorities to support an award of damages for decedent's "loss of enjoyment of life" in response to objections from Defendants. [Day 4, RT:14-15]  Yet, despite a complete lack of authority, the Court nonetheless unfortunately included Question No. 10 in the special verdict: "*What damages do you award based upon Casimero Casillas' loss of enjoyment of life*." In response to this question, the jury awarded $2,000,000.

In a civil rights action, recoverable damages are governed by state law unless such are inconsistent with the policies of 1983.  *Robertson v. Wegmann, 436 U.S. 584, 589-90 (1978).*  Although the Ninth Circuit has held that an outright prohibition of "pain and suffering" damages for decedent would be inconsistent with 1983 [*Chaudry v. Los Angeles, 751 F3d 1096, 1105 (9th Cir. 2014)*], a decedent is entitled to nothing more than such pre-death "pain and suffering".

Consistent with Defendants' objections, *California Code of Civil Procedure § 377.34* expressly provides that damages recoverable for a decedent's survival action "are limited to the loss or damage that the decedent sustained or incurred <u>before death</u>." (emphasis added)

In the instant case, the jury in fact separately and specifically awarded $250,000 in response to Question No. 9: "*What damages do you award based upon Casimero Casillas' mental, physical, and emotional <u>pain and suffering experienced prior to death.</u>*" (emphasis added).  Given that this question was the only correct statement of the applicable law, the jury's award of damages beyond those allowed by controlling state and federal law must be reversed and minimally reduced by $2 million.

## C.    THE JURY AWARD OF $250,000 FOR DECEDENT'S PAIN AND SUFFERING IS CONTRARY TO THE EVIDENCE.

While *Chaudry* makes it clear that a decedent is entitled to an award of damages for "pain and suffering", this Court recently had occasion to measure such a damage award for conformance to the evidence presented in the case. *Willis v. City of Fresno, 2017 U.S. Dist. LEXIS 195321,* *19-21 (E.D. Cal. 2017). Although this Court was unable to find any 1983 cases on point, the Court found guidance in a series of drowning cases in which decedent's pain and suffering was measured by the amount of time during which decedent likely remained conscious and aware of his injuries.  In *Willis*, this Court assessed "pain and suffering" damages in the amount of $25,000 based upon evidence that decedent was conscious and survived his gunshots for 15-20 seconds.

In the instant case, the evidence revealed that Casimero Casillas uttered a momentary "ugh" at the moment of the shots, but thereafter was pulseless and without respirations when Officers Wright and Long promptly began CPR.  Even when EMT's arrived minutes later, the testimony of EMT Robin Anderson and the EMS run sheet (trial exhibit "21") confirm that decedent remained non-responsive

to paramedics and was never conscious during any of the perhaps 90 minutes that he remained "alive" during CPR.  Thus, while the evidence suggests that decedent might have technically been capable of experiencing some momentary "pain and suffering" for a few seconds after being shot, Defendants would submit that an award of $250,000 is excessive and contrary to the evidence.  This case is instead analogous to the facts in *Willis* and warrants an award for "pain and suffering" no more than $25,000.

> **D.    THE UNDENIABLY INCONSISTENT VERDICT WARRANTS A NEW TRIAL.**

Ironically, even the Court immediately recognized and commented that there was a "mistake" with the jury's responses in the special verdict form before reading it into the record without sending the jury back for further deliberations to reconcile the obvious inconsistency.  As the Court noted, this inconsistency involved the jury's responses with respect to the negligence of decedent.

After finding that Casimero Casillas was negligent [Question No. 6, Doc. 88], the jury answered Question No. 7 by finding that his negligence was nonetheless not a cause of his own death.  Although Defendants fail to see how decedent's negligence could not have been a substantial cause of his death [Jury Instruction CACI 430, Doc. 87, p. 19], the jury was then instructed to skip Question No. 8 [assignment of comparative fault percentages] and proceed to Question No. 9 [damages] if they answered "no" to Question No. 7.  However, the jury failed to follow these clear instructions and instead assigned 40% negligence to Casimero Casillas and 60% to Officer Shipman.  This inconsistency was never addressed and the now-discharged jury never clarified their intentions with respect to this division of negligence.

When answers in a special verdict are inconsistent, judgment shall not be entered.  *Trans-world v. Smith Hemion, 952 F.Supp. 667, 672 (C.D.Cal 1996).*  In the event of an inconsistent special verdict, the trial court must first attempt to

1   fairly reconcile the inconsistency, but must then order a new trial if irreconcilable.

2   *Floyd v. Laws, 929 F2d 1390 (9th Cir. 1991); Cf.  Duhn Oil Tool v. Cooper*

3   *Cameron, 818 F.Supp.2d 1193, 1219 (E.D. Cal. 2011).*  Although no one can ever

4   be certain what the jury intended by dividing negligence between the two parties

5   at 60/40, it would logically appear that the jury intended to have the Court reduce

6   the $2.5 million damage award stemming from the wrongful death claim by 40%

7   (i.e. $1 million) to $1.5 million.  This, of course, would be consistent with the

8   Court's Jury Instruction CACI 401/407 [Doc. 87, p. 18] in which the jury was told

9   that the Court would calculate the reduction of damages according to the jury's

10   determination of percentages.

11          However, since it is suspected that Plaintiffs will not agree to this

12   reconciliation of the undeniably inconsistent verdict, the only remedy the Court

13   may now impose is a new trial.

14          **E.      IMPROPER JURY INSTRUCTIONS AND JURY QUESTIONS**

15                  **WARRANT A NEW TRIAL.**

16          Although the Court and the parties are to be commended for minimizing the

17   disputes over jury instructions, the Court will undoubtedly recall Defendants'

18   extensive objections over the lack of a separate jury instruction for Plaintiffs'

19   "battery" claim under state law. [Day 4, RT:6-10 and 17-25].  While this might

20   never have become an issue with a truly fair and impartial jury (*supra.*), the

21   erroneous verdict has now reiterated the impact realized by the absence of this

22   required jury instruction.

23          As the Court will recall from the record, this issue arose when Plaintiffs

24   requested (and the Court eventually conceded over Defendants' objections) that

25   Plaintiffs' "excessive force" claim under 42 USC 1983 be "folded in" with their

26   separate "battery" claim under state law as a single question. [Day 4, RT:27-31].

27   As Defendants' argued [*Id.,* RT:19], the initial problem with folding these two

28   distinctly separate claims into a single question is that, contrary to Plaintiffs'

argument (and the Court's ultimate ruling), the standard for these two claims is no longer the same.  In *Hayes v. County of San Diego, 57 Cal.4th 622, 639 (2013),* the California Supreme Court made it clear that "state and federal standards are not the same".

The problems with this Court nonetheless folding the two distinctly different claims into a single jury question addressed solely by Ninth Circuit Model Instruction 9.25 [Doc. 87, p.12] compounded in several ways.  Because the state "battery" claim was somehow absorbed into the  federal "excessive force" claim, there is now no way to determine whether the jury's award of damages was intended to be imposed against the City of Fresno on a theory of vicarious liability [Doc. 87, p. 15,  CACI 3700] or improperly against the City on a non-existent *Monell* claim. [Day 4, RT:28]  Of course, this further creates a problem with respect to Plaintiffs' inevitable request for an award of attorneys' fees under 1988 since it is now impossible to determine whether they prevailed under federal or state law.

Without repeating all of Defendants' lengthy arguments contained in the attached record, the most regrettable error arising from the Court's rejection of the model CACI 1305 instruction for "Battery" is the fact that Defendants were deprived of a critical statement of law contained in the model instruction confirming that police officers have no legal duty to retreat.  Ironically, Defendants even provided the Court with the authority contained in *Hernandez v. Pomona, 46 Cal 4th 501, 518-519 (2009)* which the California Supreme Court had relied upon to differentiate the state and federal standards in *Hayes.* [Day 4, RT:6] The importance of this "no duty retreat" language contained in CACI 1305 as a statement of controlling California law [*California Penal Code § 835a*] cannot be understated in light of the evidence presented to the jury and the lack of corresponding instruction from the Court.

///

In the instant case, it appears that the Court attempted to distinguish *Hernandez* by limiting its application the "no duty to retreat" provisions of *Penal Code § 835a* and CACI 1305 to only situations in which the officer was attempting to make an arrest. [Day 4, RT:6-7].  However, as Defendants pointed out in oral argument, Officer Shipman, like the officers who ended up shooting Hernandez, clearly had no other purpose but to arrest Casimero Casillas as the suspect who had fled from officers.  Thus, the Court's distinction is one without a difference.  Coincidentally, the Ninth Circuit has held that it would be improper to give a "duty to retreat" instruction (i.e. the reverse) in an excessive force case since "such a duty may be inconsistent with police officers' duty to the public to pursue investigations of criminal activity."  *Reed v. Hoy, 909 F2d 324, 331 (9ᵗʰ Cir. 1989).*

Throughout the trial, Plaintiffs stressed the fact that Officer Shipman considered, but did not "back-pedal" or take a step back instead of shooting Casimero Casillas. [Day 2, RT:2-4].  Thereafter, Plaintiffs reinforced this "failure to retreat" by eliciting expert testimony from Mr. Harmening that a reasonable police officer should have taken a step back instead of shooting. [Day 3, RT:2] Yet, despite this theory and evidence being presented to the jury, Defendants were prejudicially deprived of a correct statement of the applicable law coming from the Court to properly inform the jury that no such legal duty exists.  Once again, while the basis for the jury's verdict will never be known, the failure to give a requested instruction on a party's theory of the case is reversible error if the theory is legally sound and evidence in the case makes it applicable.  *Smith v. Summer, 994 F2d 1401, 1404 (9ᵗʰ Cir. 1993).*

Here, the prejudicial effect of refusing to instruct the jury on the correct statement of law must be presumed from the omission of Defendants' theory of defense in light of the evidence and the burden now shifts to Plaintiffs to demonstrate that it is more probable than not that the jury would have reached the

same verdict had it been properly instructed.  *Galdamez v. Porter, 415 F3d 1015, 1025 (9th Cir. 2005).*  Given Plaintiffs' emphasis on the purported option of Officer Shipman to have retreated, it will regrettably be impossible to determine how the jury would have found had they been properly instructed on that issue.

Thus, the improper joining of the differing standards for a federal "excessive force" claim with the separate and distinct state "battery" claim and the refusal to instruct the jury on the controlling state law set forth in CACI 1305 or to even include the provisions of *Penal Code § 835a* into the consolidated 9.25 instruction now serve as even further grounds to require a new trial.

### 3.   DEFENDANTS ARE ENTITLED TO A DIRECTED VERDICT UNDER RULE 59 AND ON A RENEWED RULE 50(b) MOTION.

Like Rule 59, Rule 50(b) provides for either granting a new trial or a directed verdict.  Having timely made their Rule 50(a) motion during trial, a directed verdict is proper in favor of Defendants under the Rule 50(b) standard of "the evidence permits only one reasonable conclusion and that is contrary to the jury's verdict" [*Joseph v. Pac. Bell, 443 F3d 1050, 1062 (9th Cir. 2006)*] and, as outlined above, even more so under the less stringent Rule 59 standard where "the verdict is contrary to the clear weight of evidence and the verdict results in a miscarriage of justice."  *United States 4.0 Acres of Land, 175 F3d 1133, 1139 (9th Cir. 1999).*

### A.   OFFICER SHIPMAN IS STILL ENTITLED TO QUALIFIED IMMUNITY.

As set forth in Defendants' Pretrial Request for Special Interrogatories to the Jury [Doc. 55], the Court had previously concluded that Officer Shipman would be entitled to qualified immunity on summary judgment if seemingly disputed facts were as Defendants had represented. [See: Doc. 26, p.12-13].  Thus, the Court expressly reserved a determination of qualified immunity until after the

jury verdict.  Although the Court declined to give Defendants' proposed special interrogatories addressing the disputed facts, the debate over qualified immunity continued through the final jury instruction conference. [See e.g. Day 4, RT:15]

Despite the jury's (erroneously) conclusion that Officer Shipman had somehow violated the constitutional rights of decedent, Officer Shipman is still entitled to qualified immunity if the right was not "clearly established" at the time of this shooting on September 7, 2015.  *Norwood v. Vance, 591 F3d 1062 (9th Cir. 2010).*  In cases such as this in which it is necessary for a jury to decide disputed facts, a bifurcation of duties is unavoidable since only the judge can decide whether the right was clearly established once the factual issues are resolved. *Morales v. Fry, 873 F3d 817, 823 (9th Cir. 2017)* [Citing *Tortu v. Las Vegas Metro Police Dept., 556 F3d 1075, 1085 (9th Cir. 2009).*]

Here, even assuming *arguendo*, that the (biased) jury factually determined that Officer Shipman violated decedent's constitutional rights under their perception of the disputed facts, it is now the duty of the Court to determine whether that right was "clearly established" at the time.  While the Court on summary judgment had understandably viewed the speculation of Plaintiffs' expert's suggestions that decedent might have held the pipe for reasons other than to attack Officer Shipman, the Court also appropriately ruled *in limine* that such state of mind opinions regarding decedent are both improper and irrelevant since it is solely the state of mind of Officer Shipman (i.e. a reasonable officer) at issue. [Doc. 67, p.10] As the Ninth Circuit has held, it is clearly established that the Fourth Amendment does not require omniscience or absolute certainty of harm before police officers are entitled to use deadly force.  *Wilkinson v. Torres, 610 F3d 546, 553 (9th Cir. 2010).*

Thus, the post-verdict issue now is whether it would have been clear "beyond debate" at the time to Officer Shipman and all reasonable police officers that his split-second decision under these specific circumstances would violate

clearly established law.  As the trial courts and particularly the Ninth Circuit have recently been reminded several times by the Supreme Court, the "clearly established" prong of qualified immunity must not be applied too broadly. *White v. Pauly, 580 U.S. ___ , 137 S.Ct. 548 (2017) (per curiam)*; *Shafter v. Santa Barbara Co., 868 F3d 1110 (9th Cir. 2017); District of Columbia v. Wesby, 138 S.Ct. 577 (2018)*; *Kisela v. Hughes, 138 S.Ct. 1148 (2018)*.

Clearly frustrated by an apparent ongoing lack of understanding by the district and appellate courts with respect to the meaning of "clearly established", the Supreme Court in *White* stressed that:

> "It is again necessary to reiterate the long-standing principle
> that 'clearly established law' should not be defined at a high
> level of generality.  As this Court explained decades ago, the
> clearly established law must be 'particularized' to the facts
> of the case.  Otherwise, [p]laintiffs would be able to convert
> rule of qualified immunity into a rule of virtually unqualified
> liability simply by alleging violation of extremely abstract
> rights."  *137 S.Ct. at 552.*

The Supreme Court's ongoing caution to the courts "not to define 'clearly established law' at a high level of generality" remains consistent.  It has continuously stressed that the law must be examined as to "whether the violative nature of a particular conduct is clearly established . . . in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna, 136 S.Ct. 305, 308 (2015).*

> "Such specificity is especially important in the Fourth
> Amendment context , where the Court has recognized
> that 'it is sometimes difficult for an officer to determine
> how the relevant legal doctrine, here excessive force,
> will apply to the factual situation the officer confronts.

1
2
3

The correct inquiry is whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the 'situation he confronted'." *Ibid.*

4
5
6
7
8
9
10
11
12

Most recently, the Supreme Court has left no doubt about the need for lower courts to grant qualified immunity absent identifying a case with such "specificity" that "an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Wesby, supra., p. 589.* In fact, the pre-existing law must have been so clearly established so as make the unlawfulness of the officers' conduct "beyond debate". *Id., p. 590.* Even if Officer Shipman was mistaken as to the facts (e.g. whether Casillas was going to strike Officer Shipman) or law, qualified immunity must still be applied as long as such mistake was reasonable. *Saucier v. Katz, 533 U.S.194, 205 (2001).*

13
14
15
16
17
18
19
20
21
22

Although the Court superficially addressed the "clearly established" prong of qualified immunity in its ruling on summary judgment [Doc. 26], not one of the cited cases comes even remotely close to the particularized facts present in the instant case (even as erroneously decided by the jury). There is not a single pre-2015 case in which an officer was suddenly confronted with a pipe wielding suspect during a search at the end of a pursuit. Given that it is Plaintiffs' burden to cite such a particularized case [*Romero v. Kitsap County, 931 F2d 624, 627 (9th Cir. 1991)*], the absence of such authority now mandates that the Court grant post-verdict qualified immunity to Officer Shipman on the constitutional claim of "excessive force" (regrettably merged with Plaintiffs' state claim of "battery").

23
24

**B.**   **A NEW TRIAL IS REQUIRED UNDER BOTH RULE 50(b) AND RULE 59 UNDER THE EVIDENCE AT TRIAL.**

25
26
27
28

Under Rule 50(b), the Court is limited to granting a new trial only in circumstances in which there is not substantial evidence to support the verdict. While this is precisely such a case, the Court may also grant a new trial under Rule 59 even if there is substantial evidence to support the verdict if the Court

1
2
3

independently finds that the verdict is not supported by the clear weight of the evidence. *Landes Constr. Co. v. Royal Bank of Canada, 833 F2d 1365, 1371 (9th Cir. 1987).*

4
5
6
7
8
9
10
11
12
13

While the surprise of everyone in the courtroom upon hearing the verdict may be intangible, even the Court preliminarily recognized the likelihood of a defense verdict in its summary judgment ruling "it would be the height of second guessing for the Court to determine Officer Shipman acted unreasonably, given the immediate threat Casillas posed, his active evasion of the officers, and the unavailability of the taser to halt Casillas's attack on Officer Shipman. (Citation) If these were the facts, summary judgment would surely issue in Defendants' favor." [Doc. 26, p. 7] Although these were the actual facts, Defendants need only address the opinions of Plaintiffs' own expert to demonstrate that the verdict was not supported by the clear weight of the evidence.

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Not only did Plaintiffs' expert make it clear that it was not necessary for decedent to either swing the pipe at Officer Shipman or to even verbally threaten the officer [Day 3, RT:41], but Mr. Harmening verified that Officer Shipman testified that decedent was "five to seven feet" away when the officer momentarily considered (but rejected) his Taser. [*Id.,* RT:31] Even giving Plaintiffs the benefit of the doubt as to Shipman's own estimate, Mr. Harmening opined from the evidence that decedent took "two maybe three (30 inch) steps when the shots rang out". [*Id.,* RT:51].  The undisputed evidence in this case [e.g. Joint Exhibit "112"] reveals that the entire length of the involved room was 19'6" from wall to wall.  It is also undisputed that Officer Shipman was on the steps (i.e. minus at least 2 ft) and that decedent's entry into the door would necessarily place him at least 3 ft. into the room when he entered (i.e. no more than 14'6" from Officer Shipman upon entry).  Given Mr. Harmening's own estimate of two or three 30" steps before he was shot, even Plaintiffs' own ultra-conservative estimate places decedent no more than 7 ft. from Officer Shipman at the time of the first shot.

1   Plaintiffs' own expert then went on to opine that Officer Shipman should
2   have deployed his Taser when decedent was five to seven feet away. [Day 3,
3   RT:57 and 60].  Acknowledging that decedent could then become a deadly threat
4   in just a split-second thereafter, Mr. Harmening gave the most amazing, if not
5   absurd, claim that the officer must then just "figure it out". [*Id.,* RT:60-61] Having
6   already conceded that the involved pipe could become a deadly threat at "arm's
7   length plus two feet" (i.e. "striking distance"), even the plaintiff-oriented William
8   Harmening testified that decedent "**is going to get shot**" at that point. [*Id.*] And,
9   that's viewing the evidence entirely from the most favorable view of Plaintiffs.

10   As the Supreme Court long ago mandated in *Graham v. Connor, 490 U.S.*
11   *386, 396-397 (1989):*

12   "The calculus of reasonableness  must embody allowance for the
13    fact that police officers are often forced to make split-second
14   judgments -- in circumstances that are tense, uncertain, and rapidly
15   evolving -- about the amount of force that is necessary in a particular
16   situation."

17   Notwithstanding the (erroneous) verdict reached by a regrettably biased
18   jury, the clear weight of the undisputed evidence (even viewed most favorably to
19   Plaintiffs from the perspective of their own expert) demonstrates that Officer
20   Shipman was placed in the classic "tense, uncertain, and rapidly evolving"
21   situation in which he was undeniably forced to make a split-second decision.
22   Under these circumstances, judgment notwithstanding the verdict is required
23   under both Rule 50(b) and Rule 59.

24
25   ///

26
27   ///

28

**4.   CONCLUSION.**

Given the evidence in this case, the Court is respectfully requested to simply enter judgment notwithstanding the verdict.  In the alternative, the only other viable option is to grant a new trial so that this case may be decided by a truly fair and impartial jury in conformance with the applicable law.

Dated: March 21, 2019                         FERGUSON, PRAET & SHERMAN
                                                          A Professional Corporation


                                                 By:  ___/s/   Bruce D. Praet_____
                                                          Bruce D. Praet, Attorneys for
                                                          Defendants