**February 26, 2019**

**Jury Trial, Day 1**
**Jury Selection**

**EXHIBIT "2"**

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII

| | | |
|---|---|---|
| THE ESTATE OF CASIMERO CASILLAS, et al., | ) ) ) | 1:16-cv-1042 AWI-SAB |
| Plaintiffs, | ) ) | JURY TRIAL, DAY 1 |
| vs. | ) ) | JURY SELECTION |
| CITY OF FRESNO, et al., | ) ) | |
| Defendants. | ) ) ) | |

Fresno, California                    Tuesday, February 26, 2019


REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES OF COUNSEL**:

For the Plaintiffs:        LAW OFFICES OF DALE K. GALIPO
                           21800 Burbank Boulevard, Suite 310
                           Woodland Hills, California 91367
                           BY:  **DALE K. GALIPO**
                                **ERIC VALENZUELA**

                           WILLIAM L. SCHMIDT,
                           ATTORNEY AT LAW, P.C.
                           P.O. Box 25001
                           Fresno, CA 93729
                           BY:  **WILLIAM L. SCHMIDT**

For the Defendants:        FERGUSON, PRAET & SHERMAN
                           1631 East 18th Street
                           Santa Ana, CA 92705-7101
                           BY:  **BRUCE D. PRAET**

REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

2

1    Tuesday, February 26, 2019              Fresno, California

2

3            *        *        *        *        *        *

4            (The prospective jurors entered the courtroom.)

5            THE COURT:  The record will reflect that the jury

6    panel is present.

7            Members of the jury panel, good morning.  And we are

8    going to go ahead and get started on the trial itself in just

9    a little bit.

10           Few things I'm going to do preliminarily is to make

11   some introductions and also read to you some of the

12   prospective witnesses.

13           Now, when I make the introductions and when I read

14   you the witness list, I don't expect you to remember all of

15   our names or the names that I mentioned, but part of the thing

16   I would like you to pay attention to when I make introductions

17   and read the witness list is just to see if there is anybody

18   that I mentioned by name that you might know that might have

19   something to do with the trial itself.  So just keep that in

20   mind.

21           Let me start off first.  My name is Tony Ishii.  I'm

22   the judge who will be presiding over this particular trial.

23           I'm going to mention two staff members.  To my right

24   and your left is Ms. Victoria Gonzales.  She is the courtroom

25   deputy who will be working with the parties in terms of the

3

1   witnesses, exhibits, et cetera.

2         To my left and your right is Ms. Peggy Crawford.  She

3   is the court reporter.  I want to mention a couple of things

4   about her role and how we proceed during the course of the

5   trial.

6         Her obligation is to take down every word that is

7   spoken in this courtroom.  That entails a couple of rules.

8   One, everybody has to keep their voices up so that everybody

9   can hear what is being said, but also so that Ms. Crawford can

10  take down what is being said.  So we need to keep our voices

11  up.

12        During the trial, you will notice that myself,

13  counsel table, witness stand, et cetera, there are

14  microphones.  That's not a problem.  During the jury selection

15  process, we will give you a hand-held microphone, so that will

16  amplify your voice in terms of responses.

17        The other thing is that she can only take down one

18  voice at a time, so only one person can speak at a time.

19        During the course of the trial, you will see, for

20  example, an attorney will ask a question, and then stop.  And

21  then the witness will answer the question, and then stop.

22        Again, this is part of the procedure, but also so

23  that Ms. Crawford can take down what is being said in the

24  courtroom.

25        Okay.  So let me continue on with the introductions.

4

1  In all cases, civil or criminal law, there are parties.  The
2  party or parties that bring the lawsuit are entitled the
3  "plaintiff" or "plaintiffs."
4          The parties or parties against whom the lawsuit is
5  brought are designated as the "defendant" or the "defendants."
6          In this case, there are a number of plaintiffs
7  involved, including The Estate of Mr. Casillas, and family
8  members, who I won't mention specifically by name at this
9  point.  I will get to them a little bit later.
10          But I did want to introduce the attorneys who are
11  seated at the counsel table who will be representing the
12  plaintiffs.  And they are Mr. Dale Galipo, Mr. William
13  Schmidt, and Mr. Eric Valenzuela.  And that's the plaintiffs'
14  counsel table.
15          On the defense side, the defendants are the City of
16  Fresno, Mr. Trevor Shipman.  He is represented by his
17  attorney, Mr. Bruce Praet, and also assisting is Mr. Jacob
18  Gonzalez.
19          Now, during the course of the trial, it may be that
20  one or more of these individuals will have to leave to do
21  other things regarding the trial.  It is also possible that
22  some may join them at the counsel table.  And when that
23  happens, I have invited counsel simply to identify them so
24  that you will know who is at the counsel table.
25          I am going to now read a list of the possible

1    witnesses in this case.  It is not necessary that all of them

2    will be called.  And again, I don't expect you to remember all

3    these names, but again, if you recognize any of these

4    individuals, if you are called up to the jury box, you can let

5    us know what your acquaintanceship is.

6         All right.  The following individuals, they include

7    the parties who may be called in this case, are:  Alani

8    Casillas, Cheryl Casillas, Calvin Casillas, Soleman Casillas,

9    Angel Casillas, Abel Casillas, Beatriz Catano, Trevor Shipman,

10   William Harmening, Robert Verduzco, Jamila Lindsey, Ricky

11   Verduzco, Doug Wright, Jonathan Long, Matt Vincent, Kristopher

12   Keener, Eric Castillo, Elizabeth Meza-Castillo, Mark Eaton,

13   Hector Tello, Jeffrey Stricker, Mark Chapman, Candice Coy,

14   Venu C. Gopal, James Davis, Tejal Pandya, Mary Wolfe, Aldo

15   Gamarra, Robin Anderson, Edward Esparza, Eddie Barrios, George

16   Williams, Ashley Vargas.

17        The next thing I'm going to do is I will read you a

18   statement of the case.  I have asked counsel to submit a brief

19   summary of the case.  It is not evidence of the case.  You are

20   not to consider it as evidence during the course of the trial.

21        The reason that I'm going to read this to you is

22   twofold.  So I'm just going to go ahead and read this to you:

23            "This case arises out of the officer involved fatal

24             shooting of Casimero Casillas by Trevor Shipman of

25             the Fresno Police Department, which occurred on

6

1          September 7, 2015, at the residence located at

2          5590 East Saginaw, in the City of Fresno, California.

3      "The plaintiffs in this case are Alani Casillas, the

4          daughter of Casimero Casillas; Cheryl Casillas, the

5          wife of Casimero Casillas; Calvin Casillas, the son

6          of Casimero Casillas; Soleman Casillas, the son of

7          Casimero Casillas; Angel Casillas, the son of

8          Casimero Casillas; and Abel Casillas, the son of

9          Casimero Casillas.

10     "The plaintiffs contend that Defendant Officer Trevor

11         Shipman used unreasonable and excessive force when he

12         shot Casillas.  Causing his death.  Plaintiffs also

13         contend that Trevor Shipman was negligent, including

14         pre-shooting negligent tactics.  The plaintiffs are

15         seeking damages as permitted by the law.

16     "The defendants in this case are the City of Fresno

17         and Trevor Shipman.  The defendants contend that the

18         use of lethal force against Casimero Casillas by

19         Officer Trevor Shipman was reasonable and justified

20         under the circumstances, and was in self-defense.

21         The defendants additionally dispute the nature and

22         extent of the compensation sought by the plaintiffs."

23         Okay.  At this time, what I'm going to do is I'm

24 going to ask Ms. Gonzales, our courtroom deputy, to call 14 of

25 you up into the jury box.  They are assigned seats, so when

1  you come up, I will give you an indication where you should be

2  seated.

3      (Jurors are identified by number only.  Any reference to

4      personal identifiers regarding jurors has been redacted.

5      Release of personal information requires a motion and

6      Court order.)

7          THE CLERK:  Juror 001.

8          THE COURT:  Come forward through the gates there.

9          THE CLERK:  Juror 001, you will take the very first

10 seat at the top row, furthest in, please.

11         Next will be Juror 002.  Juror 002, you will take the

12 seat next to him, please.

13         Next individual, Juror 003.  That would be next to

14 Juror 002, Juror 003.

15         The next will be Juror 004, Juror 005, Juror 006,

16 Juror 007.

17         Juror 008, Juror 008, you will take the first seat,

18 furthest in, in the first row, please.

19         Juror 009, Juror 010, Juror 011, Juror 012, Juror

20 013, Juror 014.

21         THE COURT:  All right.  Those of you who are members

22 of the jury panel, who have not been seated in the jury box,

23 you are still very much a part of this case.  We are going to

24 be focusing our attention on the 14 of your colleagues who are

25 in the jury box.

8

1          But what I would like you to do as you are seated in

2     the audience area is listen very carefully to the questions

3     that I ask, and then that the lawyers ask, and as you are

4     sitting there in the audience area, think in your own mind

5     what the answer would be, what you would give if you are

6     actually in the jury box.

7          That way, if you are actually called up to replace

8     any of the 14 in the box, instead of my repeating all of the

9     questions to you that have been previously asked, I can simply

10    ask you if you heard and understood all the questions that

11    were previously asked of your other prospective jurors,

12    whether or not you were able to form an answer in your own

13    mind, and whether or not your answer was different, or if

14    there is anything further you wish to say about it.  That way,

15    we can speed up the process.

16         So if you are not able to hear or understand the

17    questions that are being asked or the answers that are given,

18    just speak up, and I will just remind those of you in the jury

19    box, make sure you keep your voices up so that everybody in

20    the courtroom can hear you, and your fellow prospective jurors

21    can hear you also because they are back in the audience area.

22         With that then, I will be asking a number of

23    questions of you.  The attorneys will be asking followup

24    questions.  My questions are not designed to put you on the

25    spot, embarrass you, or argue with you about any beliefs you

1   might have or responses you might give.

2          The purposes of my questions are to have you get in

3   your own mind whether or not you can be fair and impartial to

4   both sides in this case.

5          Now, we don't have any doubt that in your general

6   lives, you are fair and impartial.  That's not the issue.  But

7   we also recognize that everyone comes into this courtroom with

8   their own life's experiences, which might affect how you view

9   a particular case.

10         Now, this happens to be a civil law case, which we

11  will talk about a little bit later, but let's say, for

12  example, instead of civil law case, this was a criminal law

13  case where someone was charged with a burglary, breaking into

14  someone's home.

15         And it just so happens that just within the last

16  weekend, your house was burglarized or a family member's house

17  was burglarized.  The police had to come out, contact the

18  insurance company, et cetera.  And it really sort of shook you

19  up.

20         It is very possible that if you are sitting in the

21  box here, and I said this is a burglary case, you might think,

22  "Oh, I have been through a lot now.  I can be fair, but not in

23  this kind of a situation," and that's totally understandable.

24  Okay.

25         So it is also possible that even though you were a

1  victim of a burglary, that you could still put that aside and

2  be fair and impartial in a case that involves a burglary

3  charge.  Okay.

4         So at any rate, that's just a brief explanation of

5  how we recognize that you come in with your life's

6  experiences.  And we are going to explore that a little bit,

7  but, basically, the bottom line, at the end of all the

8  questions we ask of you, are you going to be able to look at

9  both sides and say, "Yeah.  I can be fair to both sides."

10        And if not, because of whatever responses you might

11  give, then that's perfectly fine.  That's the whole purpose of

12  this part of the case.

13        So with that, if I ask a question of you, and you are

14  not sure what I'm asking you, just ask me to repeat or

15  rephrase it.  If I ask you a question you don't feel

16  comfortable answering in front of your entire jury panel, let

17  us know at the next break.  You can go ahead and give your

18  response just in front of the parties and the attorneys in the

19  courtroom.  Okay.

20        So now with that, let me just go ahead and start off

21  with some general questions of you.

22        First of all, do any of you know anything about this

23  case?  I'm not saying that there is a reason why you would or

24  could, but do any of you know anything about the case?  If so,

25  could you raise your hand?  Okay.

1       Now, I mentioned a number of names.  I made some

2  introductions, and I have read off to you a possible list of

3  prospective jurors [sic].

4       Do any of you recognize any name that I mentioned

5  that you might be acquainted with?  Anybody?  No.  Okay.

6       All right.  The next thing I'm going to ask of you is

7  some background information on yourselves.  And I will explain

8  to you what I'm going to be asking and why I'm asking these

9  questions.  These are preliminary questions about you.

10      First of all, I'm going to ask you where do you live.

11  I don't want your home address.  I want the community you

12  reside in.  For example, you might live in Bakersfield, you

13  might live in Lemoore, you might live two miles outside of

14  Modesto, whatever.  The purpose of my asking the residence

15  question is sometimes cases are location-specific.

16      For example, if this case involved a traffic

17  collision and it occurred at an intersection in the same

18  community where you live, and you pass by that intersection

19  every day, that's something we would need to know as to

20  whether or not that might affect your ability to be fair and

21  impartial in this particular case.

22      First question:  Where do you live?  Basically the

23  community.

24      The second, and the next several questions I'm going

25  to ask you, really relate to employment, both you and others

12

1    that are close to you.

2          The reason that I ask the employment question is

3    sometimes people, jurors have a background that might be

4    something that might come up during the course of the trial.

5          For example, in my traffic collision scenario, if the

6    question was what happened in the emergency room where one of

7    the parties were taken for treatment, you might be in the

8    medical field.  You might be a doctor, a nurse, you may work

9    in emergency rooms, et cetera, which does not disqualify you,

10   but we need to be aware of whether or not your employment

11   status might have something to do with the employment status

12   or something to do with the case itself.  Okay.

13         Now, if you are not currently employed, if you are

14   retired or between jobs, just let us know what your last job

15   was.  If you are self-employed, just what it is that you do,

16   briefly.  If you are employed with a company, for example, you

17   might give your job title, and we can follow up from there.

18         If you are not employed, but you are in school

19   full-time, you can let us know that, okay.

20         The next question is your marital status, married or

21   otherwise.  The only reason I ask that question is the

22   followup question.  If you are married, whether or not your

23   spouse is employed outside the home.  Again, that's the

24   employment question.

25         In my emergency room scenario, you might not be

13

1    employed in the medical arena, but your spouse might.

2         The next question is whether or not you have any

3    children.  Now, if you have school age children, all you have

4    to do is say.  "I have a boy, eight, and a girl, six."  That's

5    all I need to know.

6         I'm more interested in whether or not you have adult

7    children who are employed.  And, again, that's the employment

8    question.

9         The next question is whether or not you have any

10   other adults living in your household, a significant other, a

11   family relative, whatever, roommate.  And, again, the reason I

12   ask that question is the follow up question about their

13   employment status.

14        And then the final preliminary question is your

15   educational background, highest level of formal education.

16        We are going to go ahead and start off.  We will

17   start off, and if I mispronounce your name, correct me.  We

18   will start off with Juror 001, and I will go down the line and

19   ask the questions.

20        The first three of you, down probably to Juror 003, I

21   will ask the questions, and by the time I get to you, Juror

22   004, and the rest of the folks, I will ask you if you know the

23   background questions.  If you can't remember, I will go ahead

24   and prompt you.

25   BY THE COURT:

14

1    **Q.**  Juror 001, you have the microphone there.

2           The first three of you, you may already know what the

3    questions are, but I'm going to ask it specifically anyway,

4    because I want to make sure that all of the other prospective

5    jurors have the questions in mind and their answers in mind.

6           Where do you live?

7    **A.**  I live in Modesto.

8    **Q.**  Okay.  And do you work outside the home?

9    **A.**  Yes, I do.

10   **Q.**  What is it that you do?

11   **A.**  I work with Amazon.

12   **Q.**  Amazon?

13   **A.**  Yes.

14   **Q.**  And job title or job capacity, what is it you do?

15   **A.**  Fulfillment.

16   **Q.**  Great.  Your marital status?

17   **A.**  Single.

18   **Q.**  Any children?

19   **A.**  No.

20   **Q.**  Okay.  Any other adults living in your household?

21   **A.**  Yes, my mother and father.

22   **Q.**  Do they work outside the home?

23   **A.**  Yes.

24   **Q.**  Briefly, what do they do?

25   **A.**  My father is a business owner for a brewery, and my mother

1   works for the probation department.

2   **Q.**   That would be for the county?

3   **A.**   Stanislaus County.

4   **Q.**   Stanislaus County, great.  Then your highest level of

5   formal education?

6   **A.**   Medical.

7   **Q.**   Great.  By "medical," is it a certification or a actual

8   degree?

9   **A.**   It is certification.

10   **Q.**   Okay.  And what is basically the title of the

11   certification?

12   **A.**   Phlebotomy.

13   BY THE COURT:

14   **Q.**   Juror 002?

15   **A.**   Yes.

16   **Q.**   Where do you live?

17   **A.**   I live in Riverbank, east of Modesto.

18   **Q.**   Do you work outside the home?

19   **A.**   Yes.

20   **Q.**   What is it that you do?

21   **A.**   I do two things.  For one, I'm a self-employed general

22   contractor, and, secondly, I'm a pastor.

23   **Q.**   Great, good.  Your marital status?

24   **A.**   Married.

25   **Q.**   Does your spouse work outside the home?

16

1   **A.**  No.

2   **Q.**  Has she worked outside the home, say, in the last five

3   years or so?

4   **A.**  No.

5   **Q.**  Okay.  Any children?

6   **A.**  Yes.

7   **Q.**  Adult or?

8   **A.**  All of them are adults.

9   **Q.**  How many children do you have?

10   **A.**  Four.

11   **Q.**  Do any of them work outside the home?

12   **A.**  I think all of them do.

13   **Q.**  What is it that they do?

14   **A.**  My daughter is in Reno, her and her husband.  They -- he

15   works for -- I'm not sure exactly what the company is, but

16   they do different work, governmental contract work.

17   **Q.**  Okay.

18   **A.**  She works at Starbucks.

19   **Q.**  Great.

20   **A.**  And I have a son in Arizona.  His wife is a teacher.  He

21   is in IT.

22         I have a daughter that's -- that I don't know where

23   she is.

24         And then I have another son in Elk Grove, and he is

25   in sales.

1    **Q.**  Any other adults living in your household?

2    **A.**  We have had my sister-in-law, but she does not work.

3    **Q.**  All right.  And then your highest level of formal

4    education?

5    **A.**  I have a high school diploma plus some classes, college

6    classes.

7    **Q.**  In your classes, did you have a specific emphasis or

8    major?

9    **A.**  No.  I used to be in the automotive business, and that's

10   gone.

11            THE COURT:  Thank you.

12   BY THE COURT:

13   **Q.**  Juror 003?

14   **A.**  I'm Juror 003.

15   **Q.**  Where do you live?

16   **A.**  Bishop, California.

17   **Q.**  Did you work outside the home?

18   **A.**  Yes.

19   **Q.**  What is it that you do?

20   **A.**  I'm a career counselor.

21   **Q.**  Okay.  And do you work for a public entity or private?

22   **A.**  For Owens Valley Career Development Center.

23   **Q.**  Your marital status?

24   **A.**  Single.

25   **Q.**  Any children?

1  **A.**  Yes.

2  **Q.**  Any adult children?

3  **A.**  Yes.

4  **Q.**  Okay.  And how many?

5  **A.**  Three.

6  **Q.**  Do they work outside the home?

7  **A.**  One does.

8  **Q.**  And what does that one child do?

9  **A.**  He is a finance manager for used cars.

10  **Q.**  Okay.  Any other adults living in your household?

11  **A.**  Yes.  My boyfriend.

12  **Q.**  Does he work outside the home?

13  **A.**  Yes.

14  **Q.**  What is it that he does?

15  **A.**  He works at a Grocery Outlet.

16  **Q.**  Great.  And your highest level of formal education?

17  **A.**  An A.S. degree in Human Services.

18          THE COURT:  And if you would pass the microphone down

19  to Juror 004.

20  BY THE COURT:

21  **Q.**  If you could give us your background information.

22  **A.**  I live here in Fresno.  I'm married.  My wife is a

23  stay-at-home mom.  We have three young children, two girls,

24  nine and six, a son that's three.

25          I work in outside sales for a media company,

1  primarily here in Central Valley, as well as the state of

2  Idaho, and a few theatres in the Central Coast.

3  Q.  Your highest level of formal education?

4  A.  Bachelor's degree, in Business.

5       THE COURT:  Thank you very much.

6  BY THE COURT:

7  Q.  If you would give us some background information, Juror

8  005?

9  A.  I live in Tuolumne.  I'm single.  I have two children, a

10 boy, 16, and a girl, 11.  And I manage a pizza parlor.

11 Q.  Any other adults living in your household?

12 A.  No.

13 Q.  Your highest level of formal education?

14 A.  High school.

15      THE COURT:  Thank you.  If you would pass the

16 microphone down to Juror 006.

17 BY THE COURT:

18 Q.  Where do you live?

19 A.  I live in Atwater.  My highest level of education is a

20 high school diploma.  I'm a divorced father of one 14-year-old

21 girl.  My mother currently lives at my home.  And that's all

22 you need to know.

23 Q.  Do you work outside the home?

24 A.  I do.  I'm a electronics technician.  I work for a local

25 electronic company, in Atwater.

20

1   **Q.**   Does your mother work outside the home?

2   **A.**   No, she does not.

3   **Q.**   Your highest level of formal education is?

4   **A.**   High school.

5          THE COURT:   Thank you.   If you could pass the

6   microphone down to Juror 007.

7   BY THE COURT:

8   **Q.**   Where do you live?

9   **A.**   Hi.

10  **Q.**   Good morning.

11  **A.**   I'm single.   I have one son, and he works for -- in home

12  care.   I don't work.   I am -- haven't worked since 2007.   I

13  have a pacemaker.

14          So my highest level of -- I went to one semester of

15  college.

16  **Q.**   Did you have an emphasis or major in that one semester?

17  **A.**   No.

18  **Q.**   And your last employment was around 2007.   What area were

19  you working in?

20  **A.**   I worked in dry cleaning.

21  **Q.**   Thank you very much, Juror 007.   Any other adults living

22  in your household?

23  **A.**   No.   Just me and my son.

24          THE COURT:   Pass the microphone down, and we will

25  move it all the way over then to Juror 008.

1   BY THE COURT:

2   **Q.** Okay.  If you could give us some background information on

3   yourself?

4   **A.** I live in Ridgecrest, California.  And I work as a

5   Licensed Vocational Nurse in Lone Pine, California.  I have a

6   four-year-old daughter.

7          My only -- my boyfriend lives with me, and he works

8   with a cardiologist as a medical assistant.  And also my

9   brother works with me, but he is in between jobs right now.

10  **Q.** What was the last employment?

11  **A.** For my brother?

12  **Q.** Yes.

13  **A.** He worked at Edwards Air Force Base.

14  **Q.** Civilian or military?

15  **A.** Civilian.

16  **Q.** Your highest level of formal education was?

17  **A.** Certification in Licensed Vocational Nursing.

18          THE COURT:  If you can pass the microphone down to

19  Juror 009 then.

20          JUROR 009:  I live in Fresno, and I'm retired.  I

21  have two daughters.  They don't work.  I have a son-in-law

22  that lives with me too.  He works in oil changing.  I have a

23  high school diploma.  And that's it.

24  BY THE COURT:

25  **Q.** And then when you retired, what did you retire from?

1   **A.**  I used work in electronics and DPS, Dell Com.

2   **Q.**  Your highest level of education was?

3   **A.**  High school diploma.

4        THE COURT:  Pass the microphone down to Juror 010.

5   BY THE COURT:

6   **Q.**  Let me go ahead and start you off.  Where do you live?

7   **A.**  I live in Selma, California.

8   **Q.**  Do you work outside the home?

9   **A.**  I do.  I work at AT&T.

10  **Q.**  What's your job title or capacity at AT&T?

11  **A.**  Entertainment consultant.

12  **Q.**  Are you married?

13  **A.**  Single.

14  **Q.**  Any children?

15  **A.**  No.

16  **Q.**  Any other adults living in your household?

17  **A.**  Yes.  Mom and dad.

18  **Q.**  Do they work outside the home?

19  **A.**  Yes.  My mom works at AT&T, and my dad works as an

20  instructor in Avenal Prison.

21  **Q.**  Is he civilian?

22  **A.**  Yes.

23  **Q.**  Your highest level of education?

24  **A.**  Still in college.

25  **Q.**  Do you have a major or emphasis?

1    **A.**  Yes.  I'm going to be an accountant.

2    BY THE COURT:

3    **Q.**  Juror 011?

4    **A.**  I live in Modesto, California.  I'm divorced.  I have a

5    son that's 25.  Works as a delivery driver for Round Table

6    Pizza.  My other son is 15.

7            Highest level is high school.

8    **Q.**  You work outside the home?

9    **A.**  I do.  I work for Kaiser Permanente.  I'm a work force

10   planning analyst.

11   **Q.**  Your highest level of formal education?

12   **A.**  High school.

13           THE COURT:  Thank you.

14   BY THE COURT:

15   **Q.**  Juror 012?

16   **A.**  I'm from Rosamond, California.  I'm a medical assistant.

17   I drew a blank.

18   **Q.**  No problem.  Marital status?

19   **A.**  Single.

20   **Q.**  Any children?

21   **A.**  No.

22   **Q.**  Any other adults living in your household?

23   **A.**  A parent, sister, and boyfriend.

24   **Q.**  Do any of them work outside the home?

25   **A.**  Yes.

1   **Q.**  What do they do?

2   **A.**  My mom works for a restaurant, and my dad works for L.A.

3   County, and my boyfriend is a contractor on base, and my

4   sister is a full-time student.

5   **Q.**  Okay.  What is your father's job title or capacity?

6   **A.**  I'm not sure of the exact job title.

7          THE COURT:  All right.  And if you could pass the

8   microphone down to Juror 013.

9          JUROR 013:  My name is Juror 013.  I live in Fresno.

10  I work in Sonora.  I work for CDCR.  As a Community Resource

11  Manager.

12          I'm married.  My wife works for State of California.

13          I have two adult children.  They both work for State

14  of California.

15          I am working as a Community Resource Manager, and my

16  background, getting to this position, I have worked as a Labor

17  Relation Analyst at State of California, as well as a Use of

18  Force Coordinator at the prison.

19  BY THE COURT:

20  **Q.**  Are you considered to be a sworn officer or civilian

21  employee?

22  **A.**  I'm civilian, sir.

23  **Q.**  And then your family members, what is their job title or

24  capacity?

25  **A.**  My wife works as a District Manager for Cal/OSHA, and my

1    son works as an inspector for Cal/OSHA.  And my other son

2    works for Covered California.

3    **Q.**  Great.

4    **A.**  One thing I just forgot to mention also.  Prior to this, I

5    was City Manager for two towns, in Fresno County.

6    **Q.**  Oh, okay.  Which?

7    **A.**  San Joaquin and Mendota.

8    **Q.**  Good, good.  And then your highest level of formal

9    education?

10   **A.**  It's public Administration and City and Regional Planning.

11          THE COURT:  Thank you.  Pass the microphone down to

12   Juror 014.

13          JUROR 014:  I'm single.  I have a daughter.  And

14   employment, I do wildland firefighting.  And, actually, have

15   training this week.  And also I'm a student too.

16   BY THE COURT:

17   **Q.**  Yes.

18   **A.**  And I live in Porterville.  And what was --

19   **Q.**  Let me ask you, on your major and what you are training

20   for, is that with a public entity or is it private?

21   **A.**  Oh, it's for the Sequoia National Forest.

22   **Q.**  Okay.

23   **A.**  And --

24   **Q.**  Now, are you working for the National Park Service, or

25   anything like that now, or are you applying?

1  **A.**  Oh, I'm in.  I actually, this week, landed training, yeah.

2  But we don't start until later on.

3        But what was the other thing?

4  **Q.**  Let me ask you, let me just go through all of them.  You

5  have already indicated your employment and your schooling.

6        Marital status, you're single, with a child?

7  **A.**  Yes.

8  **Q.**  How old is the child?

9  **A.**  Eight.

10  **Q.**  Any other adults living in your household?

11  **A.**  Yes, my mother and father.

12  **Q.**  Do they work outside the home?

13  **A.**  Yes.  Father does ranching work, with walnuts.  And my

14  mother, packing oranges.

15        THE COURT:  Great.

16        Now, the next thing I'm going to mention to you,

17  which you are all curious, is what's the length of the trial

18  and duration?

19        Now, unlike a movie or a TV program that has a set

20  start and finish, trials are what we call "dynamic."  That is,

21  the lawyers can't tell you exactly how long it will take.  It

22  depends on the length of a witness.  Sometimes there are --

23  witnesses go much more quickly.  Sometimes they go a little

24  slow.

25        So their best estimate, this is an outside estimate,

1  is that they believe that the trial will easily conclude by

2  next Wednesday.

3         Now, let me explain to you.  Our trials are Tuesdays

4  through Fridays from -- your commitment is from 9:00 to noon,

5  with a break in the morning, 1:30 to 4:30, with a break in the

6  afternoon.  We will go Tuesday through Friday this week.  If

7  we spill over to next week, it will be next Tuesday, possibly

8  next Wednesday.  So that's the time frame.

9         Probably our jury administrator has already told you,

10  we have very little leeway in terms of excusing prospective

11  jurors.  Obviously, if you have some conflict that it just is

12  not workable, then we need to know that.

13         The only thing I can tell you is if we excuse you

14  from this trial, you just have to call that 800 number to see

15  what your next assignment might be.

16         So with that understanding, let me ask.  In the --

17  well, let's see.  The microphone is in the front row.

18         Do you have any time issues that we need to be aware

19  of for the next few days that you will be in trial?  Anything

20  that we need to be aware of in terms of time?  We will start

21  with the front row first.  And, okay.

22         Let me start off first, Juror 014?

23         JUROR 014:  Like I said, just my training actually

24  fell this week, and this is the only week we do a training,

25  and if I'm not there, I'm pretty much cut from the program for

1    this season.

2         THE COURT:  Oh, okay.  So how long is the training

3    program?

4         JUROR 014:  Just this week.

5         THE COURT:  The entire week?

6         JUROR 014:  Yeah.

7         THE COURT:  Time-wise, does it occupy the whole day?

8         JUROR 014:  Whole days, from 8:30 to 4:30.

9         THE COURT:  And if you don't participate in this

10   program, you don't get the position?

11        JUROR 014:  Then they won't send me out for this

12   season.

13        THE COURT:  For the whole season?

14        JUROR 014:  Yes.

15        THE COURT:  This is the firefighting for the entire

16   season that's coming up, and if you don't attend this

17   training, you are not eligible this year?

18        JUROR 014:  Yes.

19        THE COURT:  I don't know if either side has any

20   questions, but I intend to excuse.

21        MR. GALIPO:  No questions.

22        MR. PRAET:  No.

23        THE COURT:  I'm going to go ahead and excuse you from

24   this particular case.  You will need to report back to the

25   jury room, on the second floor.  They will give you more

29

1   information.

2          If you need a note or letter to prove that you were

3   here, then she can provide that to you, and she will let you

4   know what your next assignment will be for a trial.

5          I will excuse you from this particular case only.

6          JUROR 014:  Thank you.

7          THE COURT:  We will go ahead and fill seat number 14.

8          THE CLERK:  Juror 015.

9   BY THE COURT:

10  **Q.**  All right, Juror 015, let me get you up to speed with

11  everybody else.  First of all, do you know anything about this

12  case?

13  **A.**  No, I do not.

14  **Q.**  Do you know or recognize anybody that I mentioned by name

15  so far?

16  **A.**  No, I do not.

17  **Q.**  Okay.  And then in terms of background, first, where do

18  you live?

19  **A.**  Tulare.

20  **Q.**  Do you work outside the home?

21  **A.**  Self-employed.

22  **Q.**  Doing what?

23  **A.**  Utility management.

24  **Q.**  Okay.  And your marital status?

25  **A.**  Separated.

1  **Q.**  Okay.  Any children?

2  **A.**  Three.

3  **Q.**  Any adult children?

4  **A.**  All three.

5  **Q.**  Do they work outside the home?

6  **A.**  Yes, they do, but out of the state.

7  **Q.**  And what is it they do, just very briefly?  Job title is

8  fine.

9  **A.**  My oldest son Joseph, he works for Veteran's

10  Administration, in Tennessee.  My son Jonathan works in

11  Tennessee as well as he works for Amazon.  And my daughter is

12  a victim advocate for the State of Kansas.

13  **Q.**  All right.  And your separated spouse, does she work

14  outside the home?

15  **A.**  I would imagine she does, but we haven't really spoken in

16  four or five years.

17  **Q.**  And your highest level of formal education?

18  **A.**  I have a Bachelor's degree.

19  **Q.**  Since you have the microphone, time frame wise, we are

20  looking at finishing up not later than next Tuesday or

21  Wednesday.  So let me just go ahead and again ask in general,

22  in terms of any time issues, anything, Juror 015, for you?

23  **A.**  I have no problems.

24         THE COURT:  Pass the mike down.

25         And yes, Juror 012?

1         JUROR 012:  I'm currently in the process of

2    transitioning employers.  The current company I'm working with

3    is in the process of being bought by a different company.  And

4    as of right now, last I heard, February 28th is the last day

5    with my current employer.  And then March 1st is when I'm

6    supposed to start with the new company.

7         THE COURT:  Okay.  Now, once you start with the new

8    company, obviously, this will be this coming Friday, where we

9    will be completing the first week of trial.

10        Now, in terms of transition, do you have to do any

11   paperwork?

12        JUROR 012:  Yeah.  We have to do paperwork, like

13   orientation, when we sign for all the benefits and all those

14   things, and all of their rules and stuff.

15        THE COURT:  Okay, all right.  Do they have a set

16   date, a time that staff is supposed to do that?

17        JUROR 012:  As of right now, I'm not sure.  I would

18   have to check work e-mails.

19        THE COURT:  All right.  Now, obviously, we will try

20   to accommodate that.  Obviously, you can let your current and

21   your future employer know that you have jury service.  Most

22   companies are good about understanding jury service.

23        But otherwise, assuming you can work that out, are

24   you okay with serving on the jury here?

25        JUROR 012:  Aside from that, yes.

1          THE COURT:  Keep us informed.  And oftentimes, we

2     will intervene on your behalf and notify the company, yes,

3     indeed, you are serving as a juror in this case, and we have

4     had really good cooperation from companies.

5          JUROR 012:  Thank you.

6          THE COURT:  Okay.

7          JUROR 011:  I actually have a planned business travel

8     for next Monday through Friday, flying out to Ontario, for my

9     business, for work, for my quarterly meeting.

10         THE COURT:  Let me ask this.  Can it be delayed a

11    couple of days in case we spill over to next week?

12         JUROR 011:  It's already paid for, hotels, car fare,

13    et cetera.

14         THE COURT:  Let me keep that in mind.

15         JUROR 010:  I'm a full time employee, as I mentioned.

16    Also a full-time student.  As far as school goes, I would hate

17    to miss some days, but I am also a full-time employee.  So I

18    do have -- of course, everybody has bills to pay, but that

19    would be the only thing.

20         THE COURT:  Do you know offhand, with your employer,

21    would they allow for jury service in terms of being able to

22    serve as a juror?  Most companies do.

23         JUROR 010:  I would assume so, yeah.  I do work in

24    sales, so commission is a big part of my paycheck.  So I would

25    be missing, of course, some expenses that need to be paid for.

1          THE COURT:  Okay.  And that's understandable.  Like

2    you say, everybody has those concerns.  We are not indifferent

3    to that.  We recognize that.

4          To the extent that you can work around your

5    scheduling, noon hours, whatever.

6          JUROR 010:  As far as school goes, I'm a full-time

7    student, so I would be missing school, for the most part.  And

8    of course, we are creeping up on midterms, so I would be

9    missing out on some major classes I need to take.

10          THE COURT:  Then in terms of your classes, is it

11   Monday through Friday?

12          JUROR 010:  It's Monday through Thursday.

13          THE COURT:  Then, Monday, every -- all day, Monday

14   through Thursday?

15          JUROR 010:  From about noon to about 4:30.

16          THE COURT:  All right.  Do your instructors know that

17   you have been called for jury service?

18          JUROR 010:  No.

19          THE COURT:  So you don't know offhand what the

20   school's policy is?

21          JUROR 010:  No.

22          THE COURT:  All right.  Thank you.

23          JUROR 008:  I do have concern because I'm a mother of

24   a four-year-old.  I don't have a full-time baby-sitter, but

25   just as long as it is not going past -- we are not here over

1   the weekends?

2          THE COURT:  No.

3          JUROR 008:  Other than that, that's pretty much my

4   biggest concern.

5          THE COURT:  Okay.  And I will just notify everyone,

6   or let everybody know that you will have communication access

7   during breaks, et cetera.  And we are not in session on

8   weekends nor are we in session on the coming Monday.  Keep

9   that in mind also.

10          You will be able to keep in communication with

11   whoever the caretaker is.

12          JUROR 008:  Thank you.

13          THE COURT:  Go up to the top.

14          JUROR 004:  May I speak to Court or counsel during

15   the break regarding a situation we are currently in?

16          THE COURT:  Sure, yes.

17          JUROR 006:  My problem is financial.  I work Monday

18   through Friday, 8:00 to 5:00.  Those are the hours that are

19   given to me by my employer.  They do not compensate for jury

20   time.

21          And I'm a divorced father.  And my pay is very

22   important to keeping up the standard of living required as a

23   parent.  If I were to miss more than one or two days, I would

24   be at risk at missing rent payments, utilities, et cetera.

25          THE COURT:  Okay.  All right.  Hmm.  All right.

1  Okay.  Are you saying that you are literally paycheck to

2  paycheck?

3          JUROR 006:  At this point in my life, yes, I am.

4          THE COURT:  Okay.  I will keep that in mind.

5          JUROR 007:  This week, I don't have anything but a

6  doctor's appointment tomorrow.  It is my heart doctor.  I see

7  him every three months, and the appointment is tomorrow.

8          THE COURT:  What time tomorrow?

9          JUROR 007:  10:30 a.m.

10          THE COURT:  Okay.  Now, is it something that can be

11  moved even a week?  Because we will be done, at the very

12  latest, next Wednesday.  Do you know offhand you can move it

13  without jeopardizing your health and safety?

14          JUROR 007:  I'm not sure.  Probably.  It is just that

15  they have to test my defibrillator, and they haven't checked

16  that in three months.

17          THE COURT:  All right.

18          JUROR 007:  But I could call, I guess, and try to

19  make another appointment.

20          THE COURT:  Reschedule it?  Okay.  All right.  All

21  right.  I'm going to take a quick break now.  If you can call

22  the doctor's office, and see whether or not they can

23  reschedule, and as long as it doesn't jeopardize your health

24  and safety, if it can be rescheduled, that's great.

25          Members of the jury panel, we are going to take a

1    15-minute break right now so you can use the restrooms, get a

2    drink of water, whatever.

3         And I believe, Juror 004, if you can remain in court,

4    we are going to remain in session, but I'm going to go ahead

5    and excuse the jury panel.

6         Come back here in 15 minutes.  We will continue with

7    the jury selection process, and anyone who needs to call

8    somebody to make arrangements, knowing that you might have a

9    commitment of this week and maybe next Tuesday and Wednesday,

10   so that you can let us know when you come back in here if

11   there are any issues, okay.

12        So go ahead and you folks take a break, and we will

13   remain in session.

14      (The prospective jurors exited the courtroom.)

15        THE COURT:  Are there any jury panel members who are

16   still in the courtroom?  Any jury panel members still in the

17   courtroom?  Okay, all right.

18        Go ahead and have a seat.  The record will reflect

19   then that the jury panel has left the courtroom.  We are still

20   in session.

21        Juror 004, if you can let us know what your situation

22   is.

23        JUROR 014:  You bet.  My wife and I have been

24   together 18 years, and married 15.  And as of about a week and

25   a half ago, we came to the conclusion that we are going to

1   possibly separate and divorce.  Emotions have been highly

2   charged the last five days.  I met with my attorney last week.

3   She is meeting with hers tomorrow.

4           There has been discussion as far as who is moving out

5   of the house.  And, candidly, she has not played very nicely.

6   And I don't know what could happen in the next 48 to 72 hours,

7   in terms of my needing to leave the premises, or her.

8           We have three small children involved, as I mentioned

9   earlier, and the impact to them.  I want to keep as much

10  normalcy as I can and the best interest of them to heart.

11          And so my time commitment is uncertain at this point.

12  I would love to be able to serve on this case if there is an

13  opportunity, but, again, there is just a lot of unknown

14  variables right now.

15          THE COURT:  Okay, all right.  Let me ask, first

16  plaintiffs' side, do you wish to inquire of Juror 004 as to

17  his personal situation here?

18          MR. GALIPO:  May I ask a few questions, your Honor?

19          Good morning, sir.  Are you concerned that you are

20  going to be so preoccupied over the next few days about what's

21  going on with that situation that it might be difficult for

22  you to pay attention to the case?  What is your specific

23  concern?

24          JUROR 004:  I think in terms of being able -- I

25  haven't retained an attorney yet.  I'm going to meet with one

1   more this week, but certainly, there is a lot going on in my

2   mind right now, and anxiety is pretty high.  But I don't know

3   what that looks like in terms of scheduled visits with my kids

4   potentially or getting a mover to help me move.

5           MR. GALIPO:  Are you saying because of that, you

6   would rather not serve on this particular jury at this time

7   because of the timing?

8           JUROR 004:  That would be correct.

9           MR. GALIPO:  You feel like you might be a little

10  thinking about the kids or what's going to happen or whether

11  you should be talking to an attorney and things like that

12  while the case is going on?

13          JUROR 004:  Yes, sir.

14          MR. GALIPO:  Thank you, your Honor.

15          THE COURT:  Defense?

16          MR. PRAET:  No questions, your Honor.

17          THE COURT:  All right.  Juror 004, if you can go

18  ahead and step out with the other fellow jurors, and we will

19  get back to you as soon as you come back in, okay.

20          The record will reflect that Juror 004 has left the

21  courtroom.  One of the things that I wanted to chat with you

22  folks about are some of the other jurors had raised some

23  concerns.  I just wanted to get your take.

24          We will start off with Juror 004.  Now, if both sides

25  stipulate, then that's all I need, but there may be some that

1   you are not going to agree on, and I will not excuse them.

2   The only people I would excuse were the people that both sides

3   stipulate to.

4           Juror 004, plaintiffs' position?

5           MR. GALIPO:  We would be willing to stipulate, your

6   Honor.

7           THE COURT:  Defense?

8           MR. PRAET:  As would we, your Honor.

9           THE COURT:  All right.  Basically what will happen is

10  when the panel comes back in, I'm going to excuse Juror 004,

11  and we will fill his seat.

12          While we are at it, we have Prospective Number 11,

13  Juror 011, says he has a business commitment out of town, and

14  it's been pre-paid.

15          Thoughts on that?

16          MR. GALIPO:  Willing to stipulate, your Honor.

17          MR. PRAET:  My only concern, your Honor, is that I

18  mean we all have business travel and things.  Other than

19  perhaps a flight change fee, I didn't hear him say that

20  whatever business commitment he has at the other end couldn't

21  be altered.

22          I'm just afraid that we would start a, as you say,

23  domino effect if people think they can get out just because

24  they have some other plans.  So if the Court is inclined to

25  excuse him, but I just didn't find it to be terribly

1 | persuasive, for cause, anyway.

2 | THE COURT:  I will do some followup questions.  If it

3 | seems to me that it is something he just can't move or

4 | whatever, then I will excuse him, but if it is equivocal, then

5 | I won't.

6 | Obviously, the down side is I don't want to keep

7 | somebody on this jury that is going to be resentful.  So I

8 | will keep that in mind.  I will do some followup questions,

9 | and then I will just rule one way or the other.  Okay.

10 | And then we have Prospective Juror Number 10, Juror

11 | 010.  Student and employed.

12 | Thoughts on that, plaintiffs' side?

13 | MR. GALIPO:  That was a little less clear to me, your

14 | Honor.  Obviously, someone is in classes, I never like to see

15 | them miss their classes.  But I think the school policy maybe

16 | was a little unclear, and whether he gets paid was a little

17 | unclear.  So I would submit to the Court that that one was, at

18 | least as to a hardship, a little less clear to me.

19 | THE COURT:  Defense?

20 | MR. PRAET:  I would agree, your Honor.  There is

21 | probably a need for a little more inquiry.

22 | THE COURT:  I will do a followup question on him.

23 | Then Prospective Juror Number 8 sounded like she is

24 | okay.  Juror 008 has the four-year-old, but seems to be okay,

25 | at least at this point.

1          MR. GALIPO:  And then we had number 6, your Honor,

2     about the financial hardship.

3          THE COURT:  Yes.  Your thoughts on that, plaintiffs'

4     side?

5          MR. GALIPO:  Well, I think he is the only juror that

6     I have heard so far say that he really is living paycheck to

7     paycheck, and even if he missed a couple of days, he wouldn't

8     be able to pay his bills, so I would stipulate to excuse him.

9          THE COURT:  Defense?

10         MR. PRAET:  Stipulate, your Honor.

11         THE COURT:  Then Juror 007, we will see if we can

12    rearrange her medical appointment or if -- well, we will see

13    if we can rearrange her medical appointment.

14         Basically, do you recall anybody else on the panel

15    had some concerns?

16         MR. PRAET:  Number 12, Juror 012, I think she

17    expressed some concern, didn't she, or no?

18         MR. GALIPO:  I think she's okay.

19         THE COURT:  Yeah.

20         MR. GALIPO:  She transitioned --

21         MR. PRAET:  From one job to another.

22         THE COURT:  I didn't see that as a --

23         MR. PRAET:  We are fine then.

24         THE COURT:  Plaintiffs' side, do you recall anybody

25    else?

42

1          MR. GALIPO:  No, your Honor.

2          THE COURT:  So when the panel comes in, it is my

3    understanding that parties have stipulated to, and I will

4    excuse Prospective Juror Number 4, Juror 004, and Prospective

5    Juror Number 6.

6          MR. GALIPO:  Yes, your Honor.

7          THE COURT:  Those two will be excused.  I will fill

8    those seats, do some followup questions on some of the other

9    folks, and go from there.

10         MR. GALIPO:  Thank you, your Honor.

11         THE COURT:  Take a quick break, and we will be back

12   in maybe ten minutes.

13      (Recess)

14         THE COURT:  All right.  Go ahead and have a seat.

15   Back on the record.  Before we have the jury panel come back

16   in, anything further on the jury selection proceedings?

17         MR. GALIPO:  Yes.  Your Honor, my associate, Attorney

18   Eric Valenzuela, during the break, he went to the restroom,

19   and on his way back, he told me that Prospective Juror Number

20   4, the gentleman that, I guess, is going through this issue

21   with his wife, approached him and said something to the

22   effect, "I have been thinking about it.  I would like to talk

23   to the Judge again."  I don't know what the exact words were,

24   but something to the effect that "Maybe I can be on this

25   jury."

1          And Mr. Valenzuela explained he can't really speak to
2   him, and I told one of your court attendants.  So I wanted to
3   tell you.  And I also told Mr. Praet during the break.
4          THE COURT:  Great.  Okay.  We can have Juror 004 come
5   back in.
6          Juror 004, go ahead and retake your seat up there on
7   the top row.
8          Back on the record.  Juror 004, you had approached
9   counsel that you had some further thoughts.  And we thought we
10  would give you an opportunity to mention that to us before we
11  had the rest of the panel come in.
12         JUROR 004:  Absolutely.  After giving it a few more
13  minutes to ponder and think about it, I think my wife can
14  agree to not do anything extreme as it relates to our case, at
15  least for another week, to allow me to serve on this jury.
16  And I don't think I would have any problem at all that, under
17  that agreement from her, to be able to focus on the details of
18  the case, and that it would be an honor and privilege to serve
19  on this jury.
20         THE COURT:  So as I understand then, you are
21  agreeable to remain on the jury panel as we proceed on with
22  the jury selection process?
23         JUROR 004:  Yes, sir.
24         THE COURT:  Any other inquiry?
25         MR. GALIPO:  No, your Honor.

1           MR. PRAET:  No, your Honor.

2           THE COURT:  I will say this, this is true with any

3  juror, if you are selected to serve as a juror, and something

4  comes up that causes you some concern, you are obviously

5  welcome to come into the courtroom, outside the presence of

6  the jurors, and express any thoughts or concerns.  And that

7  applies to any juror at any point during the trial.

8           If there is nothing further, we will have the entire

9  jury panel come back in.  We will have the jury panel come in.

10      (The prospective jurors entered the courtroom.)

11          THE COURT:  Please be seated.  The record will

12  reflect that the jury panel is present and the prospective

13  jurors are in the jury box.

14          All right.  Thank you for your patience.  We did have

15  some discussion with the attorneys regarding the whole

16  process, so we are good to go now.  Thank you for your

17  patience.

18          One thing that we will do in this case is that, Juror

19  006, we are going to go ahead and excuse you from this case.

20  It is only this case, though.  You will have to call that 800

21  number after 5:00 o'clock, on Friday, for your next

22  assignment.  This is a fairly short case, but I can't make any

23  promises, other than you need to call that number for your

24  next assignment, but you are excused from this case only.

25          We will go ahead and fill seat number 6.

1        THE CLERK:  Juror 016.

2   BY THE COURT:

3   **Q.**  All right.  Juror 016, let me get you up to speed.  Do you

4   know anything about this case?

5   **A.**  No.

6   **Q.**  Do you know anybody I have mentioned by name so far?

7   **A.**  No.

8   **Q.**  In terms of your background, where do you live?

9   **A.**  I live in Bakersfield.

10  **Q.**  Do you work outside the home?

11  **A.**  Yes, I do.

12  **Q.**  What do you do?

13  **A.**  I'm a dental receptionist for Clinica Sierra Vista.

14  **Q.**  Marital status?

15  **A.**  Married.

16  **Q.**  Does your spouse work outside the home?

17  **A.**  Yes.  He works nights at Grimmway.

18  **Q.**  That is the agricultural?

19  **A.**  Yes.

20  **Q.**  Great.  And any children?

21  **A.**  Yes.  A girl, eight; boy, two.

22  **Q.**  Any other adults living in your household?

23  **A.**  No.

24  **Q.**  Your highest level of formal education?

25  **A.**  Some college.

1  **Q.**  Did you have a major or emphasis in college?

2  **A.**  No, just general Ed.

3           THE COURT:  Thank you.  Let me continue on, and that

4  would include you also Juror 016, with respect to hardships.

5  I do want to follow up on some of you folks who had responded,

6  some concern.

7           And let me start off, Juror 011, you indicated that

8  you have a business commitment out of town that's coming up,

9  and we understand that and appreciate that.

10          The big question -- if we could pass the microphone

11  down then to Juror 011 -- and of course, the bottom line is

12  that with many business commitments, they can't be

13  rescheduled.  Is this something that can be rescheduled?  We

14  are not talking about a lot of time commitment.  It can be

15  later in the next week or following week.

16          JUROR 011:  This is our quarterly meeting, so it is

17  scheduled next week, it is one time every quarter, and,

18  unfortunately, they won't reschedule the meeting just because

19  of my absence.

20          THE COURT:  This is the company, a parent company?

21  Or how does that work?

22          JUROR 011:  I work for Kaiser, so Kaiser So Cal is

23  who I support, but I live in Modesto.  I support them

24  remotely.  So every quarter, they fly me down for our

25  quarterly meetings.  I have proof of, if you do need it.

1          THE COURT:  We don't have any doubt about that.  Is
2     it a lengthy meeting?  Is it like several days?
3          JUROR 011:  Monday through Friday.
4          THE COURT:  So a full week.  Is that section-wide or
5     unit-wide?  It is not just you?
6          JUROR 011:  It is our team.  Work force management.
7          THE COURT:  How many are in the team?
8          JUROR 011:  There is like 25 of us.
9          THE COURT:  So all 25 gather for a week?
10         JUROR 011:  I'm the only remote agent.  We support 13
11    call centers.  We all gather at a location that's already been
12    deemed, and we meet there.
13         THE COURT:  That's only once a quarter?
14         JUROR 011:  Yes.
15         THE COURT:  They don't switch that for you?
16         JUROR 011:  No.
17         THE COURT:  Anything further by either side?
18         MR. GALIPO:  No, your Honor.  Nothing further.
19         MR. PRAET:  No.
20         THE COURT:  I will excuse you from this case only.
21    You will have to call that 800 number, after 5:00 o'clock,
22    Friday, for your next assignment, but we will go ahead and
23    excuse you from this case only.
24         THE CLERK:  Juror 017.
25         THE COURT:  I did want to mention to everybody,

48

1   Ms. Crawford, the court reporter has my authority to speak up

2   at any time, because she is legally obligated to take down

3   every word.  Sometimes we can hear it okay, but she is

4   required by law to certify the entire proceedings.  If she

5   gets a word wrong, that could be problematic for her.  So she

6   will speak up.

7           If she is not able to hear anybody, that includes

8   during the trial, lawyers or witnesses, or if we are speaking

9   over each other, she will let us know because she is under

10  strict requirements to take everything down.

11          With that, then.  Let me ask, Juror 017, do you know

12  anything about this case?

13          JUROR 017:  I do not.

14          THE COURT:  Do you know anybody we mentioned by name

15  so far?

16          JUROR 017:  No.

17          THE COURT:  Let me get the background information.

18  I'm not sure if it is working.

19  BY THE COURT:

20  **Q.**  Where do you live?

21  **A.**  In Fresno.

22  **Q.**  Do you work outside the home?

23  **A.**  I do.

24  **Q.**  What?

25  **A.**  I'm a high school teacher.

1  **Q.**  What subject matter?

2  **A.**  English.

3  **Q.**  Great.  And marital status?

4  **A.**  I am currently separated.

5  **Q.**  Okay.  Does your spouse work outside the home?

6  **A.**  He is self-employed.  He does web design.

7  **Q.**  Any children?

8  **A.**  Yes.  Eight, six, and ten.

9  **Q.**  Okay.  And any other adults living in your household?

10  **A.**  No.

11  **Q.**  Your highest level of formal education?

12  **A.**  I am almost complete with my Master's degree.

13       THE COURT:  Great.  We are going to continue on, and

14  that would include you, Juror 017, that we are dealing with

15  hardships.  And the next one, and I'm following up on some of

16  the responses.

17       We can pass the microphone right next to Juror 010.

18       Couple things you mentioned, that you are both a

19  student and you are employed.  Let me start with the

20  employment.  While you are serving as a juror, do you get

21  compensated at all by your employer?

22       JUROR 010:  Actually, I asked before, the day before.

23  He states that it will be nonpaid because -- I'm assuming

24  because you guys pay us the amount for coming counsel here,

25  that would be the only type of compensation I would receive.

1         THE COURT:  Okay.  So you would get some

2  compensation; it just would be the Court's daily stipend.

3         JUROR 010:  Yes.

4         THE COURT:  Then in terms of your student status, you

5  indicated midterms were coming up.  When specifically are the

6  midterms?

7         JUROR 010:  Those are going to be the next two weeks

8  or three weeks, but it is just more of the study time.  I do

9  have some tests coming up, so that's I want to be more

10  focused.  As far as not missing school, I had to take the day

11  off from today, but you mentioned this week and next, so I

12  will be coughing up some study time that will probably be very

13  valuable to me.

14         THE COURT:  You said you would be missing class.  You

15  said the classes run from noon to 4:30 every day?

16         JUROR 010:  Yes.

17         THE COURT:  And those are live classrooms you have to

18  actually sit in?

19         JUROR 010:  Yes.

20         THE COURT:  All right.  Then you said the midterms

21  are coming up in two to three weeks?

22         JUROR 010:  Yes.

23         THE COURT:  Did they give you a specific schedule on

24  the midterms?

25         JUROR 010:  I want to say she gave me a date, but I

1    can't remember off the top of my head.  I would have to look

2    at my syllabus or talk to her again.

3          THE COURT:  You are confident it is within the next

4    few weeks?

5          JUROR 010:  Three weeks to a month from now, three or

6    four weeks.

7          THE COURT:  Now, do you have the one instructor or do

8    you have other instructors?

9          JUROR 010:  I have four instructors.  So it would be

10   two on class from 12:00 to 4:30, which run about two hours,

11   with a 30-minute break.  And then I would have two online

12   classes that, of course, have midterms but no meetings in

13   class.

14         THE COURT:  The other two classes are online?

15         JUROR 010:  Online and in class.

16         THE COURT:  Can you do those off hours?

17         JUROR 010:  With respect to my work schedule and my

18   school schedule, I would be fitting it in at night, and then

19   I'm transitioning between jobs, but it is a career choice that

20   is put on pause at the moment.  So I also have some more stuff

21   that I'm balancing on my plate.

22         THE COURT:  Okay.  I will --

23         Inquiry by plaintiffs?

24         MR. GALIPO:  No questions, your Honor.

25         THE COURT:  Defense, anyway?

1          MR. PRAET:  No, your Honor.

2          THE COURT:  All right.  Juror 010, I'm going to go

3    ahead and excuse you from this case.  You still have to call

4    the 800 number, after 5:00 o'clock.

5          If you can tell them what your midterm schedule is,

6    they can probably schedule in another trial that does not

7    conflict with your midterms itself.  This is not a long trial

8    here, so whatever trial you wind up in is, I have no control

9    over.

10         JUROR 010:  I appreciate it.

11         THE COURT:  I will excuse you from this case only.

12   Call the 800 number, after 5:00 o'clock, for your next Court

13   trial assignment.

14         If you need to check to with the jury administrator

15   today to say, "Okay.  I have got the midterm here.  Can you

16   schedule me for a different date," she might be able to

17   accommodate you and put you on a panel that would be coming in

18   after your midterms.

19         JUROR 010:  That would be Friday to call in?

20         THE COURT:  Well, the 800 number is probably a

21   recording, but if you need to talk to the administrator

22   directly, you need to go see her today.  And if you need a

23   note indicating you were here, she can give you that.

24         JUROR 010:  Okay.

25         THE CLERK:  Juror 018.

1    BY THE COURT:

2    **Q.**  Good morning, Juror 018.  Let's get you up to speed.

3    First of all, do you know anything about this case?

4    **A.**  I do not.

5    **Q.**  Do you know of anybody I have mentioned by name so far?

6    **A.**  I do not.

7    **Q.**  Background information.  First of all, where do you live?

8    **A.**  I live in Wasco.

9    **Q.**  Do you work outside the home?

10   **A.**  I do.

11   **Q.**  What do you do?

12   **A.**  I am secretary of a corporation for Campbell Chiropractic,

13   and I also work as a physician's assistant in Shafter.

14   **Q.**  Marital status?

15   **A.**  Single.

16   **Q.**  Children?

17   **A.**  I do not.

18   **Q.**  Any other adults living in your household?

19   **A.**  Yes.  I have my father, who works as a -- in the fields.

20   And then my boyfriend, who works as a maintenance, in

21   Wal-Mart.

22   **Q.**  Your highest level of formal education?

23   **A.**  I have an A.A. in Human Biology, and I'm currently going

24   to classes for my Doctorate.

25          THE COURT:  Good.  We will continue on, and that

1  would include you Juror 018.  Anything else with respect to --
2  I'm sorry.

3        Juror 007, I don't know if you had a chance to check
4  with your physician.  We will pass the mike down to you.

5        JUROR 007:  They did make another appointment for me
6  for next month.

7        THE COURT:  Okay.  And I will mention to you, and I
8  will mention to this applies to everybody.  If, during the
9  course of the trial, we normally break every hour and a half
10 or so, but if you need to take a break earlier or separate,
11 different from that, if you need to make medication, if you
12 need to stand up, because some people have back problems, et
13 cetera, that's perfectly fine.

14       So Juror 007 --

15       JUROR 007:  I forgot my medication.  I don't have it
16 with me, and I didn't take it this morning.  Nervous.

17       THE COURT:  All right.  So you will remember to bring
18 it if you are selected to serve on a jury, bring it tomorrow?
19 Thank you.

20       Anything else with respect to scheduling that we need
21 to address in terms of your time commitment as a juror?
22 Anything?  Couple of folks.

23       Let's see, Juror 016?

24       JUROR 016:  My only concern is my job does pay me my
25 40 hours to be here, but my only concern is my two-year-old.

1   Since my husband works nights, my mother-in-law was not very

2   happy to watch the kids today, this afternoon.

3         But if -- is there a way or is there something for

4   the child care for the two-year-old here since I'm coming from

5   Bakersfield?

6         THE COURT:  We don't have a child care facility.

7   Let's see.  So unless your mother-in-law or anyone else can

8   deal with the child care issue.

9         JUROR 016:  If I can make a call when we go on break,

10   I will see if someone can watch the two-year-old overnight.

11         THE COURT:  If you can get that taken care of?

12         JUROR 016:  Up to 40 hours, we are okay.

13         THE COURT:  Thank you very much.

14         Then we had a couple of other folks.  Yes, Juror 017?

15         JUROR 017:  My only concern is, like I said, I'm a

16   high school teacher, and we have planned a trip for an entire

17   year, and we actually leave on Friday for the weekend to

18   Monterey.  And this trip has been fund-raised for, and all of

19   that, and I'm the -- well, me and another counselor is the

20   only driver.

21         The only thing that I could think to do is see if we

22   could rush to get another driver, but I don't know how

23   possible that is with all the red tape through the district,

24   to get somebody to drive.  It is only Friday.  Every other day

25   is fine.

1           THE COURT:  Okay.

2           JUROR 017:  We are supposed to leave at like

3 9:00 a.m.

4           THE COURT:  Okay, all right.  I will definitely keep

5 that in mind.  But otherwise, your commitment would be for

6 this project or program, Friday?

7           JUROR 017:  It is Friday, Saturday, and Sunday.  So I

8 would be back, yeah.

9           THE COURT:  All right.  But it is that Friday?

10           JUROR 017:  It is the Friday that's the issue.

11           THE COURT:  But if they can get another driver,

12 adviser, chaperone?

13           JUROR 017:  I would have to drive up after we get out

14 here because I'm the lead adviser, so I'm the primary contact.

15           THE COURT:  All right.  So if you can get someone to

16 drive them there on Friday, you can join them possibly even

17 Friday evening?

18           JUROR 017:  Yes.

19           THE COURT:  Thank you.  Keep that in mind.  And I

20 think we had another person.

21           Juror 018?

22           JUROR 018:  Yes.  Like I mentioned, I am secretary of

23 a corporation, and I am also a PA.  And so I took a sick day

24 today to be here.  They would not pay me for serving.

25           THE COURT:  All right.  And some companies don't, I

1    guess, which is, yeah, okay.

2           All right.  So with that understanding, though, you

3    would get some compensation with the courts, and maybe have to

4    reschedule some assignments, but other than that, would you

5    still be able to serve as a juror, understanding that there

6    are some personal hardships, if you will, for you?

7           JUROR 018:  I would have to talk to my doctor and

8    also my boss.  I don't know if they will be willing to give me

9    the time off.

10          THE COURT:  Okay.  Because a lot of times, we will

11   call them and tell them, "Hey, you know, there is a civic

12   obligation to serve as jurors and when your staff and

13   employees are called to serve as jurors, you can't punish them

14   by withholding anything from them."  And usually, they will

15   get the message.

16          So that's something that I'm certainly more than

17   happy to do if that will alleviate any concerns you have as

18   far as scheduling.  If you give me their names and numbers at

19   the next break, I can even call.

20          JUROR 018:  Okay.

21          THE COURT:  Fine.  And if that gets worked out, then

22   you will be okay, I assume?  In terms of serving as a juror in

23   this case?

24          JUROR 018:  Yes.

25          THE COURT:  At the next break, remind me, and we will

1   do that.

2           Anything else?

3           We are going to continue on.  And again, there are a

4   number of things that I need to discuss with you with respect

5   to serving as a juror in this case.

6           Again, I'm keeping in mind what has transpired so

7   far, and that's all part of the mix, but what -- the next

8   question really deals with what, if anything, you know about

9   the court or the legal system.  There may be a number of

10  different avenues.  And I'm going to mention a few

11  specifically, and then end with a general question.

12          But what I'm going to ask you in terms of your

13  knowledge of the court system are as follows:  First, whether

14  or not you have ever served as a juror before; second, if you

15  have ever been a party to or witness to any legal proceeding;

16  and, third, the general question, any other association with

17  the court system, the legal system, attorneys, et cetera.

18          I will start off in the front row and ask if anyone

19  in the front row has ever served as a juror before.  If you

20  have, please raise your hand.  A couple of you have.

21          Let me start off first, Juror 017, how many times

22  have you served as a juror?

23          JUROR 017:  Once.

24          THE COURT:  Criminal or civil?

25          JUROR 017:  Criminal.

59

1          THE COURT:  How long ago was that?

2          JUROR 017:  Before I had children, so at least ten

3     years ago.

4          THE COURT:  Do you remember what kind of a case it

5     was?

6          JUROR 017:  I believe it was a robbery, and I was an

7     alternate juror.

8          THE COURT:  In terms of -- was a verdict reached in

9     that case?

10          JUROR 017:  Yes.

11          THE COURT:  But as an alternate juror, you weren't a

12     part of the actual verdict portion?

13          JUROR 017:  Correct.

14          THE COURT:  All right.  Let me ask you, was there

15     anything about that experience, anything the judge did, the

16     parties, lawyers, witnesses, jurors did, that concerned you,

17     upset you, bothered you, whatever, that would spill over and

18     affect your service as a juror here today?

19          JUROR 017:  No.

20          THE COURT:  Now, it was quite a while ago, but you

21     might remember a little bit about what went on, you might

22     remember a little bit about the jury instructions, et cetera,

23     but for this case, you have to totally disregard what you

24     might remember about that case in deciding this case.  Are you

25     okay with that?

60

1          JUROR 017:  Yes.

2          THE COURT:  And I will explain to everyone, just in

3    general, there are big differences between criminal law cases

4    and civil law cases.  For example, the burden of proof in a

5    criminal law case is what we call "beyond a reasonable doubt."

6    We have all heard that phrase.  It is basically the highest

7    standard we have in the legal system.

8          In a civil case, generally, the standard is what we

9    call a "preponderance of the evidence."  That is, that if we

10   did an imaginary scale, whoever has the burden of proof has to

11   tip that imaginary scale.  So it is not as high as beyond a

12   reasonable doubt, it is a preponderance of the evidence.  And

13   that is normally the burden of proof of whoever it has a

14   responsibility of proving that issue to the jury.

15         All right.  Was there somebody else in the front row

16   who had served as a juror?

17         THE COURT:  Juror 015, how many times have you served

18   as a juror?

19         JUROR 015:  Once.

20         THE COURT:  Criminal or civil law case?

21         JUROR 015:  It was civil.

22         THE COURT:  Do you know what kind of a case it was?

23         JUROR 015:  It was an insurance case.

24         THE COURT:  Okay.  How long ago was that?

25         JUROR 015:  Minimum of 12 years.

1       THE COURT:  Was a verdict reached in that case?

2       JUROR 015:  Yes, it was.

3       THE COURT:  Was there anything about that case that

4  concerned you, bothered you, whatever, that would spill over

5  and affect your service as a juror here today?

6       JUROR 015:  No.

7       THE COURT:  Whatever you might remember about that

8  case, you have to totally disregard for the purposes of this

9  case.  Are you okay with that?

10      JUROR 015:  I have already forgot it.

11      THE COURT:  Great.

12      Anybody else in the front who has served as a juror

13  before?

14      Pass the mike up to the top row.  Ever served as a

15  juror before, top row?  Nobody has, okay.

16      So the next question is going to be whether or not

17  you have ever been a party to or a witness to any legal

18  proceeding.  Okay, you could have been a party to a regular

19  lawsuit like this.  It might have been a small claims case,

20  you might have gone to traffic court, whatever.  Might have

21  been an administrative hearing.

22      Yes, Juror 016?

23      JUROR 016:  It was a civil court against me and my

24  father.  About 2010, was the court proceeding, but the

25  accident occurred about 2007.

1          THE COURT:  Oh, okay.  So the accident was like a

2    traffic collision?

3          JUROR 016:  Yes.  And then that party tried to sue

4    us, so we were part of a small claims court.

5          THE COURT:  Oh, a small claims, okay.  Did you

6    actually go before the judge to decide the case?

7          JUROR 016:  Yes, we did.  And that particular party,

8    the -- I guess he was a plaintiff and I was a defendant, the

9    plaintiff was trying to sue us for money for the claims of the

10   damages, his medical bills, lost wages.  The verdict came out

11   as a verdict for us, we won, for that case.

12         THE COURT:  All right.  Anything about that situation

13   that would affect your service as a juror here today?

14         JUROR 016:  No.

15         THE COURT:  All right.  From that, as the defendant,

16   do you have any concerns about plaintiffs, in general,

17   bringing lawsuits?

18         JUROR 016:  No.

19         THE COURT:  Okay.  So in this case, we have some

20   plaintiffs here.  You are not holding it against them because

21   they brought this lawsuit?

22         JUROR 016:  No.  Everyone has that right.

23         THE COURT:  And as to the defense here, you are not

24   either for or against them because you were a defendant at one

25   point?

63

| | |
|---|---|
| 1 | JUROR 016:  No, because he has a ride to defend. |
| 2 | THE COURT:  Thank you very much. |
| 3 | Anybody else in the back row, either been a party to |
| 4 | or witness to any legal proceeding in the back row? |
| 5 | How about the front row?  Ever been a party or |
| 6 | witness to any legal proceeding. |
| 7 | Juror 015? |
| 8 | JUROR 015:  I have more of a question, Judge.  I was |
| 9 | asked to do a deposition.  Is that -- it is? |
| 10 | THE COURT:  Yes. |
| 11 | JUROR 015:  I was recently asked to perform a |
| 12 | deposition. |
| 13 | THE COURT:  All right.  Is that because they |
| 14 | considered you to be a witness in some kind of a dispute? |
| 15 | JUROR 015:  Yes, there was. |
| 16 | THE COURT:  Have you had your deposition taken yet? |
| 17 | JUROR 015:  Yes, I did. |
| 18 | THE COURT:  Were there lawyers representing the |
| 19 | various parties? |
| 20 | JUROR 015:  There were lawyers for both sides. |
| 21 | THE COURT:  Was there anything about that experience |
| 22 | that caused you some concern about the process itself or how |
| 23 | the deposition was handled? |
| 24 | JUROR 015:  No.  It actually went well. |
| 25 | THE COURT:  Good.  Now, sometimes lawyers are |

1    advocates, so one side might have been friendlier to you

2    because they really wanted your testimony, and the other side

3    might have been trying to ask you some questions to clarify

4    things or maybe even to see whether your memory was really all

5    that good.  They might have been a little aggressive, hostile.

6    Did you see anything like that?

7            JUROR 015:  There was a little, but it didn't bother

8    me.

9            THE COURT:  I will mention to you and everybody else.

10   The lawyers in this case are advocates.  I mean they have a

11   legal obligation to represent their clients, and they are

12   going to do their best.

13           And sometimes you will see them, they may be a little

14   more kind, if you will, to a witness they call.  They may be a

15   little more aggressive to witnesses that they feel are

16   opposite to the case.  That's all part of the process.

17           They are all very professional.  They are not going

18   to be, you know, the Rambo mad dog sort of people you might

19   see on TV.

20           But the bottom line is it is not a popularity contest

21   between lawyers.  In other words, you don't decide the case

22   based on whether you like or dislike what a lawyer did or

23   didn't do.  You are still looking at the parties themselves.

24   And the main thing is the evidence.  Everyone okay with that?

25           All right.

1          THE COURT:  Juror 013?

2          JUROR 013:  Just a small claims court.  I went before

3   a judge because of a property rental dispute by a renter.

4          THE COURT:  How long ago was that?

5          JUROR 013:  Six years.

6          THE COURT:  Anything about that experience that would

7   affect your service as a juror here today?

8          JUROR 013:  No.

9          THE COURT:  I should mention, sometimes when I say

10  "party to or a witness to a legal proceeding," it could be, as

11  with Juror 015, where you are called to have your deposition

12  taken simply because you were a witness or maybe part of an

13  office and they wanted to get information, but that counts

14  also.

15          Back row up there, Juror 005.

16          JUROR 005:  I testified in a case about six years

17  ago.

18          THE COURT:  Was it a deposition in a lawyer's office

19  or whatever, or was it actually in a courtroom?

20          JUROR 005:  It was in a courtroom.

21          THE COURT:  You were a witness -- let me back up.  Do

22  you remember, was it a criminal case or civil case?

23          JUROR 005:  Civil case.

24          THE COURT:  And were you called by the plaintiffs'

25  side or defense side?

1          JUROR 005:  Defense.

2          THE COURT:  Was there anything about that experience,

3    anything the lawyers did or didn't do, that caught your

4    attention that was a little different than what you might have

5    expected or anticipated?

6          JUROR 005:  No.

7          THE COURT:  Anything about that experience that would

8    spill over and affect your service as a jury today?

9          JUROR 005:  No.

10         THE COURT:  The last is a catch-all question.  Any

11   exposure to the court system, legal system?  You might have

12   been employed by a company that worked with the courts.  You

13   might have actually worked with a law firm or something else.

14   Any other experience with the legal system?

15         Juror 018?

16         JUROR 018:  For our company, we do have a lawyer that

17   we refer patients to whenever they have a personal injury, so

18   we do communicate with them.

19         THE COURT:  Good.  And when you communicate with

20   them, do you communicate directly with the lawyer, as far as

21   your office?  Are you like the representative for the office?

22         JUROR 018:  Yes.

23         THE COURT:  All right.  And has that caused you to

24   maybe go into court or at least to help prepare to go into

25   court?

67

1          JUROR 018:  We do subpoenaes from time to time, but I

2     personally haven't gone.

3          THE COURT:  Okay.  Do you consider yourself, is it

4     more like you would consider yourself to be on the plaintiffs'

5     side or defense side?

6          JUROR 018:  No.  I really don't.

7          THE COURT:  Okay.  But it is basically, are you

8     dealing with the injured person?

9          JUROR 018:  Yes, our doctor does.

10          THE COURT:  And so would it be that the injured

11     person is looking for legal advice as far as suing somebody

12     for the injuries that they got?

13          JUROR 018:  They do ask that of the doctor, but we

14     can't give them any legal advice.  That's why we refer them to

15     our attorney.

16          THE COURT:  So you don't -- other than referring them

17     to the attorney, you don't get involved on the legal side of

18     it?

19          JUROR 018:  I personally don't.

20          THE COURT:  Do you provide information to the

21     attorney, like medical records?

22          JUROR 018:  We do, yes.

23          THE COURT:  Is that something that you do personally?

24          JUROR 018:  I do, yes.

25          THE COURT:  Does that cause you to lean for or

1    against what might be someone who brings a lawsuit or who is

2    injured, as opposed to the other side that may have arguably

3    caused the injury?

4            JUROR 018:  Not really, because we are only there to

5    treat them.  We are not there to deal with any personal

6    issues.

7            THE COURT:  Great.  That wouldn't affect your service

8    as a juror in this kind of a case?

9            JUROR 018:  No.

10           THE COURT:  Anybody else, any other relationship to

11   the legal system?  All right.

12           As I mentioned earlier, the basic principles in terms

13   of a civil lawsuit is that, obviously, like any dispute, and

14   you've probably all dealt with disputes in your own lives,

15   whether it is family members, coworkers, friends, whatever, a

16   decisionmaking process.

17           And usually when that occurs, whether it is in a

18   formal setting or informal setting, before you take action,

19   okay, it might be your children complaining about a sibling,

20   or it might be a coworker, a neighbor, whatever, it could be

21   formal, informal, before you take any action, you need

22   information, right?  You need someone to prove to you that you

23   should do something, usually to the other person or, whatever.

24   And that's really common sense, that you do that.  You make

25   decisions.

1          And the same thing really holds true in a lawsuit.

2     You, as a jury, have to decide this case, and we will talk

3     about how you decide that, but basically, you are sitting

4     there, and someone has the burden of proof.

5          Before you act; that is, before you decide this case,

6     the person who has the burden of proof has to present enough

7     information to you so that you are satisfied that, yes, what

8     they are saying is correct and they are entitled to what they

9     are asking for.  And that burden of proof is what we call a

10    "preponderance," as I mentioned earlier.

11         I can sort of give you a visual.  It is that tipping

12    of the scales situation.  So anyway, that's the basic legal

13    principles involved here in this case.  The plaintiffs have

14    the burden of proof.  They are the ones that brought the

15    lawsuit, and their burden generally is by a preponderance of

16    the evidence.

17         So those are the basic principles.  And you will be

18    following those based on the law that I give you in terms of

19    jury instructions.

20         The big thing for you is to decide, of course, what

21    the facts are.  You are the sole deciders of what the facts

22    are in this case.  The lawyers will present information to you

23    in terms of witnesses on the witness stand, documents, et

24    cetera.

25         They will make opening statements.  They will make

1   closing arguments, but the bottom line is it is your sole

2   province to decide the facts.

3         You will decide the facts from documents presented as

4   exhibits, but primarily from the witnesses.  You will decide

5   from the witnesses what the facts are.

6         In most, if not all, lawsuits, just like most

7   disputes, there are two sides to every story, and you are

8   going to have to decide what the facts are from the witnesses.

9         And from the witnesses, you have to decide

10  credibility or believability.  Okay.  Every witness that

11  appears on this witness stand, whether it is for five minutes

12  or five hours, you ultimately decide whether or not you are

13  going to believe all of their testimony, just a part of their

14  testimony, or none of their testimony.  That's your sole

15  prerogative to decide.

16        Now, I will give you some jury instructions in

17  general about deciding credibility.  You know, the opportunity

18  to see what was happening, their ability to recall what

19  happened, how it fits in or doesn't fit in with all the other

20  evidence, whether they have a bias, interest, or motive in

21  their testimony, et cetera.

22        So I will give you a jury instruction on general

23  things to look for in terms of credibility or believability,

24  but the bottom line is we anticipate that you will decide,

25  based upon your own reasoning and common sense, the

1   credibility of each witness.

2          Is everyone okay with that?  Anyone have a concern,

3   problem with having to do that?

4          In terms of credibility, there are some things that

5   do not apply in terms of determining credibility or

6   believability.  One of them, of course, is it doesn't matter

7   whether the plaintiffs call a witness or the defendants call a

8   witness.  That has nothing to do with credibility or

9   believability.

10          So the fact that somebody may be deemed a plaintiffs'

11   witness or a defendants' witness has nothing to do with

12   credibility.  They are actually entitled to call whoever they

13   deem relevant to testify, whether the defendants called them

14   or the plaintiffs called them.  Is everyone okay with that?

15          Now, in terms of credibility or believability, one

16   other thing that is not a factor in credibility or

17   believability is job title, in and of itself.

18          Let me give you an example of this.  Let's say that

19   there is a traffic collision at an intersection, and the

20   question is who had the red light and who had the green.

21          So a person comes in to testify, you are a juror in

22   this case, as to who had the red light or who had the green

23   light.  The witness comes in to testify under oath.  Says, "I

24   was standing at the street corner.  I was very observant of

25   traffic and the signal lights because I wanted to cross, and I

1    wanted to make sure it was safe to cross.  And I was standing

2    there, and I saw two cars coming from different directions

3    approaching, and it was clear to me that neither one of them

4    was going to stop.  And, sure enough, they collided in the

5    middle of the intersection.  Car A had the green light.  Car B

6    had the red light," okay.

7         And then the next witness comes in under oath to

8    testify the same thing, "I was at the same intersection.  I

9    was very observant because I wanted to be careful when I

10   crossed the street.  Saw the two come together, collide.  Car

11   B had the green light, car A had the red light," okay.

12        So that's what you get.  Go ahead and decide the

13   case, okay.  Right now, you are probably thinking, "Gee, based

14   on what you told me, I don't know who had the red light or

15   green light."

16        I'm going to give you one more fact.  One of the

17   witnesses was a physician.  Okay.  Now, does that make a

18   difference?  Job title?  It shouldn't.  And I'm not picking on

19   any profession.  It could have been a lawyer, judge, whatever.

20   But the bottom line is there is no scientific evidence that a

21   doctor has a better ability to see a red light or green light

22   than anybody else.  Everybody okay with that?

23        You may be in the medical arena, you may really like

24   your doctor, but you can't give more weight or less weight to

25   someone because of their mere job title.

1         Now, if the scenario were a little different, if it

2    were what happened in the emergency room, then if a person

3    would appear to testify, testify they are a physician, they

4    were indeed a treating physician, and they gave you their

5    background, training, and experience of what they did, and

6    they tell you that this person that came in had a broken leg.

7         If you believe that physician, then you can believe

8    that the person suffered a broken leg.  But that's not simply

9    job title, "I'm a doctor."

10        It is based upon all of the facts that were presented

11   to you for you to decide the credibility of that individual

12   that, yes, indeed, she was a physician and, yes, indeed, she

13   made a diagnosis, and it was a broken leg.  Is everybody okay

14   with that?  Okay.

15        As an aside, if you are wondering what do I do in my

16   scenario with the two witnesses, always remember who has the

17   burden of proof.  And if you can't decide, whoever has the

18   burden of proof loses, that's the bottom line.

19        My scenario was not to get to the burden of proof,

20   but more credibility of witnesses and job title, okay.

21        Now, when I chat with prospective jurors about this,

22   no one really has a problem with the understanding that job

23   title has no place in terms of credibility or believability.

24   Everybody is open.

25        There is sometimes a difficulty with one particular

74

1  job title, and that is law enforcement.  Okay.  The same

2  ground rules apply, okay.  The fact that someone comes in and

3  says, "I'm a police officer, a Highway Patrol officer,

4  sheriff's officer," doesn't mean that you automatically give

5  that person more or less weight because of job title.  We have

6  all agreed that job title, in and of itself, is not relevant

7  in terms of deciding credibility or believability.

8         Okay.  Now, of course, on my traffic collision

9  scenario, if someone were to appear to testify, Highway Patrol

10 officer, "I have been on the force for 20 years, I do accident

11 reconstruction," et cetera, et cetera.  "I went out to the

12 scene, and based upon the skids, the gouge marks, the damage

13 to the vehicles, I have determined that the point of impact

14 was here."  Okay.

15        Again, if you believe that person, then you can

16 believe that that's where the point of impact was.  But that

17 doesn't have anything to do with job title only.  It has to do

18 with the quality of the testimony.  That's what you are

19 looking at, is not job title, but quality of the testimony.

20 Is everyone okay with that?

21        Now, I will tell you this.  Obviously, from the brief

22 summary that I read to you, this does involve a law

23 enforcement officer, and you will be hearing probably a number

24 of law enforcement folks come in to testify.  Okay.

25        Now, when they do, remember the ground rules, okay.

1   Because someone comes in and says, "I'm a police officer," or

2   "I'm a deputy sheriff," or whatever, "you don't automatically

3   decide, "Okay.  I will believe what you have to say because

4   you are law enforcement officer."  Or "Not going to believe

5   what you say."

6          Now, that has to do with your own background, and I'm

7   going to explore this with you just to see where you are at.

8          And I want to make sure that you understand, I'm not

9   talking about general respect for law enforcement.  We will

10  assume that everyone respects law enforcement.  Okay.  So this

11  isn't a question of do you support law enforcement, do you

12  believe in the law enforcement agencies, police, sheriff, et

13  cetera.  That's not the issue here.

14         The only issue for you is to decide in this

15  particular case, one person comes in, and they identify

16  themselves in law enforcement, that you cannot automatically,

17  just on that, decide, "Okay, I will believe everything you

18  have to say," or "I won't believe anything you have to say,"

19  and that's all background.

20         Couple of things I want to ask you.  And, again, this

21  is to get you thinking in your own mind, knowing that one of

22  the parties is in law enforcement, whether or not you are

23  tending to lean for or against that side because he is in law

24  enforcement, or that one side or other calls more or less law

25  enforcement officers than the other side.

1        These questions are really designed to get you

2    thinking about that so you can look at both sides and say,

3    hey, I can be fair and impartial to both sides and I will

4    determine credibility based on the quality of the testimony.

5        The first set of questions I'm going to ask you is:

6    Do you know anybody in law enforcement?  Okay.  It could be a

7    neighbor, a friend.  It could be a fellow church member or

8    whatever.

9        And so if you know people in law enforcement, the

10   only thing I'm going to ask you is whether or not -- if there

11   is a relationship, you can say, "I have a cousin who is in the

12   Highway Patrol," or "I have a brother-in-law who is a police

13   officer," or whatever.  That's basically all we need to know.

14   And the question is, based upon that relationship, would you

15   be tending to side more with someone in law enforcement?

16       So with that, I'm not sure.  Who has the mike?  Front

17   row, okay.  In the front row, let me just have the mike sent

18   over to Juror 008.  And if you know someone in law

19   enforcement, I don't need names.  Just, "Okay.  I have a

20   friend," cousin, whatever, relative.

21       And then we will go from there, and I will follow up

22   with a few questions, and it will be pretty obvious to you

23   after that.

24       Juror 008, do you know anybody in law enforcement?

25       JUROR 008:  I do.  Just a friend.  Actually, my

1    friend's fiancee, so I consider him a friend as well.

2            THE COURT:  Great.  Have you chatted with that person

3    about any experiences that he might have had in law

4    enforcement?

5            JUROR 008:  That he might have had?

6            THE COURT:  Yes.

7            JUROR 008:  Yes, I have.

8            THE COURT:  There is nothing wrong about that.  They

9    can tell you some of their interesting stories.

10           Let me ask you this.  Based upon that relationship

11   and the fact that you have chatted with him about some of his

12   experiences, do you think that you are tending to lean for or

13   against one side in the other in this particular case?  What

14   little you know, which is basically what I read to you at the

15   beginning there?

16           JUROR 008:  Not at all.  I think it is based on

17   facts.

18           THE COURT:  Thank you.

19           If you know anybody in law enforcement, let us know.

20           JUROR 007:  I do.  I have a nephew that's a police

21   officer.

22           THE COURT:  Have you chatted with about your nephew

23   about some of his experiences?

24           JUROR 007:  No.

25           THE COURT:  Okay.  Do you think that that

1  relationship would affect your service as a juror here today?

2          JUROR 007:  No.

3          THE COURT:  Okay.  And I will ask the general

4  question I should have asked Juror 008.

5          Do you think in this case, if you were to serve as a

6  juror and you heard all the evidence, and you decided that

7  plaintiffs' side has proven their case, that you, as a juror,

8  you would hesitate, "Well, you know, if I vote for the

9  plaintiff, that means I'm voting against a defendant, a police

10  officer.  My friend or relative might get upset with me."

11          Do you think that would affect your decisionmaking

12  process in this case?

13          JUROR 007:  No.

14          THE COURT:  Juror 008, would that affect you?

15          JUROR 008:  No.

16          THE COURT:  Go ahead and pass the mike down.

17          JUROR 018:  I do know people.  They are patients.

18          THE COURT:  Have you chatted with them about some of

19  their experiences?

20          JUROR 018:  They do intend to inform us of things

21  that are going on in our community.

22          THE COURT:  And the treating injuries, have any of

23  the injuries, to your knowledge, been work-related, that maybe

24  they were injured on the job or maybe even were a victim of

25  something as a law enforcement officer?

1          JUROR 018:  No.

2          THE COURT:  So they are different kinds of

3    treatments?

4          JUROR 018:  Yes.

5          THE COURT:  Would that affect your service as a juror

6    here in this case here?

7          JUROR 018:  I don't believe so.

8          THE COURT:  Thank you.

9          Juror 017?

10         JUROR 017:  I know -- excuse me -- several police

11   officers.

12         THE COURT:  Have you chatted with them about any of

13   their experiences?

14         JUROR 017:  Yes.

15         THE COURT:  Now, would that knowledge, would that

16   affect your service as a juror here today?

17         JUROR 017:  No.

18         THE COURT:  Thank you.  Pass the mike down.

19         JUROR 012:  I also know multiple family friends that

20   are in law enforcement.

21         THE COURT:  Have you chatted with them about some of

22   their experiences?

23         JUROR 012:  Yes.

24         THE COURT:  Would that affect your service as a juror

25   here today?

1        JUROR 012:  No.

2        THE COURT:  Thank you.

3        JUROR 013:  I was a city manager, and I used to work

4   for the Fresno County Sheriff's Department.  We had contracts

5   with the Sheriff's Department for a while, for 14 years.

6        On the other hand, right now, I work for CDCR, so I

7   deal with law enforcement everyday.  And during the course of

8   my employment, I have done use of force, where I have taken

9   incidents against the inmates and the law enforcement, and

10  present that to the Warden and everybody else.

11       But I don't think that should bias my decision either

12  way.

13       THE COURT:  I think you mentioned at the beginning,

14  you had done either training or whatever in use of force?

15       JUROR 013:  I was a Use of Force Coordinator, and

16  then I was in labor relations.  So as a coordinator, I would

17  review the incident and present it to the Warden and Inspector

18  General to review the excessive use of force, just presenting

19  it to them.

20       THE COURT:  Were you required to take POST

21  certification?

22       JUROR 013:  No.

23       THE COURT:  All right.  But you were trained

24  obviously in use of force, et cetera, I mean at least in terms

25  of the use of force itself?

1          JUROR 013:  Based on regulation, I was aware of all

2     the regulations and our operational procedures to make sure

3     that they complied with the procedures.

4          THE COURT:  Great.  Now, during this case, if you

5     hear testimony regarding use of force, or there may be some

6     experts that will testify, and it may be something that you

7     are going, "Hmm, that's not the way I learned it," or

8     whatever, you have to rely solely on what's presented or not

9     presented here in court.

10         And you can't use at all any of your own background,

11    training, or experience, regarding what I will just call, in

12    general, use of force.  You okay with that?

13         JUROR 013:  I'm okay with that, because currently I'm

14    working as a Community Resource Manager, so I run all the

15    inmates' religious and nonreligious programs.  I work both

16    sides.

17         THE COURT:  Perfect.  Thank you.

18         Juror 015?

19         JUROR 015:  I have had some business relationships

20    with top staff for the City of Tulare.

21         THE COURT:  Would that affect your service as a juror

22    here today?

23         JUROR 015:  No, it would not.

24         THE COURT:  If you could pass, we will pass it up to

25    Juror 007, and move it across the row there.

82

1          JUROR 007:  I have a cousin that just joined Highway

2     Patrol.  His father just sent me a picture, and that's all I

3     know.  We are not close.

4          THE COURT:  That would not affect your service?

5          JUROR 007:  No.

6          THE COURT:  Thank you very much.

7          JUROR 016:  My brother is a correctional officer.

8          THE COURT:  Have you chatted with him about some of

9     his experience?

10         JUROR 016:  Yes.

11         THE COURT:  Would that affect your service as a juror

12    here today?

13         JUROR 016:  No.

14         THE COURT:  Thank you very much.

15         JUROR 005:  I have several family friends.

16         THE COURT:  Have you chatted with them about some of

17    their experiences?

18         JUROR 005:  Yes.

19         THE COURT:  Would that affect your experience?

20         JUROR 005:  No.

21         THE COURT:  Those who have chatted with friends or

22    relatives, you can't use what they might have told you in this

23    particular case?  Everyone okay with that?

24         JUROR 004:  I too have a number of friends or

25    teammates that are in law enforcement.

1          THE COURT:  Would that affect your service as a juror

2    here today?

3          JUROR 004:  No, sir.

4          THE COURT:  Thank you.

5          JUROR 002:  I have two nephews that are police

6    officers.

7          THE COURT:  Would that affect your service as a

8    juror?

9          JUROR 002:  No.

10         THE COURT:  Great.  Thank you.

11         JUROR 001:  The father of my godson is a police

12   officer, as well as we have a lot of family friends that are

13   with the probation department, but it won't affect my opinion.

14         THE COURT:  All right.  And I'm going to follow up.

15   Most of you who know people in law enforcement, not

16   necessarily, and you are not required to mention the agency,

17   but in a follow up, those of you who have mentioned you know

18   people in law enforcement, were any of those in law

19   enforcement with the City of Fresno Police Department?

20         Front row?  Juror 017, yours is or was?  Okay.

21         Pass the mike down to Juror 017 then.

22         Now, let me mention to you, I rattled off a whole

23   bunch of names right at the beginning.  A few of those folks

24   either were or are members of the Fresno Police Department.

25   Did you recognize any of those names?

84

1          JUROR 017:  No.

2          THE COURT:  Okay.  The fact you know someone in the

3   Fresno Police Department, who is or was, would that alter or

4   your service as a juror?

5          JUROR 017:  It should not, no.

6          THE COURT:  Okay, thank you.  If it turns out that

7   you find that the plaintiffs have met their burden of proof

8   and that they are entitled to a verdict in their favor, do you

9   think you might hesitate, as a juror, thinking, "You know, if

10  I vote in favor of them and against a police officer from the

11  Fresno Police Department, that might affect my friendship or

12  relationship with the other folks," do you think that would

13  affect your decisionmaking?

14         JUROR 017:  No.

15         THE COURT:  Anybody else?

16         Yes, Juror 004?

17         JUROR 004:  I do know a couple officers in Fresno

18  P.D.

19         THE COURT:  Knowing that -- did you recognize anybody

20  I mentioned by name as far as being involved in the Fresno

21  Police Department?

22         JUROR 004:  No, your Honor.

23         THE COURT:  Would that affect your service as a juror

24  here?

25         JUROR 004:  No, sir.

1          THE COURT:  Anybody else?  Let me broaden that scope.

2          Well, before I get to that area.  Okay.  So,

3   basically, that was what I call sort of the pro aspect of law

4   enforcement, the fact you know people in law enforcement.

5          I'm going to ask the other side, which may be the con

6   side, if you will, and that is, whether or not you, a family

7   member, or close friend, have had what you consider to be a

8   bad experience relating to law enforcement.

9          It could be a traffic ticket you thought you didn't

10  deserve, you thought that, "Okay.  Maybe I deserved the

11  ticket, but the officer was rude" or whatever, all the way up

12  to you, a family member, or a close friend being arrested,

13  stopped, pulled over, maybe arrested, maybe even prosecuted.

14          And, again, that doesn't mean it is a bad experience,

15  but it is an experience I want to explore to see whether or

16  not you have any exposure to law enforcement that you would

17  consider to be negative, adverse, or whatever, that might

18  affect your service as a juror here today.  I don't need

19  anything in great detail.

20          If you have a situation where you, a family member,

21  or close friend were actually arrested and prosecuted, I don't

22  know the great detail.

23          Again, the bottom line is whether that experience

24  would affect your service as a juror here today such that you

25  would view, perhaps, a law enforcement officer negatively when

1  they first appeared and said they were in law enforcement, or

2  you would be leaning against the defense side because it

3  involves a law enforcement officer, et cetera.

4          Let me start off in the front row.  Any situation

5  relating to law enforcement that you would consider to be

6  negative or adverse in any way?  Again, I don't need any great

7  detail.  It could be anything, again, from a traffic stop to

8  maybe even a contact on the street, all the way up to maybe an

9  arrest?

10         Anybody in the front row?  Yes, Juror 017.

11         JUROR 017:  Yes.  I have experienced some negative, I

12  guess, contact with police officers personally and with family

13  members, but I don't believe it would affect my

14  decisionmaking.

15         THE COURT:  Okay.  Did that involve the Fresno Police

16  Department?

17         JUROR 017:  One of them did, and the other was the

18  Tulare Police Department.

19         THE COURT:  On the Fresno Police Department, how long

20  ago was that?

21         JUROR 017:  Probably 12 years ago.

22         THE COURT:  Okay.

23         JUROR 017:  I'm sorry.  It was not the Fresno Police

24  Department.  It was the California Highway Patrol.

25         THE COURT:  All right.  And, again, I don't want any

1   detail on this next question, but did any of those ever wind

2   up in the court system?

3            JUROR 017:  No.

4            THE COURT:  Anything about that experience that would

5   affect your service as a juror here today?

6            JUROR 017:  No, but I will say that there was a

7   formal complaint that I filed against that police officer.

8            THE COURT:  Do you know how that followed up, if at

9   all?

10           JUROR 017:  They called me and apologized for how he

11  acted, told me they were investigating.  And then about six

12  months later, I received a letter in the mail that said they

13  couldn't find anything that he had done wrong.

14           THE COURT:  Did that concern you, bother you, or

15  upset you to the extent that it would affect your service as a

16  juror here today?

17           JUROR 017:  No, because I don't know what happened.

18  So I wouldn't make a decision before hearing any evidence.

19           THE COURT:  Okay.  I use this example, and I don't

20  want to belabor your point because I think you have already

21  made it, but this is not the chance for anybody to exact

22  revenge, if you will.  Saying, "I got a bum deal, and this is

23  my only chance to rectify that."

24           So I don't see that.  Anybody else in the front row?

25           How about the back row, what we call bad experiences,

88

1    negative experience, whatever, relating to law enforcement?

2             Great.  Let me follow up with that question.  Have

3    any of you had any dealings or exposure with the City of

4    Fresno, not just the Police Department, but the City of Fresno

5    itself, any of its employees, or whatever?

6             And I don't mean the usual just paying my property

7    taxes, paying my water bill, or whatever, or maybe an inquiry,

8    but actually where maybe you had a complaint with the City,

9    you know, they are not fixing the sidewalk or the street, or,

10   you know, you came across a Fresno City employee and they were

11   rude to you or didn't get back to you?

12            Anybody in the front row?  And it could be a positive

13   experience dealing with the employees of the City of Fresno

14   and not just limited to the Fresno Police Department.

15            Back row?  Juror 004?

16            JUROR 004:  Just recently here in the last month, our

17   neighborhood, someone had complained on the FresGO app about

18   basketball hoops being in violation, and I was one of the 15

19   in the neighborhood that were obstructing an easement.

20            And felt a little bit of contentious tone and tenor

21   from the person I spoke with over the phone, but then

22   eventually, with the investigator, he and I had a cordial

23   conversation, and I felt him to be very helpful.

24            But nothing that would impact my decisionmaking in

25   this particular case.

1          THE COURT:  Anybody else then?

2          I'm going to focus a little bit more now on what you

3   saw or what you have heard about the kind of case this is.

4   This is a case that involved a shooting.

5          And so, obviously, whenever you have any kind of a

6   situation where there is any kind of injury at all, whether it

7   is deadly or otherwise, you know, we are just not accustomed

8   to that.

9          I mean of course with the news now, it seems like

10  everything get publicized, but firsthand, I don't know in this

11  case.  You know, sometimes there are autopsy reports,

12  sometimes there are photos, sometimes there is graphic

13  descriptions of how the use of force resulted in the death in

14  this case of Mr. Casillas.

15         Is there anyone who at this point feels, you know, I

16  can't handle the sight of anything, or it really bothers me

17  when I hear that someone is injured in any manner, including

18  death, obviously, such that the fact that this case involves a

19  shooting death would cause you to be of concern, personally,

20  emotionally, whatever, so that you couldn't focus in on the

21  facts?  Anyone have any concerns about the kind of case this

22  is?

23         All right.  Now, in terms of the case, and I will

24  give you the law at the end, so I'm just sort of paraphrasing

25  this so you get some understanding of the kind of a case that

1   this is, with respect to law enforcement, there are certain

2   general guidelines or rules regarding what we call the "use of

3   force."  Okay.

4           The basic premise is that law enforcement officers,

5   in the execution of their duties, are entitled to use force.

6   Force, in the whole range of things, could be anything from a

7   verbal command to hands on to the use of less lethal force,

8   like maybe a baton, maybe a Taser, whatever, handcuffs, up the

9   scale to the use of deadly force, which it could obviously

10  include some kind of firearm.

11          So that's sort of the range, the continuum, from

12  verbal commands all the way up to deadly force, okay.  And law

13  enforcement are entitled to use that entire range as long as

14  it is reasonable.  The limiting factor on law enforcement use

15  of force is any use of force must be reasonable under the

16  circumstances.

17          So it is possible that even a verbal command or even

18  a touching, you know, just to turn someone around or whatever,

19  might be excessive.  And it is also possible that the use of

20  deadly force is not excessive.  It all depends on the

21  circumstances of the case.

22          And you will get jury instructions on this.

23  Obviously the attorneys will be presenting evidence.  But you

24  will have to decide whether or not any use of force in this

25  case, including use of deadly force, was or was not

1   reasonable.  Okay.  And you will get evidence on that one way

2   or the other.

3          But is everyone okay?  Everyone understand?  Now,

4   there will be some witnesses talking to you about use of

5   force, et cetera, so I won't go into any detail, except I will

6   mention a little something about their role in this case.  But

7   is everyone okay with that, that the use of force, in and of

8   itself, is not illegal?

9          The use of excessive force is illegal.

10          That's sort of the basic parameters.

11          So there are going to be a range of witnesses.  As I

12   say, for every witness, you will have to decide credibility or

13   believability.

14          There is a category of witnesses that are somewhat

15   special.  They are expert witnesses.  And these expert

16   witnesses may not have even been on the scene.  They may not

17   have come into contact with the case until months afterwards.

18   They take a look at all the information, and they are entitled

19   to present to you their opinions regarding in this case use of

20   force, et cetera, whether it was proper, improper.

21          And I won't get into any detail on that because,

22   obviously, you will hear their testimony.

23          But the bottom line is that there may be individuals

24   called who are designated as expert witnesses; that is, they

25   have specialized training, experience, or knowledge, that is

1   supposed to be helpful to you in deciding the case, okay.

2          Now, with respect to expert witnesses, sometimes

3   people have their concerns about expert witnesses.  For some,

4   it is like, "Well, he or she is the expert.  Who am I to

5   question that?  If this expert says A, then I will believe A."

6          And others are skeptical that "Experts are hired

7   guns.  They will say whatever, you know, the party will pay

8   them, and they will say whatever.  So I really don't give any

9   credence to experts."

10          Basically, a person who is designated as an expert

11   still is entitled for you to decide credibility, not based on

12   any preconceived notions you might have about expert

13   witnesses.  You can, with any expert, decide to believe

14   everything that expert says, part of what that expert says, or

15   none of what that expert says.

16          So the fact that they are designated as experts

17   doesn't mean that you treat them differently in terms of

18   credibility or believability.  You just factor in their

19   testimony along with everybody else's.

20          Is everybody okay with that?  Does anybody have a

21   concern about being designated as an expert or their role or

22   your job?  You decide their credibility just like anybody

23   else.  Is everybody okay with that?  All right.

24          The other specifics -- and I have already mentioned

25   that there was use of force and a death in this case.  There

1  are some things that might come up during the course of the
2  trial that might have some impact, bearing on the case itself
3  in terms of facts.

4        But I want to say it is possible in this case there
5  may be some testimony in this case that after the fact, it was
6  determined that Mr. Casillas, the decedent, had ingested
7  alcohol or drugs before the incident itself.

8        Now, that's something you can consider where it is
9  appropriate, but I just want to make sure that everyone
10 understands that the mere fact, the simple fact that
11 Mr. Casillas might have ingested drugs or alcohol immediately
12 before this incident is not, in and of itself, what you decide
13 this case on.

14        So you might think, "Oh, if he drank or if he had any
15 alcohol or drugs in his system, he got what he deserved," or
16 something like that.  Okay.  That's a factor, but it is not
17 the deciding factor, okay.

18        Nor can you think, "Oh, well, if he had drugs and
19 alcohol in his system, the officer should have never shot
20 him," or whatever.  Okay.

21        So my questions here really relate to whether or not,
22 in your own life's experiences, you, a family member, close
23 friend, have had any thoughts, experience, relating to alcohol
24 or drugs, drugs like methamphetamine or something, that causes
25 you some concern so that if you hear testimony that maybe in

1   his system, Mr. Casillas might have had alcohol, drugs, maybe

2   methamphetamine, or whatever, in his system, that you would

3   automatically say, "You know, based upon my thoughts about the

4   use of drugs or alcohol," or based upon maybe some family

5   experiences that were not pleasant in terms of drug or alcohol

6   abuse, that you would automatically say, okay, if there is any

7   evidence at all that Mr. Casillas had ingested drugs or

8   alcohol, methamphetamine, whatever, before the incident, he is

9   going to lose, okay.

10          Anyone have that thought or concern?  Anybody had any

11  life's experiences relating to what you would consider to be

12  drug or alcohol abuse that would cause you some concern

13  about -- just that fact coming out -- that you would shudder

14  or think, "Oh, my God, that reminds me of my cousin or my

15  brother," or whatever, "who had some drug problems," that it

16  would cause you to maybe get sidetracked as far as deciding

17  what the facts are in this particular case and how, if any,

18  any prior use of drugs or alcohol, methamphetamine, whatever,

19  might have impact the case?

20          Anybody have any concerns, any life's experiences,

21  any organizational experiences, like Mothers Against Drunk

22  Drivers, or those sorts of organizations, that would cause you

23  to think, you know, "I have an obligation now, that if there

24  is any evidence at all of any drug or alcohol use by

25  Mr. Casillas, that he is going to lose"?

1          Anybody have any concerns?  You decide the facts on

2   the totality of all of the evidence presented to you, and not

3   just focus on one aspect.  Everybody okay with that?

4          Now, with respect to the decisionmaking process of

5   this jury -- and this applies to most cases -- the jury

6   decides, once you have decided credibility, believability,

7   what the facts are in this case, you have to decide whether or

8   not the plaintiffs have proven their case by a preponderance

9   of the evidence.  And that's what we call "liability aspect."

10         You know, my scenario with the two cars hitting each

11  other in the intersection, whichever driver sued the other

12  driver has that burden of proof.  And so if it ever went to

13  trial, the jury would have to decide liability.  Who had the

14  red light, who had the green light in that particular case,

15  okay.

16         So if the jury decides liability, did the plaintiffs

17  prove by a preponderance of the evidence that in this case,

18  defendant and, through him, the City of Fresno, acted

19  improperly to the extent that they are entitled to a verdict

20  in their favor, okay.  So that's the liability aspect.

21         If you decide there is no liability, then that ends

22  the case.  If you decide that there is liability, you must

23  determine damages.  And damages is strictly in terms of

24  dollars.

25         In the traffic collision scenario, if someone

1  suffered a broken leg, you cannot, as a jury, you can't mend

2  that leg, okay.

3       If they suffered like a death, for example, you can't

4  bring the person back to life.  That's obvious.

5       So really, the bottom line is if the plaintiffs prove

6  liability, you have to determine damages in terms of money,

7  okay.

8       Now, those of you who have not been in the court

9  system, most of our exposure to lawsuits and money damages

10 have been through the media.  And sometimes you may hear about

11 a case or read about the case, and there is some huge verdict

12 of hundreds of thousands of dollars or whatever, millions of

13 dollars.  And you might be thinking, "What was that jury

14 thinking?  That's a lot of money."

15      There was the case about the woman who went to

16 McDonald's and had coffee spilled on her lap, and she sued.

17 We weren't the jury there.  We don't know what actually

18 transpired.

19      And most of the things you read in the newspaper

20 obviously are the big cases, in terms of the money judgment,

21 but 99.5 percent of the cases never get reported, obviously,

22 because they are not, quote, newsworthy, they don't have that

23 big dollar amount.

24      But it could be through all of that that you have

25 thought about money damages.

1          In this case, in terms of awarding money damages,

2     that if you determine liability, the dollar amount is totally

3     in your hands as long as it is reasonable.  And the lawyers

4     will present their evidence or information to show what they

5     believe would be reasonable money damages if you find

6     liability.

7          But there is no floor and there is no ceiling.  In

8     other words, if you came into this court thinking, "Well, if

9     the plaintiff prevails, I haven't heard any of the evidence,

10    but I'm going to award at least this amount of money."

11         Or you can't say, you know, "Based upon all of these

12    runaway juries, if I'm a juror in this case, and I find

13    liability in this case, the plaintiffs aren't going to get any

14    more than this dollar."

15         There is no floor or ceiling.  You decide what is

16    reasonable in terms of compensation.  Is everyone okay with

17    that?

18         So when you determine liability, if you determine

19    there is liability, and if you determine there is damages,

20    then you would decide whether or not, in this type of case,

21    there is what we call "punitive liability"; that is, whether

22    or not anyone that you hold liable in this case acted in such

23    a manner that was so outrageous, unreasonable, et cetera, that

24    they should not only get the money damages of compensation for

25    what they suffered, but there should also be punitive damages,

1   which is basically punishment damages.

2           And the courts allow punitive liability, and

3   ultimately punitive damages, in some cases where there is such

4   a conduct that a jury believes that this person or this entity

5   should be punished.

6           For example, if you had a lawsuit involving a tire

7   manufacturer, and you learn that there was a blowout of -- a

8   person was driving and the tire blew out, and they suffered

9   horrendous injuries, and it goes to lawsuit that was fairly

10  straightforward that there was liability, the tire was

11  defective, and the liability was clear.  Damages was decided.

12          But you also learned during the trial that the

13  manufacturer of the tire knew that it was defective, that they

14  had manufactured these tires, they are just not -- they were

15  likely to blow out because they just weren't constructed, the

16  management that knew about it, they were concerned that if

17  they did a recall or whatever, that they would hurt their

18  reputation as a tire manufacturer.  So they figured, "Let's

19  keep quiet about this.  Let's hope there aren't too many

20  blowouts.  That way we don't ruin our reputation and we will

21  be okay.  We will decide that the price for having to pay off

22  some people who are injured is worth keeping our mouth shut

23  about it," okay.

24          That could be conduct that a jury could find so

25  egregious, outrageous, that they knew of the defect and they

1    didn't do anything about it, and they kept quiet because they

2    didn't want to hurt their reputation, the jury could find

3    punitive liability.

4          Because it does two things.  Number one, it punishes

5    the company for what they did or didn't do, but also sends a

6    message out there to other manufacturers:  If you have a

7    defect, you better do a recall, because if not, if you hurt

8    somebody because of that, then you are going to get punished.

9          That's punitive liability, punitive damages.

10          The dollar amount in punitive damages is like

11    compensatory damages.  You make the determination as to what

12    you believe.  If you find punitive liability, punitive damages

13    is what you believe to be reasonable under the circumstances.

14    Is everyone okay with that?

15          So the process is liability, yes or no.  And if

16    liability, damages, dollar amount, what is reasonable.  And if

17    you find damages, you can, but are not required to, find

18    punitive liability.  If you find punitive liability, then you

19    determine punitive damages.

20          Is everyone okay with that?  All right.

21          Now, all of you have given your background, but one

22    thing I didn't ask is have any of you studied or worked in any

23    forensic field, crime scene investigation, background training

24    that you have not mentioned?  Okay.

25          One fact that will come out in this case is that the

1    decedent, Mr. Casillas, was a member of the Table Mountain

2    Indian Tribe or at least a Native American Tribe.

3         And the question I'm going to ask really is, as you

4    know, we have a number of tribes in our region.  A lot of

5    publicity has come about because a number of the Tribes have

6    been able to form casinos.  And so we have got a lot of

7    publicity.

8         A number of the Tribes, as you are probably aware of,

9    have done really good things in terms of contributing dollars

10   for the public good.

11        And other people might think, well, you know, gee,

12   they are making money off gambling, taking advantage of that,

13   et cetera.

14        So really the question relating to the fact, if it is

15   brought out, that the decedent was a member of an Indian

16   Tribe, whether or not that, in and of itself, would affect how

17   you view this case because of your own thoughts or opinions

18   regarding Indian or Native American Tribes and that sort of

19   thing.

20        And it could be very direct.  You might have, in your

21   organization or employment, might have benefitted from

22   contributions made by a Tribe to your work, or whatever.

23   Maybe programs or a project that you have worked, so you have

24   a very favorable impression.

25        Or it could be that you have had a friend that is

1    addicted to gambling, and you are really down on the Tribal

2    casinos, whatever.  It could be anything.  I'm just throwing

3    those out as examples.

4         If it turns out that Mr. Casillas was a Native

5    American or member of a Native American Tribe, would that

6    fact, in and of itself, affect your service as a juror in

7    being fair and impartial to both sides?

8         Anybody in the back row?  Any experiences, thoughts,

9    concerns about that aspect?

10        Yes, okay.  If we can pass the microphone back up.

11        Juror 005?

12        JUROR 005:  I'm a member of the Tribe up in Tuolumne,

13   for Black Oak Casino.

14        THE COURT:  Okay.  So in this case, would that

15   association, if you will, would that affect your service as a

16   juror?  Are you tending to lean for or against Mr. Casillas

17   or, in this case, his family, because of that aspect?

18        JUROR 005:  No.

19        THE COURT:  If there is anything that comes out about

20   tribal relationships or whatever, and if it is not within your

21   experiences, you are limited to what you see and hear in the

22   courtroom.  Any problem with that?

23        JUROR 005:  No.

24        THE COURT:  Anybody else?  Pass the microphone down.

25        Juror 003?

1        JUROR 003:  I am also a member of the Bishop Paiute

2   Tribe.  And I work for a tribal organization.

3        THE COURT:  Now, the fact that I just mentioned that

4   Mr. Casillas may have been a member of the Table Mountain

5   Indian Tribe, would that, when you heard that, would that

6   cause you any kind of impact as far as being -- maybe leaning

7   for or against one side or the other?

8        JUROR 003:  No.

9        THE COURT:  Anybody else?

10        Maybe I could do a little follow up with Juror 005

11   and Juror 003.

12        In terms of how the process works, I guess with

13   respect to some Tribes, mainly those who have the financial

14   ability, members are compensated.  And I'm not sure if that's

15   enrollment in membership, where they get a certain amount.

16        Juror 003, are you familiar at all?  Is that part of?

17        JUROR 003:  Yes.

18        THE COURT:  If you hear information about that in

19   this case, again, you have to limit it to what you see and

20   hear in the court and how it relates to the case itself.  Are

21   you okay with that?

22        JUROR 003:  Yes.

23        THE COURT:  Juror 005, are you okay with that?

24        JUROR 005:  Yes.

25        THE COURT:  Juror 003, and I just want a "yes" or

1    "no."  Are you, a family member, or close friend, receiving

2    any -- I'm not sure what it would be called, percentages or

3    anything, compensation based upon tribal membership?

4              JUROR 003:  Distribution?  Yes.

5              THE COURT:  You are familiar with that aspect of

6    tribal governments?

7              JUROR 003:  Yes.

8              THE COURT:  Would that affect your service as a juror

9    here?

10             JUROR 003:  No.

11             THE COURT:  If you, a family member, or close friend,

12   were receiving the benefits, if you will, and that person

13   dies, does it continue on to the heirs, or does it just end?

14             JUROR 003:  I think it just goes back into the Tribe.

15             THE COURT:  Okay.  So it is specific to that tribal

16   member, and it is not like hereditary sorts of things that?

17             JUROR 003:  Right.

18             THE COURT:  Juror 005, is your understanding any

19   different?  I don't know if you, a family member, or close

20   friend receive any benefits or anything like that.

21             JUROR 005:  Yes.

22             THE COURT:  And is there a hereditary aspect or does

23   it end?

24             JUROR 005:  It ends.

25             THE COURT:  So it is specific to that member?

1          JUROR 005:  Yes.

2          THE COURT:  Again, would that affect your service as

3     a juror here today?

4          JUROR 005:  No.

5          THE COURT:  Now, just in general, for you folks,

6     there are a number of plaintiffs in this case.  They are the

7     children of the decedent.  And you are going to hear all of

8     the evidence in this case, and you may determine, based on all

9     the evidence, that the plaintiffs have not proven their case

10    in terms of liability.  But in the back of your mind, you are

11    thinking, "Wait a minute, what's going to happen to these

12    children if we don't award judgment for the plaintiffs?"

13         Okay.  I don't want to seem cold-blooded about this,

14    but that's not your role, okay.  Your role is not to just

15    think about, "Okay.  There are children involved here, so no

16    matter what, we have to award judgment to the plaintiffs, even

17    though they haven't proven their case, because what's going do

18    happen to the children?"

19         That's not the province of this jury.  The jury here

20    only determines whether or not there is liability as to the

21    defendants in this case.  Then you determine damages.  Anyone

22    have any concern about that?  Okay.

23         So it is very possible you could be very sympathetic

24    to the family, but, nonetheless, decide that the plaintiffs

25    have not proven liability, and that would end your inquiry.

1     Does everyone understand that aspect?  Okay.

2          Now, in this case, you might hear some evidence that

3 Mr. Casillas had spent some time in custody.  And we don't

4 really get into great detail on that, but if you hear evidence

5 that Mr. Casillas had previously, before this incident, had

6 served some time in custody for various offense or offenses,

7 that that inquiry, if it comes out, would be limited to

8 certain aspects of the case, not whether or not Mr. Shipman in

9 this case did or did not use excessive force.

10          Everybody understand that?  That there might be some

11 evidence that Mr. Casillas had previously spent some time in

12 custody.  You can't say, "Oh, he has already been in custody

13 once.  He doesn't deserve anything, family doesn't deserve

14 anything, and we are going to vote for the defense, even

15 though the plaintiff has proven their case."

16          It may come out, but that is something that you can

17 consider, but if it does come out, we will tell you what you

18 can consider it for and what you cannot consider it for, and

19 you have to follow the rules.  Everyone okay with that?  All

20 right.

21          Now, I have asked a bunch of questions of you, and,

22 again, the purpose was to get you thinking in your own mind,

23 "Okay.  Can I be fair and impartial to both sides?"  Okay.

24          Now, but I may have not asked the right question of

25 you.  You are sitting there thinking, "You know, Judge, you

1    have not asked this question.  You should ask this question

2    because I have an answer."  Or I may have started to go into

3    an area, and just about when you were ready to respond, I went

4    off to another area.  That's my bad.

5         So this is my question to you now.  Is there anything

6    that you have not had a chance to mention to the parties that

7    you feel that they should at least be aware of or that you

8    wanted to, at least, say?

9         Anybody in the front row?  Something you have not

10   been able to tell the parties about your thoughts or whatever

11   that you feel that they should at least be aware of?  Anybody

12   in the front row?  Anything you have not had a chance to say?

13        Anybody in the back row?

14        Okay.  Now, it is 12:00 o'clock.  We are going to

15   take our noon recess.  We will come back at 1:30, this

16   afternoon.  These are assigned seats.  You must sit back in

17   these same seats.

18        The jury panel members out in the audience, you can

19   have a seat anywhere.  If you want to be close to the jury,

20   that's perfectly fine.

21        I do have a caveat for everyone.  This is a big

22   building, but the common areas that you are going to be around

23   are very limited.  Outside, the hallway, the restrooms, the

24   cafe down below, whatever, and the elevators.

25        The lawyers in this case and the parties and

1   witnesses may not talk about the case anywhere in the common

2   areas.  So obviously because that should not influence any of

3   you folks at all.

4          Now, the attorneys -- and they will let the parties

5   know, let the witnesses know -- don't talk.  There are horror

6   stories.  I had cases where a juror was in the cafe and they

7   were just quietly eating lunch and, unbeknownst to them, right

8   in the table right next to them, the lawyers were talking

9   about the case.

10          And I had a situation, again, in the restroom, where

11   someone was in the restroom, and the lawyers or the witnesses

12   or the parties were talking about the case.

13          I had a person who was in the elevator that got in

14   first, and were in the very back, and the lawyers came in or

15   witnesses came in, and they chatted about the case.  Okay.

16          So sometimes it happens.  But no one who is involved

17   in this case, including me and my staff, can talk to you about

18   the case or anything to do with the case, or even talk about

19   the case in your presence.

20          Right now, obviously, there are a number of you.  The

21   lawyers know who you folks are.  They have had a couple hours

22   to recognize you, but that wouldn't necessarily apply to the

23   witnesses and the other parties.

24          So please try to avoid them.  I know sometimes, you

25   know, you want an innocent conversation with them, which is

1 | okay, but they really can't respond to you, okay.

2 | And the main reason for that is you might ask them,

3 | "Is there a good place to eat," and it is very innocent for

4 | you, but for an outsider, they might look and say, "Oh, look,

5 | that lawyer," or whatever "is trying to influence that juror,"

6 | or whatever.  And then we have a problem.

7 | Aside from Juror 015, don't talk to anybody who is

8 | wearing a tie.

9 | So anyway, be very careful.  If someone does come

10 | into contact with you, you know, try to avoid them and, if so,

11 | report it to me, and we will try to address that.

12 | But at any rate, the bottom line is don't think that

13 | the lawyers are being snobbish or whatever because they are

14 | not chatting with you.  They are not allowed to do that.

15 | With that, we will return at 1:30 this afternoon.

16 | Have a good lunch.

17 | Those of you who need to make contacts, go ahead and

18 | do that, and when we come back, if there is anything you want

19 | to mention to me and the parties, we will do that.

20 | When we come back in, I'm going to give the attorneys

21 | an opportunity to ask some followup questions.  They are not

22 | going to be lengthy, but they are entitled to do that.

23 | Okay.  Go ahead and go have a good lunch, and we will

24 | see you at 1:30.

25 | (The prospective jurors exited the courtroom.)

109

1          THE COURT:  Are there any other prospective jurors in

2   the courtroom now?  Very briefly, in session, if you have any

3   followup questions, go ahead and jot them down, and I will ask

4   them when we come back.

5          When we come back in, I will let plaintiffs' side and

6   defense side ask some followup questions.

7          Before we recess, there were some questions or

8   concerns by the jurors.  Anything about any of the prospective

9   jurors that you want me to follow up on where they might have

10  expressed some concern about serving as jurors, any hardship

11  issues, that we should take up or at least consider?

12         Plaintiffs' side, anything?

13         MR. GALIPO:  No, your Honor.

14         THE COURT:  Defense side?

15         MR. PRAET:  No, your Honor.

16         THE COURT:  If you have followup questions, again, I

17  will take them up at 1:30.  Otherwise, we will go right into

18  the plaintiffs' side with followup questions and right to the

19  defense side.  See you at 1:30.

20    (The lunch recess was taken.)

21

22

23

24

25

110

AFTERNOON SESSION

1:30 p.m.

THE COURT:  Back on the record outside the presence of the jury.  Before we have the jury panel come in, there were a couple of question marks.

I think Juror 007, at least she resolved her doctor's appointment.

I did not get a phone number for Juror 018's employer.  I don't know if she contacted them during the break.

And then Juror 017 is going to need to check that they can get a driver for Friday.

I believe Juror 016 had a child care issue.

So I will check with them.

Do you recall anybody else that we need to -- further that I need to follow up on that you can recall?

MR. PRAET:  Actually, those were the question marks I had too, your Honor.

THE COURT:  I will follow up on them.

And then depending on their responses, again, I may ask, if you wish to inquire, if they come up with good reason, I might excuse them for cause, but otherwise, probably not.

Okay.  Before the jury panel comes back, anything further before they come in for the record?

Plaintiffs' side, anything?

1          MR. GALIPO:  No.  I would like to thank the Court,

2     because I think you did a very thorough and complete job of

3     your jury questioning, which makes our job a lot easier, and

4     makes it more manageable in the time allotment.  So I really

5     appreciate that.

6          THE COURT:  Sure.

7          Defense anything?

8          MR. PRAET:  No.  We are good.  Thank you.

9          THE COURT:  We will have the panel come in.

10    (The prospective jurors entered the courtroom.)

11         THE COURT:  All right.  Please be seated.  The record

12    will reflect that the jury panel is missing one.

13    (Pause in the proceedings to await Juror 003's arrival.)

14         THE COURT:  All right.  The record will reflect that

15    the jury panel is present, and the 14 prospective jurors are

16    in the jury box.

17         And there are a couple of issues a couple of you

18    prospective jurors had raised.  And I thought maybe during the

19    lunch hour, I don't know if you had a chance to make contact,

20    but let me follow up.

21         Let's see, Juror 016, you had a couple of questions.

22    One was child care, and the other was -- well, you had the 40

23    hours that you had available to you.  Any follow up on that?

24         JUROR 016:  Yes.

25         THE COURT:  Let me get the microphone to you.

1          JUROR 016:  I spoke to my mother-in-law.  She is not

2     happy.  And she says that she will not watch the child.  So my

3     husband is trying to get time paid off from work, but they

4     usually don't pay him for jury duty either.  And then he would

5     have to take more than a week off.

6          THE COURT:  Okay.  With that -- excuse me.

7          With that understanding, and I totally recognize your

8     concern, you have made effort, if you were to ask to be serve

9     on the jury, would you still be able to serve on the jury

10    then?

11         JUROR 016:  My only concern is he is going to try to

12    call HR at work and see if he is able to do something about

13    it.  We have another one, but the other child goes to school,

14    but our concern is the baby.

15         I have already explained that to my husband and

16    mother-in-law, if I don't serve on this jury, I may have to

17    come back, so if I could get it done today so I don't have to

18    worry about the next two weeks to be on call.

19         THE COURT:  Bottom line is, at this point, if nothing

20    else changes, will you be able to serve as a juror in this

21    case?

22         JUROR 016:  I will try, yeah.  That's my concern.  We

23    are doing everything in our power to do it.  I'm being honest.

24    But, yeah, regardless or not, I'm going to have to come back,

25    and I won't have enough paid time anyways, so we will run into

1   less hours and child care.

2           THE COURT:  In terms of final resolution, do you know

3   when that would occur?

4           JUROR 016:  He said, "I give you 2:30, 3:00."  Maybe

5   our last break.

6           THE COURT:  We will keep that in mind, but we will

7   see where we go from there.

8           Juror 017, with respect to your obligation as far as

9   transporting the students?

10          JUROR 017:  They said they could not get anybody

11  approved because of the late notice because of the district's

12  red tape to get somebody approved.

13          Is there a possible way to not do a full day on

14  Friday?  You know, like because I don't have a problem

15  serving.  I honestly -- this is my civic duty.  I'm all for

16  that.

17          Otherwise, I have to drive at night, and I'm not,

18  with my vision, I'm not a good night driver.

19          THE COURT:  What time frame were you looking at?

20          JUROR 017:  Noon, 1:00.  What is it, a two-hour drive

21  to Monterey?  I don't know.  Whatever it would take before

22  sundown.

23          THE COURT:  Then Juror 018, I didn't get a phone

24  number, but I don't know if you had a chance to check with

25  your office?

1          JUROR 018:  I did call one of the offices.  I

2    couldn't get ahold of the doctor.  And I did send e-mails out

3    to my professors stating that I was going to be in jury duty,

4    and I haven't heard back from them yet.

5          THE COURT:  You haven't gotten a response on any of

6    those folks, okay.  Let me do the following then, and I

7    understand the concerns raised by each of you.

8          Were there any others that I needed to address, or at

9    least the attorneys need to be aware of, as far as jury

10   service commitments, et cetera, that have not yet been

11   addressed by any of the other folks?

12         Are there any followup questions you want me to ask

13   before you begin your voir dire for plaintiffs' side?

14         MR. GALIPO:  Not on behalf of the plaintiffs.

15         MR. PRAET:  No, your Honor.

16         THE COURT:  What we are going to do -- and again this

17   may change the dynamics depending on your responses to the

18   questions -- but I will have counsel go ahead and inquire of

19   you, keeping in mind there is still some question marks

20   regarding the three of you.  And I will meet with the

21   attorneys and we will go from there.

22         But I will allow counsel to inquire.  And, again, you

23   need not reserve time if there is anyone that comes up a

24   little after you have spoken.  You will obviously have a

25   chance to do individual inquiry of any new persons.

115

1          Plaintiffs, voir dire.

2          MR. GALIPO:  Yes.  Thank you.

3          Good afternoon, everyone.

4          THE JURY:  Good afternoon.

5          MR. GALIPO:  My name, again, is Dale Galipo.  And I

6     think I'm going to be pretty brief because the Judge did such

7     a great job at asking you all the questions, and I was trying

8     my best to take good notes.

9          The main issue in the case is going to be whether the

10    use of deadly force was appropriate or not.

11         Is there anyone on the panel that feels, for whatever

12    reason, they would not be comfortable deciding that issue?

13    Does anybody feel that way?  Okay.  I see no response.

14         One of the issues may be whether there were other

15    reasonable alternatives other than using deadly force.  Does

16    anyone think they would have difficulty considering what other

17    reasonable alternatives there were to using deadly force?  And

18    I see no response.  Okay.  Thank you.

19         The Judge touched on there may be some evidence of

20    drugs or alcohol.  You may hear that there was a -- some

21    methamphetamine that was found in the blood at the time of

22    autopsy.

23         And I want to ask again, because I understand some

24    people have very strong feelings about drugs, understandably.

25    Is there anyone that thinks, if they hear that, it's going to

1    be difficult for them to concentrate on the main issue in the

2    case as to whether the deadly force was appropriate or not?

3          In other words, is someone going to hear

4    "methamphetamine" and get so tuned out or turned off, that it

5    would be difficult to concentrate on the main issue?  Does

6    anyone feel that way?  Okay.  I'm getting no response, and a

7    shaking of many heads.

8          There also -- you may hear that I can't get into all

9    the details about what happened, but you will learn the

10   shooting happened in a residence.  And prior, there was a

11   short pursuit.

12         Some people, I know, drives them nuts if they see one

13   of these pursuits on television or whatever.  Is there anyone

14   that has such strong feelings about that, that, again, it

15   would make it difficult for them to concentrate on the issue

16   of whether the use of deadly force was appropriate or not?

17   Does anyone feel that way?  And again, I'm getting no

18   response.

19         Okay.  So I'm just going to go around quickly, as I

20   promised the Judge I would.

21         Juror 001, good afternoon.  You think you can give

22   both sides a fair trial?

23         JUROR 001:  Of course.

24         MR. GALIPO:  Probably should pass the mike.  I will

25   go in order so you will know I'm coming.

1        JUROR 001:  Yes.

2        MR. GALIPO:  Thank you, Juror 001.  Can you pass it

3    to your right, to Juror 002.

4        Good afternoon, sir.

5        JUROR 002:  Good afternoon.

6        MR. GALIPO:  Now, you have a couple of nephews who

7    are police officers.  And I thought the Judge did a very good

8    job with all of you in following up, but because this

9    particular case happens to be against a police officer, do you

10   think in any way, you are going to be more siding with the

11   police because of the relationship with your nephews?

12       JUROR 002:  No.

13       MR. GALIPO:  If this case was against a dentist and

14   your nephews were dentists, I would probably be asking the

15   same question.  So you think you could be fair to both sides?

16       JUROR 002:  Absolutely.

17       MR. GALIPO:  Thank you very much.  Pass it to your

18   right.

19       Juror 003, I don't want to mispronounce it.  (Name

20   redacted.)  How did I do?

21       JUROR 003:  That's right.

22       MR. GALIPO:  I got lucky.  All right.  Do you think

23   you could be fair to both sides based on what you have heard?

24       JUROR 003:  Yes, I do.

25       MR. GALIPO:  Would you be okay being a juror on this

118

1   case if you are selected?

2           JUROR 003:  Yes.

3           MR. GALIPO:  Would we be getting dirty looks from you

4   all week like, "I can't believe I'm here"?

5           JUROR 003:  I'm good.

6           MR. GALIPO:  Pass it to your right, to Juror 004.

7           Good afternoon, sir.

8           JUROR 004:  Good afternoon.

9           MR. GALIPO:  I was trying to listen and take notes,

10  so I may have got it a little bit wrong.  You said you had

11  some friends who were former teammates who were now in law

12  enforcement.

13          JUROR 004:  I have friends and former teammates from

14  college who are both in law enforcement.

15          MR. GALIPO:  Were you in a sport?

16          JUROR 004:  Football.

17          MR. GALIPO:  Oh, football.  Where did you play

18  football?

19          JUROR 004:  Western Oregon University.

20          MR. GALIPO:  Great.  Did you say you know a couple of

21  officers in the Fresno Police Department?

22          JUROR 004:  I do.

23          MR. GALIPO:  This kind of cuts a little closer to

24  home because, as you know, the officer at the time worked for

25  the Fresno Police Department in this case.

1           So what I'm wondering, and I think the Judge touched

2    on it, do you think that it might be more difficult for you,

3    or maybe I start a step behind, if you will, to vote against

4    an officer from the Fresno Police Department if you know a

5    couple of officers from that department?

6           JUROR 004:  I don't think there is any issue, at

7    least in my mind, of being fair and impartial and looking at

8    strictly the facts of the case.

9           MR. GALIPO:  Fair enough.

10           JUROR 004:  I'm confident about that.

11           MR. GALIPO:  As the Judge mentioned, it is not a

12    criminal case, it is a civil case.  The burden is

13    preponderance of the evidence, which you will hear more likely

14    true if not true.  If, after you hear all the evidence, you

15    believe that it is more likely true than not true that the

16    deadly force was excessive, would you have any hesitation in

17    voting for the plaintiffs, the children of the decedent?

18           JUROR 004:  Not at all.

19           MR. GALIPO:  Pass it to your right.  Keep it moving

20    here.

21           Juror 005, good afternoon.  Now, you have some family

22    and friends who are police officers.  So same question I asked

23    all these other nice people.  You think that's going to keep

24    you from being fair?

25           JUROR 005:  No.

1      MR. GALIPO:  You don't think that I start a step

2  behind because, somehow, you are going to favor the police

3  just because you have family and friends who are police

4  officers?

5      JUROR 005:  No.

6      MR. GALIPO:  If you can pass it to your right, to

7  Juror 016.

8      So I guess we will hear, hopefully shortly, about the

9  coverage for the child.

10      JUROR 016:  Yes.

11      MR. GALIPO:  Other than that, do you think you could

12  be fair to both sides?

13      JUROR 016:  Yes.

14      MR. GALIPO:  Your brother is a correctional officer?

15      JUROR 016:  Yes.  Out in Corcoran.

16      MR. GALIPO:  Let me ask you about that.  That's a

17  form of law enforcement.  We have another gentleman in the

18  front who is in that profession.  Do you think in any way

19  that's going to make you side more with the police

20  necessarily?

21      JUROR 016:  No.

22      MR. GALIPO:  You think you could be fair to both

23  sides?

24      JUROR 016:  Yes.

25      MR. GALIPO:  Good afternoon, Juror 007.

1          JUROR 007:  Hi.

2          MR. GALIPO:  You were able to change your doctor

3     appointment, it sounds like?

4          JUROR 007:  Yes.

5          MR. GALIPO:  You think you could be fair to both

6     sides?

7          JUROR 007:  Yes.

8          MR. GALIPO:  That's all we can ask.  Try your best.

9          I will try to go in reverse order.  We will see how I

10    do here.

11         Juror 015, good afternoon.

12         JUROR 015:  Good afternoon, sir.

13         MR. GALIPO:  Checking my notes real quick.  I'm not

14    sure if it is working or not, but we will figure that out.

15    Did you have some business dealings before, I think it was

16    with the City of Tulare, is that what you said?

17         JUROR 015:  Yes, sir.

18         MR. GALIPO:  But how about with Fresno directly?

19    City of Fresno, any business relationship with them or direct

20    dealings?

21         JUROR 015:  No.  I was the city manager for the City

22    of Tulare, and they just made me aware of what was going on,

23    pretty much.

24         MR. GALIPO:  Fair enough.  Did you say your daughter

25    worked for a victim advocate, in Kansas?

1          JUROR 015:  Yes, she does.

2          MR. GALIPO:  Do you know what type of an organization

3    that is?

4          JUROR 015:  She was working for the State.

5          MR. GALIPO:  Okay.

6          JUROR 015:  She was working in Bell County, for the

7    county, as a victim advocate.  I don't really know what she

8    does.  That's what she calls it.

9          MR. GALIPO:  You got it pretty good.

10         If you could pass it next to Juror 013?

11         JUROR 013:  (Name redacted.)

12         MR. GALIPO:  Good afternoon, sir.  I will ask you the

13   same question.  You have had a professional career working in

14   some aspect of law enforcement; is that fair, as a

15   correctional officer?

16         JUROR 013:  No.  I'm not a correctional officer.  I'm

17   a Community Resources Manager, and I have worked as a city

18   manager, so I have never been on the peace officer side.

19         MR. GALIPO:  I understand, okay.  And then in some of

20   your work, you get involved as a Use of Force Coordinator?

21         JUROR 013:  I was in the transformation from the

22   state, I started off as a Labor Relation Analyst.  Then I

23   went, doing the Use of Force.  Did that for about six months

24   at one of the institutions.  Then I got promoted to a

25   Community Resource Manager.

1          MR. GALIPO:  You think you could be fair to both

2    sides?

3          JUROR 013:  I sure can.

4          MR. GALIPO:  Thank you very much.

5          I'm going to be very quick.  I promised the Judge I

6    was going to be 15 minutes, and I'm probably running late.

7          Juror 012, do you think you could be fair to both

8    sides?

9          JUROR 012:  Yes.

10          MR. GALIPO:  Juror 017, do you think you could be

11    fair to both sides?

12          JUROR 017:  Yes.

13          MR. GALIPO:  We will see what arrangements we can

14    make.  The Judge is going to talk about it with us.

15          Juror 018, you think you could be fair to both sides?

16          JUROR 018:  Yes.

17          MR. GALIPO:  Okay.  And to the left, is it Juror 009?

18          JUROR 009:  (Name redacted.)

19          MR. GALIPO:  Did you have, I think it was a --

20          JUROR 009:  A nephew.

21          MR. GALIPO:  Anything about that that you think would

22    make it difficult for you to give my clients a fair trial?

23          JUROR 009:  No.

24          MR. GALIPO:  All right.  Last, but certainly not

25    least, Juror 008.

124

1          JUROR 008:  Yes.

2          MR. GALIPO:  Good afternoon.  And do you think you

3    could give both sides a fair trial?

4          JUROR 008:  Yes, I do.

5          MR. GALIPO:  Okay.  It looks like it was your

6    friend's fiancee is a police officer?

7          JUROR 008:  Correct, uh-huh.

8          MR. GALIPO:  Anything about that that you think would

9    make you unfair?

10          JUROR 008:  Not at all.

11          MR. GALIPO:  I appreciate your time.

12          Thank you, your Honor.

13          THE COURT:  Defense.

14          MR. PRAET:  Thank you, your Honor.

15          Hi.  My name is Bruce Praet.  Excuse me, I get all

16    choked up at these things.

17          I represent Officer Shipman in this case.  And you

18    will notice something, that I'm always going to go second.

19    Plaintiffs have the burden.  They go first.  I go second.  And

20    we ask that you wait to hear the whole case and not base it on

21    what you hear from one side.

22          I do have some follow up questions.  You may have

23    noticed, there has been some children running in and out of

24    the courtroom.  And, of course, we are most concerned about

25    the sympathy factor.  I mean, obviously, somebody's father was

1  killed in this situation.

2          Is anybody here just going to say, "You know what,

3  right or wrong, I want to do something for those kids," and

4  that you would put aside the evidence and just say, "Hey, he

5  is a police officer, it is the City, let's just give them some

6  money"?

7          Anybody going to do that?  Okay, good.

8          Juror 002, you are a pastor.

9          JUROR 002:  Yes.

10         MR. PRAET:  Do you have any religious beliefs or

11  anything that's going to cause you concern about the fact that

12  there is deadly force used by one human being against another?

13         JUROR 002:  No.

14         MR. PRAET:  You are okay with that?

15         JUROR 002:  Yes.

16         MR. PRAET:  Does anybody else have any religious or

17  other beliefs in terms of you don't think that one human being

18  has the right to use deadly force against another, regardless

19  of the circumstance?  Anybody have a problem?  Good.

20         Anybody former military?

21         Juror 015, what branch were you in?

22         JUROR 015:  United States Army.

23         MR. PRAET:  Thank you for your service.  Did you see

24  any combat?

25         JUROR 015:  No.

126

1        MR. PRAET:  Do you have any familiarity with weapons

2   and guns, rifles and things?

3        JUROR 015:  Yes, I do.  We were basic M-16, .45,

4   bazooka, those types of things.

5        MR. PRAET:  Do you still recreationally have any

6   guns?

7        JUROR 015:  No.

8        MR. PRAET:  Use guns or anything?

9        Anybody else a gun collector or just shoot for

10  recreational purposes, hunting, whatever?  All kinds of

11  people.

12       Juror 017, you are right in line.  I'm sorry.

13       Juror 012?

14       JUROR 012:  Yes, I do.

15       MR. PRAET:  Juror 012, recreational, hunting?

16       JUROR 012:  Recreational.

17       MR. PRAET:  Handguns?

18       JUROR 012:  Yes.  9 millimeter handgun.

19       MR. PRAET:  You a good shot?

20       JUROR 012:  Yes.

21       MR. PRAET:  How about Juror 017?

22       JUROR 017:  Recreational.

23       MR. PRAET:  Handguns?

24       JUROR 017:  No.  Rifles.

25       MR. PRAET:  Rifles.  Hunting or just target?

127

1          JUROR 017:  Target.  We have property in Corcoran.

2          MR. PRAET:  Very good.

3          Was there anybody else in the front row, with guns,

4     just to --

5          Juror 002?  Could you pass the mike back?

6          JUROR 002:  I have a concealed permit that I carry

7     once in a while.  I believe in guns.

8          MR. PRAET:  All right.  Okay.

9          Was there anyone else I missed in the back row?

10         Juror 004?

11         JUROR 004:  Just shotgun and rifle for recreation

12    purpose and target practice.

13         MR. PRAET:  Very good.

14         See, Juror 005, you were a member of a Tribe in

15    Tulare?

16         JUROR 005:  Tuolumne.

17         MR. PRAET:  Tuolumne, I'm sorry.  One of the Ts.

18         JUROR 005:  Yes.

19         MR. PRAET:  The decedent in this case, Mr. Casillas,

20    is a member of the Table Mountain Indian Tribe.  Is that going

21    to affect your decision one way or the other?  Is there any

22    animosity, closeness, or whatever between the Tuolumne Tribe

23    and the Table Mountain?

24         JUROR 005:  No.

25         MR. PRAET:  Totally not going to affect you?

128

1          JUROR 005:  No.

2          MR. PRAET:  Okay.

3          And see, Juror 003, you were a member of the Bishop

4  Tribe?

5          JUROR 003:  Yes.

6          MR. PRAET:  Same thing.  Are you going to feel

7  because Mr. Casillas, the decedent in this case, was a member

8  of the Table Mountain Tribe, is that going to cause you any

9  animosity, any favoritism, bias?

10          JUROR 003:  No.

11          MR. PRAET:  Juror 007, maybe we can get the

12  microphone down to her.  I know you were able to make

13  accommodations on your doctor's appointment for your

14  cardiologist, but you mentioned you are taking medication on a

15  daily basis.

16          JUROR 007:  Yes, yes.

17          MR. PRAET:  Are you going to be okay throughout the

18  trial?  Your medication, does it affect your ability to hear

19  or pay attention?

20          JUROR 007:  I'm not sure.  I have to make trips back

21  and forth to the restroom.

22          MR. PRAET:  We all do.

23          JUROR 007:  And I just got out of the hospital for

24  arthritis in my neck.  So I'm -- I got pins and needles in my

25  fingers right now.

1      MR. PRAET:  Is that going to distract you?  Are you

2  going to have a tough time paying attention?

3      JUROR 007:  It might, because I get pains here

4  (Indicating).

5      MR. PRAET:  In your chest?

6      JUROR 007:  Yeah, where my incision is, it is a big

7  keloid, so it bothers me a lot.

8      MR. PRAET:  Okay.  Are you going to feel comfortable

9  serving on this jury?

10      JUROR 007:  Not really.

11      MR. PRAET:  Okay.

12      Juror 017, I know you are trying to make arrangements

13  for other drivers, and I appreciate you trying to accommodate

14  the schedule to serve on the jury.

15      If the Court is not, and the parties, and we have

16  witnesses and everything lined up so we couldn't accommodate a

17  shorter day on Friday, is that going to pretty much eliminate

18  you ability?

19      JUROR 017:  I will make it work.

20      MR. PRAET:  You will make it work?

21      JUROR 017:  I will make it work.

22      MR. PRAET:  Would you be distracted if you knew the

23  kids were --

24      JUROR 017:  They will be in class.  They are upset

25  that they will have to go to class.  I got text messages that

130

1   they are upset that they have to go to class, and I said,

2   "Such is life."

3           MR. PRAET:  Sounds like a teacher.

4           JUROR 017:  12 years.

5           MR. PRAET:  Okay.  And Juror 016, I know you have a

6   two-year-old at home.

7           JUROR 016:  Yes.

8           MR. PRAET:  I appreciate that you are trying to make

9   arrangements with your mother-in-law and your husband trying

10  to get off work.  If you can't make those arrangements, is

11  that going to pretty much eliminate you from being able to

12  serve here?

13          JUROR 016:  Unless you want to child care.  I give

14  him a phone, and he is fine.  I just don't want to come back

15  and have hours and --

16          MR. PRAET:  I have been through the terrible twos, I

17  will leave that to you.  You do that on your own.

18          I guess my last, probably, question to all of you.

19  If you were Officer Trevor Shipman, and you were looking at

20  this jury panel, would any of you not want yourself to be

21  sitting on the jury, judging his actions back in September of

22  2015?

23          Any of you saying, "You know what, if I'm that police

24  officer, I shouldn't be on his jury"?  Does anyone feel that

25  way, that you wouldn't want yourself to be on his jury,

1    judging what he did?  Everybody good with that?

2           Okay.  I'm amazed.  I know the Judge asked all if you

3    had any negative contacts with law enforcement and, Juror 017,

4    you are the only one, and that was Highway Patrol, so that's

5    okay.

6           Was your situation resolved to your satisfaction?  I

7    know you really, they told you there wasn't enough evidence or

8    something.  Were you satisfied with that?

9           JUROR 017:  It was.  I mean, again, I am able to move

10   past things pretty quickly.  It is what it is.  I did, I felt

11   like my part in making a complaint, and if they did their due

12   diligence and their investigation and they didn't come up with

13   anything, then I'm going to trust them.

14          MR. PRAET:  I mean obviously, from a police officer's

15   standpoint, quite frankly, he might be concerned that you

16   filed a complaint --

17          JUROR:  Absolutely --

18          MR. PRAET:  -- against a police officer.

19          Are you going to be able to be fair to Officer

20   Shipman, even though you filed a complaint against the Highway

21   Patrol officer?

22          JUROR 017:  I don't know Officer Shipman.  I don't

23   know anything about him, so I would listen to the evidence and

24   make a decision that way.

25          MR. PRAET:  That's all we can ask.  Thank you.

132

1          All right.  I don't think I have any further

2   questions.  Thank you.

3          THE COURT:  Okay.  Let me follow up, if I can get the

4   mike to Juror 007.  I don't want to browbeat you, but it is

5   important that we understand for every prospective juror what

6   they really mean.

7          Obviously, if you are uncomfortable, you have

8   keloids, I don't know.  How long ago was your heart surgery,

9   the transplant?

10         JUROR 007:  I had the defibrillator put in nine years

11  ago, but last year, they just replaced it, and it is worse

12  than before.  That's about it.

13         And I have not eaten today.  I won't eat because I

14  know my body.  That's why I say, I make frequent trips to the

15  bathroom, so.

16         THE COURT:  Couple of things.  As I already

17  mentioned, we try to accommodate medical issues.  Someone

18  says, "2:15, Thursday, I have to take meds," we take a break

19  2:15, on Thursday.

20         Someone says, "I have a bad back, I have to stand up

21  every once in a while.  I don't want to be impolite."  I say,

22  "Go ahead.  You have to stand up, even if a witness is

23  testifying, go ahead and do it."

24         If someone says, "I have to take a break," you don't

25  have to explain to me.

1        With that understanding -- we don't want people

2   getting up and leaving every 15 minutes -- but Juror 007, the

3   bottom line is we recognize your discomfort.  But the bottom

4   line, is your discomfort and your medical situation such that

5   you would not be able to serve as a juror?  And that is, to

6   pay attention to everything that's going on in the courtroom

7   while you are in the courtroom?

8        JUROR 007:  I think it would get in the way because

9   the pains are frequent.  I told my mom, "I forgot my

10  medicine," and she told me I should have brought it with me.

11  It just hurts a lot.

12       THE COURT:  What do you do at home?  I mean here, you

13  are sitting.  Do you just sit at home?

14       JUROR 007:  Yeah, mostly.  Me and her, we walk

15  through the week.  Try to, you know, walk.  We go to

16  Manchester and walk.  That's my exercise during the week.

17       But no one knows I have pain like I do.  I don't say

18  anything.  But I should have took my medicine this morning.

19       THE COURT:  Okay.

20       JUROR 007:  But I can't take my medicine and eat.

21       THE COURT:  Assuming you are picked for the jury,

22  though, and you are able to take your meds, and if you say, "I

23  have got to eat," again, the same thing.  If you say, "At

24  11:00 o'clock tomorrow, I have to take a break no matter where

25  you are in trial and I have to take a bite to eat and take my

134

1   meds," we will do it.  So --

2           JUROR 007:  I won't eat.  Just like when I went in

3   there to the lunchroom, I didn't get anything.  I won't eat

4   because I have a weird stomach.

5           THE COURT:  Okay.

6           JUROR 007:  And that will interrupt with a lot of

7   stuff, with me paying attention to the Court.

8           THE COURT:  Okay.  Thank you.  All right.

9           I'm going to do the following.  Unfortunately, we

10  can't delay too long, but I'm going to take one final break to

11  allow you folks to make contact with your office or family or

12  whatever.

13          In the meantime, I will stay in session with the

14  attorneys, but we will take one last break to have you folks,

15  the few of you who need to make contact, see if you can.  And

16  if you cannot, we will just have to move accordingly.

17          We will go ahead.  We are going to remain in session,

18  but you take a 15-minute break, do whatever you need to do,

19  come back in, and we have to move forward.  With that, go

20  ahead and take a 15-minute break.  I'm going to stay in

21  session with the attorneys.

22      (The prospective jurors exited the courtroom.)

23          THE COURT:  Are there any other prospective jurors in

24  the courtroom?  No, okay.  The record will reflect that the

25  jury panel has left.

1         I did want to give Juror 016 and Juror 018 an

2    opportunity to see if they can make contact.  Juror 016 for

3    child care; Juror 018, with her office, et cetera.

4         I think one of them mentioned, I think Juror 016 said

5    she may find out by 3:00 o'clock, so I don't know if we want

6    to wait that long.

7         I don't want to necessarily move forward and impanel

8    her and then find out after we have impaneled her that, no,

9    she is not going to be able to make child care arrangements.

10        Same with Juror 018.

11        It appears that Juror 017 has resolved her matter,

12   and is doing really a very nice job of really accommodating

13   the parties.

14        So it looks like she is okay.  We could have a

15   shorter session on Friday, but, again, I know you folks want

16   to try to move the case along, and I don't want to cut it

17   short on Friday to try to accommodate one prospective juror.

18   But it sounds like she is going to stay with us, and I will

19   make that -- make sure that that's clear when she comes back

20   in.

21        Juror 007 is problematic, frankly, as you probably

22   figured out.  She doesn't want to sit on this jury.  And I

23   cannot believe that people who exist, even with pain, couldn't

24   sit for an hour and a half at a time on a jury.

25        But that's problematic.  So anyway, certainly, she

1   has not expressed enough for me to excuse her for cause, but,

2   you know, that's just my thought.

3        So at any rate, as far as what your thoughts are, if

4   Juror 016, Juror 018 are not able to get a response to us

5   fairly quickly, I will leave it up to you, how you want to

6   handle it.

7        I don't necessarily want to wait around until 3:00 or

8   3:30 for them to get a response, but I don't want to boot them

9   simply because we are trying to move forward.

10       And then your thoughts on Juror 007.

11       Plaintiffs' side first on where we are in terms of

12  this particular panel?

13       MR. GALIPO:  With respect to Juror 007, I do agree

14  with the Court.  I don't think there's enough for cause, and

15  I'm also getting the feeling that some of her answers may be

16  more based on not wanting to be here than true cause.

17       With respect to the other jurors that may need to

18  2:30 or 3:00 to find out, I have no problem if we wait.  I

19  don't think another half hour in the overall scheme of things.

20       I think the other side is impanelling them, having

21  them part of the jury, and then learning at the end of the

22  day, there is a problem.

23       So at least from my perspective, I would be

24  agreeable, and I think it makes sense if we have to wait to

25  2:30 or 2:45 or 3:00, just to make sure, I'm okay with doing

137

1  that. That's my position.

2      THE COURT: Your ultimate thought with respect to

3  Juror 007?

4      MR. GALIPO: My ultimate thought is I think that

5  there is not enough for cause, so I'm not willing to stipulate

6  to dismiss her.

7      THE COURT: All right. Defense?

8      MR. PRAET: Yes, your Honor. With respect to

9  Juror 007, first, I mean watching her, she clearly doesn't

10 want to be here.

11     The Court made a general remark with respect to the

12 gentleman with a tie and she was nonresponsive and

13 nonreactive.

14     She does have medical problems. And I really don't

15 want a juror on there who is distracted and doesn't want to be

16 here. I mean we would stipulate to releasing her, but if they

17 are not going to, then I think her medical condition, that she

18 is in pain, she is not eating, she is going to be distracted,

19 she probably doesn't belong on this jury.

20     With respect to Juror 016 and Juror 018, I'm in

21 agreement that I would rather take the extra -- maybe they

22 will answer us when they come back, I don't know -- than to

23 impanel them and lose two jurors right off the bat.

24     THE COURT: You are agreeable then that we wait to

25 3:00 o'clock?

1          MR. PRAET:  If necessary, sure.

2          THE COURT:  Okay.  We can make use of that, because I

3    would like to chat with you folks, just to make sure, on the

4    preliminary jury instructions to make sure we are on board and

5    those are ready to go.  So there is something for us to do,

6    even if we have the jury wait.

7          But as I understand it then, I will not excuse Juror

8    007 for cause.

9          As far as Juror 016 and Juror 018, we will wait at

10   least until 3:00 o'clock to see if they get a response.

11         If it is a negative, for example, Juror 016 says, "No

12   way I can get child care and I cannot serve," and/or Juror 018

13   says, you know, "I did talk to my office, and they say they

14   have got scheduling issues," and et cetera, et cetera, then

15   maybe we will just do a hallway chat as to how we want to deal

16   with her.

17         But, okay, so that's fine.  We are okay.  So 007

18   stays.  016 and 018, we will wait to see.

19         I will confirm with Juror 017 as to what she is

20   saying, is that, yes, she will serve on a jury.

21         Now, I don't want to lose time on Friday, obviously.

22   It is possible that we could go through and end early.  I have

23   got to be mindful of you folks and staff.  Sometimes what I do

24   is I just don't do a lunch break, and we just go through and

25   we end at 2:00 and we still get four and a half hours in.

1          But part of that would probably have to be reported

2     by ECRO, our machine, or getting a replacement court reporter,

3     because I can't require court reporters, who constantly, as

4     you know, working to go through on that.  So it is possible,

5     that's a possibility.

6          I don't know, though, if we need to do that, if Juror

7     017 says, "Look, if you can't break early."  She sounds like

8     her students are going to be in class, and so she can, it

9     looks like that's not going to be an issue in terms of

10    breaking early, but I will confirm that with her.

11         Anything else at this point in time then?

12         MR. GALIPO:  Not on behalf of the plaintiffs.

13         THE COURT:  Let's take ten minutes to give Juror 016

14    and Juror 018 as much time as we can.  We will have them come

15    back in.  If they are still waiting, we will tell the entire

16    jury panel that we are going to start working on some aspects

17    of the trial itself.  We will give everyone an opportunity to

18    make whatever contacts they need to make, and then we will

19    reconvene at 3:00 o'clock.

20         Let's take ten and see where everybody is at.

21      (Recess)

22         THE COURT:  Back on the record outside the presence

23    of the jury panel.  There is one thing I could do if you wish.

24    I could ask Juror 016 and Juror 018 to come in and give us an

25    update so we don't have the entire panel in.

1        MR. GALIPO:  I think that would be a good idea.

2  Maybe they have already heard some news.

3        THE COURT:  If we could have Juror 016 come in first.

4        Juror 016?  Juror 016, you don't have to take your

5  seat.  We want to get an update, whether or not you were able

6  to hear from anybody.

7        JUROR 016:  My husband called HR, and they told him

8  he would have to talk to his boss, but we works graveyard, so

9  he won't talk to him until late tonight.  Coming from a

10  200-mile distance kind of puts a strain a little bit.

11        THE COURT:  Got it.  So even if we waited another

12  hour, you are not going to get an answer?

13        JUROR 016:  We thought HR would have given us a yes

14  because it is kind of like an emergency kind of thing.  They

15  can't make that call, the boss would have to make that call.

16  Doesn't seem correct from HR, but that's what they told us.

17        THE COURT:  Thank you for that update, and we will

18  get everyone back in, but I appreciate the update.

19        MR. PRAET:  Juror 018, your Honor?

20        THE COURT:  Would you have Juror 018 come in?

21        Juror 018, you don't have to retake your seat.  We

22  need to get an update as to whether or not you received any

23  responses yet.

24        JUROR 018:  I received a response from one of my

25  professors.  He said it is okay.  I will have to take some

1    losses of some grades, but that's okay with me.  I haven't

2    received anything from my other professor, but I think it

3    should be fine if this professor reacted quite okay to it.

4          And regards to my doctor, I think I'm just going to

5    do it.  I haven't heard anything from him, and I believe it's

6    because he is working, but I'm just going to do it.

7          THE COURT:  As far as you are concerned then, do I

8    understand that if you are selected to serve as a juror in

9    this case, you would be able to serve; is that correct?

10          JUROR 018:  Yes.

11          THE COURT:  We appreciate that, and we will get

12    everybody else back in in a little bit, but thank you.

13          If we could have Juror 017 come in just for a moment.

14      (Prospective Juror 017 entered the courtroom.)

15          THE COURT:  We wanted to get an update,

16    clarification.  The schedule is fairly full.  The attorneys

17    are trying to get all the witnesses coordinated and in, so it

18    doesn't look like we can do a short week.  We possibly to do a

19    short day on Friday, but I don't want to make any promise that

20    might not come through because of witness scheduling.

21          If we had to do a full Friday, which means we could

22    go as late as 4:30 p.m., would that impact your ability to

23    serve as a juror?

24          JUROR 017:  No.  I will make it work.

25          THE COURT:  We appreciate that very much.

1          (Juror 017 left the courtroom.)

2          THE COURT:  It looks like Juror 018 is good to go,

3    Juror 017 is good to go.

4          The last thing is what we are going to do with

5    respect to Juror 016.

6          MR. GALIPO:  May I inquire, your Honor, for the

7    jurors who are coming some distance, do they get some

8    accommodation for a local place to stay?

9          THE COURT:  Yes.  They get subsistence, which

10   means -- a couple of prospective jurors have come from Inyo

11   County, so that's a huge travel commitment, but if they are 80

12   miles or more from the courthouse, which Bakersfield

13   qualifies, I believe parts of Modesto, Stanislaus Counties

14   qualify, they are entitled to hotel and subsistence on a daily

15   basis, yes.

16         MR. GALIPO:  So based on the jurors' responses, my

17   position would be on behalf of the plaintiffs, that I think we

18   can work with this group of 14, understanding, we are hoping

19   to end up with a jury of eight, obviously.

20         THE COURT:  Right.

21         MR. GALIPO:  If for some reason, one person can't

22   make it, we would still have seven.  It is my understanding we

23   need at least six.

24         THE COURT:  Yes.

25         MR. GALIPO:  And it sounds like the one juror, we

1    don't know if she will be selected, but if she is, she might

2    not know until tomorrow.

3         And even if she can't serve, I feel, at least from

4    the plaintiffs' perspective, we would feel okay if we ended up

5    with seven.

6         The only other option would be to excuse her, call

7    someone else, go through the questioning again, but from my

8    perspective, I would be comfortable selecting from this 14.

9         THE COURT:  All right.  Defense?

10        MR. PRAET:  We are fine with the 14, your Honor.

11        THE COURT:  Okay.  Now, so when the jury comes back

12   in, and we will do this on the record just to clarify, but if

13   there are any cause issues, we may as well take them up now,

14   because if you pass for cause or you have a cause issue, and I

15   rule adverse to you, we go right into the peremptory challenge

16   stage, which, again, is just a single sheet of paper that's

17   passed back and forth between counsel, and you either fill out

18   your three, or pass, or whatever, and whatever is left,

19   whichever eight is left would constitute the jury.

20        So with that understanding, are there any cause

21   issues on behalf of plaintiffs' side?

22        MR. GALIPO:  Based on the state of the answers to the

23   Court's questions and counsel's questions, there are no

24   challenges for cause.  I don't think -- I haven't heard

25   anything that I think would establish a challenge for cause.

1          THE COURT:  Thank you.

2          On behalf of defense?

3          MR. PRAET:  No, your Honor.  I think we have already

4   made our record with respect to Juror 007, but other than

5   that, the Court has already ruled.

6          THE COURT:  Okay.  So I'm going to have the jury

7   panel come in, and then we will go ahead, and I will just

8   inform them that with the understanding with Juror 016 and

9   Juror 007, that there is no legal cause for excusing any of

10  them, if they are selected as a juror, they would have to

11  serve as a juror.  And we will move right into the peremptory

12  challenge stage.  I will explain that part to them.

13         Anything else then before I have the jury come in and

14  proceed accordingly?

15         Plaintiffs' side anything?

16         MR. GALIPO:  No, your Honor.

17         THE COURT:  Defense side?

18         MR. PRAET:  No, your Honor.

19         THE COURT:  We will have the jury panel come in.

20     (The prospective jurors entered the courtroom.)

21         THE COURT:  All right.  Go ahead and have a seat.

22         All right, members of the jury panel, I have had a

23  discussion with counsel.  And, basically, what they have

24  agreed is there is no legal basis that what we would basically

25  call "cause" matters, why any of you could not serve as a

1   juror in this particular case.

2           We recognize concerns raised by various prospective

3   jurors, and we respect that.  We understand it.  We understand

4   that the dynamics could be an issue later on.

5           But as to the 14 of you, there is no legal reason

6   that I can excuse any of you from this trial, at least at this

7   point in time.

8           So having said that, the next phase of jury

9   selection -- this is true in state court, federal court,

10  civil, criminal cases -- the parties are entitled by law to

11  exercise what we call "peremptory" challenges.  That is, they

12  can thank and excuse any one of you from serving on this jury.

13          I will tell you that if you are excused or not, it

14  isn't because of anything you said or didn't say.  You were

15  all very candid about any concerns you might have, the

16  responses that you gave.

17          But from the parties' perspective, they are looking

18  at you not only individually, but also a panel as a whole, and

19  it is very subjective in terms of what they feel the balance

20  of the jury, in terms of age, backgrounds, geographic

21  locations, et cetera, and so they will be entitled to exercise

22  peremptories.

23          Now, let me explain to you a little bit more about

24  that.  Most of you who have never served on a jury before or

25  those of you who have, understand that juries are 12 people,

1   okay.  So why are there 14 in the box?

2          Well, in the federal court system only, in a civil

3   case, the law requires that a jury be composed of six, six to

4   12 individuals.  It is pretty rare that we have 12 jurors on a

5   civil case.  We do abide by the mandatory six, and there are

6   no alternate jurors on a civil case.

7          So it is always possible we could lose a juror during

8   the course of the trial, so practice-wise, with many courts,

9   and what I do, is we have a jury of eight, so that if we

10  happen to lose any of you during the course of the trial, as

11  long as we are six or more, we are okay.

12         So why are there 14 in the box?  It is easier for us

13  to do the inquiry of a group here, understanding that each

14  side may exercise three peremptory challenges each, that is,

15  each side can ask the Court to thank and excuse any one of

16  you, three for each side.  That's a total of six.

17         The math is very simple.  14 in the box, six of you

18  get excused, the remaining eight is your jury.

19         If it turns out they don't exercise all their

20  peremptory challenges and there are more than eight, we just

21  take a certain number of eight of you.  So the jury will be

22  compromised of eight individuals.

23         With that, then, we are going to move into the

24  peremptory challenge stage, which is giving the attorneys a

25  sheet of paper.  They will write down the seat number, the

1    name of the prospective jurors that they wish the Court to

2    excuse, and when they get the list, I will read your name.

3    And if your name is called, you are free to leave.  You would

4    not be serving as a juror in this case.

5         With that then, we will proceed with the peremptory

6    challenge portion.

7         (The strike sheet was passed.)

8         THE COURT:  All right.  Members of the jury panel,

9    I'm going to go ahead and thank the following of you for

10   agreeing to serve as jurors; however, you would be excused

11   from this particular case only.

12        If you need to check with the Jury Commissioner to

13   have a note to signify that you were here, evidence you were

14   here, you certainly can do that.  You do have to call that 800

15   number, after 5:00 o'clock, Friday, to see if there are any

16   other assignments, but other than that, you are free to leave

17   with our thanks.

18        And we do appreciate, even those of you who are

19   excused, your willingness to serve as jurors in this case.  We

20   truly appreciate that.

21        With that, I'm going to go ahead and thank and excuse

22   the following individuals and you are free to leave.  The

23   following individuals are excused with our thanks:

24        Prospective Juror Number 2, Juror 002, you are

25   excused with our thanks.

148

1          Prospective Juror Number 4, Juror 004, you are

2     excused with our thanks.

3          Prospective Juror Number 7, Juror 007, you are

4     excused with our thanks.

5          Prospective Juror Number 10, you are excused with our

6     thanks.

7          Prospective Juror Number 12, Juror 012, you are

8     excused with our thanks.

9          And Prospective Juror Number 13, Juror 013, you are

10    excused with our thanks.

11         Now, the eight of you are the jury in this case.  If

12    you would please stand where you are at, the clerk will

13    administer an oath to you.

14    (The jury was duly impaneled and sworn.)

15    THE COURT:  Before you sit down, if everyone can

16    slide over so you occupy the first four seats in each row.

17         Go ahead and have a seat.  That will be your assigned

18    seat.  And the reason we moved you over is, number one, so you

19    are all together so a presentation could be made to you rather

20    than having to look right and left.

21         The other thing is you are all as close as possible

22    to the witness stand so you can get the best possible view.

23         Now, those of you in the audience area on the jury

24    panel, as you see, we have just selected our jury, and so we

25    do appreciate your coming in and spending the entire day.

1        You do have to call that 800 number, after 5:00

2   o'clock, Friday, to see if there is another assignment for

3   you.  Otherwise, you are excused with our thanks.

4        If you need to check with the Jury Clerk to get a

5   note, you can.  Otherwise, you are excused with our

6   appreciation and thanks.  Thank you very much.

7      (The prospective jurors exited the courtroom.)

8        THE COURT:  Are there any other jury panel members

9   present?

10        The record will reflect the jury panel has left.

11   Obviously, if anything should arise during your service as a

12   juror, please let us know.

13        And again, Juror 016, we keep in mind your

14   uncertainty in that regard, but otherwise, we are certainly

15   hopeful that you can complete your service here.

16        Members of the jury, what we are going to do next is

17   I'm going to have you go back to the jury room so you can find

18   out where your home will be the next few days, and then you

19   will be given badges and further information.

20        If you need to talk to the Jury Administrator

21   regarding anything at all, then she certainly will be able to

22   come up.

23        What I'm going to do is I will remain in session with

24   the attorneys.  The next step when you come out here is I'm

25   going to read the preliminary jury instructions to you.  And I

150

1   need to double-check with the attorneys to make sure they are

2   agreeable as to what is going to be read to you as far as the

3   preliminary jury instructions, and I will give you further

4   information after that.

5           It will take a few minutes.  Go on into the jury

6   room, and what we have is Mr. Dorough is a staff attorney.  He

7   will be watching over you.  If you have any questions of the

8   Court, you can go through him, and he will be assisting you in

9   terms of hopefully assisting with you in your care and comfort

10  as jurors.

11          So if you would, just go ahead and follow him to the

12  jury room.  As soon as we are ready to proceed, we will have

13  you come back out and begin the trial.

14      (The jury left the courtroom.)

15              *        *        *        *        *

16

17      I, PEGGY J. CRAWFORD, Official Reporter, do hereby

18  certify the foregoing transcript as true and correct.

19

20  Dated:  8th of March, 2019        /s/ Peggy J. Crawford
                                      PEGGY J. CRAWFORD, RDR-CRR
21

22

23

24

25