# February 28, 2019

# Jury Trial, Day 3
# Partial Testimony of William Harmening

# EXHIBIT "2"

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII


| | | |
|---|---|---|
| THE ESTATE OF CASIMERO CASILLAS, et al., | ) ) ) | 1:16-cv-1042 AWI-SAB |
| Plaintiffs, | ) ) | JURY TRIAL, DAY 3 |
| vs. | ) ) | Partial Testimony of William Harmening |
| CITY OF FRESNO, et al., | ) ) | |
| Defendants. | ) ) ) | |

Fresno, California                    Thursday, February 28, 2019


REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES OF COUNSEL**:

For the Plaintiffs:        LAW OFFICES OF DALE K. GALIPO
                          21800 Burbank Boulevard, Suite 310
                          Woodland Hills, California 91367
                          BY:  **DALE K. GALIPO**
                               **ERIC VALENZUELA**

                          WILLIAM L. SCHMIDT,
                          ATTORNEY AT LAW, P.C.
                          P.O. Box 25001
                          Fresno, CA 93729
                          BY:  **WILLIAM L. SCHMIDT**

For the Defendants:        FERGUSON, PRAET & SHERMAN
                          1631 East 18th Street
                          Santa Ana, CA 92705-7101
                          BY:  **BRUCE D. PRAET**

REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

2

1    Thursday, February 28, 2019                Fresno, California

2                *         *         *         *         *

3        (William Harmening testified on Direct Examination as

4         follows:)

5    BY MR. GALIPO:

6    **Q.**  Okay.  Is a reasonable option, if an officer actually

7    believes that someone is going to try to attack him with an

8    object like a pipe, is a reasonable option or alternative for

9    the officer to take a step or two back?

10   **A.**  Yes.

11               *         *         *         *         *

12       (William Harmening testified on Cross-Examination as

13        follows:)

14                          CROSS-EXAMINATION

15   BY MR. PRAET:

16   **Q.**  Good afternoon, sir.

17   **A.**  Good afternoon.

18   **Q.**  This is actually the first time you have ever been

19   permitted to testify in federal court as a police practices

20   expert, isn't it?

21   **A.**  Yes.

22   **Q.**  So just since this is your first time, can we have an

23   agreement that if you don't understand one of my questions,

24   you will let me know and not continue to answer?

25   **A.**  Yes.

1   **Q.**  And if you do understand the question, then you will just

2   limit your answer to my question, okay?

3   **A.**  Yes.

4   **Q.**  Great.  Although this is the first time you've actually

5   testified as a police practices expert, you have been retained

6   by attorneys in over 80 cases; is that right?

7   **A.**  It is approaching 80, yes.

8   **Q.**  Fair to assume you charge all those attorneys $150 an

9   hour?

10  **A.**  Yes.  Not quite.  There has been some that I have done for

11  free, but when I do charge, it is $150 an hour.

12  **Q.**  Do you know how much you have been billed or been paid by

13  the attorneys in this case so far?

14  **A.**  I would have to look at the invoice.  I want to say

15  approximately $2700.

16  **Q.**  Okay.  Now, in all the 80 plus or whatever cases that you

17  have actually been retained in, okay, you've actually

18  concluded that the officers were at fault in every single case

19  you've reviewed and been retained in, haven't you?

20  **A.**  No, that's not correct.

21          MR. PRAET:  Well, your Honor, deposition -- does the

22  Court have his deposition?

23          THE COURT:  Yes.

24          MR. PRAET:  Page 23, we will start with the question

25  at line 4, through line 11.

4

1        MR. GALIPO:  No objection.

2        THE COURT:  All right.

3   BY MR. PRAET:

4   **Q.**  You remember when I took your deposition, right?

5   **A.**  Yes.

6   **Q.**  You were under oath at that time?

7   **A.**  Yes.

8   **Q.**  And before I read this, did you want to change some

9   testimony?

10  **A.**  Well, I would like to add to it.

11  **Q.**  Let me read the question I asked you when I took your

12  deposition earlier this year.

13        "Question:  In every civil case that you have been

14         retained, you have rendered an opinion that the

15         officers acted improperly; is that correct?

16        "Answer:  No.  There are a handful where -- well, let

17         me back up, where I have actually been retained and

18         paid?  That's correct.  These are cases --

19        "Question:  That was my question.

20        "Answer:  Yeah, you are correct."

21        THE WITNESS:  Yes.

22  BY MR. PRAET:

23  **Q.**  Let me ask you again.  In every case in which you have

24  been retained and paid to give opinions about police officer

25  conduct, you've said, in those 80 or more cases, every time,

1  you felt the police officer was wrong?

2  **A.**  Well, I don't believe the number is 80, and I don't

3  believe I have said that.  It is approaching 80, but there are

4  cases I haven't started on, there are cases that are pending.

5  I think we talked about that.

6          However, I would agree with my prior testimony, where

7  I have offered a report and I have been paid for that report,

8  yes.

9  **Q.**  Put another way, of all the cases you have been retained

10  in, you've never once found that the involved officers acted

11  properly, have you?

12  **A.**  Those where I have been hired.  Can I explain that?

13  **Q.**  No.  You have been retained.  You have been paid money,

14  right?

15  **A.**  Well, that's half the story, yes.  I will agree with you.

16  **Q.**  Okay.  And of course, in this case, you feel that Officer

17  Shipman acted improperly, don't you?

18  **A.**  Yes.

19  **Q.**  Okay.  And you have been paid in this case, right?

20  **A.**  Yes.

21  **Q.**  Okay.  Now, in this case, Officer Shipman had been a

22  Fresno police officer for over ten years at the time, right?

23  **A.**  Yes.

24  **Q.**  And you would agree, you've reviewed his records, that

25  after the California Police Academy, he had in excess of 800

1    hours of additional training, California POST approved, right?

2    A.   Yes.

3    Q.   You are also aware that the Fresno Police Department has

4    somewhere close to a thousand police officers, right?

5    A.   Yes.

6    Q.   So let me go through a little bit of why you think you are

7    qualified to critique Officer Shipman in this case.  You went

8    through the academy in Illinois, what, over -- about 40 years

9    ago?

10   A.   1982.

11   Q.   Okay.  You were a deputy sheriff on some little 12-man

12   sheriff's department, in Illinois?

13   A.   I was a deputy sheriff in Illinois, yes.

14   Q.   And that was on a little 12-man rural sheriff's

15   department?

16   A.   It depends on what you mean by "little," but it was about

17   12 men, yes.

18   Q.   Not close to a thousand, like Fresno, correct?

19   A.   That's correct.

20   Q.   And I think you even told me at your deposition that where

21   you worked on this little 12-man department in Illinois, to

22   use your quote, "It is just a different way of policing a

23   rural county," didn't you?

24   A.   Yes.

25   Q.   A lot different than being a police officer in a city like

7

1    Fresno, isn't it?

2    **A.**   In some ways.  In other ways, it is probably just the

3    same.

4    **Q.**   And your entire county had less than 10,000 people, right?

5    **A.**   Yes.

6    **Q.**   You left your little sheriff's department in 1985 to

7    become an investment banker, right?  Or in the investment?

8    **A.**   In the investment industry.  I wasn't a banker, yes.

9    **Q.**   You quit as a cop?

10   **A.**   No.  I quit as a full-time police officer.  I went to

11   part-time status and maintained my commission, and became a

12   broker with Merrill Lynch.

13   **Q.**   Then the market crashed in 1990, so you went back and you

14   became the chief deputy of this 12-man department, right?

15   **A.**   No, no.  The market crashed in 1987, not 1990.  But you

16   are correct; in 1990, I went back to the department.

17   **Q.**   Okay.  So 1990, you came back, and then in 1993, you left

18   the sheriff's department to go with the state as a securities

19   or fraud investigator?

20   **A.**   Yes.

21   **Q.**   And after you left the sheriff's department, after a

22   couple years, in 1993, you never had any more exposure to

23   patrol work, police work, street work, right?

24   **A.**   I was never in uniform again, that's right.

25   **Q.**   You weren't answering calls?

8

1    **A.**   That's correct.

2    **Q.**   Chasing wanted suspects, and police pursuits, and things

3    like that, right?

4    **A.**   I wouldn't go that far, but I was never in uniform again

5    in a squad car, patrolling, that's correct.

6    **Q.**   During the few years you were a deputy sheriff in your

7    department, you were never actually involved in an

8    officer-involved shooting, were you?

9    **A.**   Yes.

10   **Q.**   You never pulled the trigger?

11   **A.**   No.

12   **Q.**   Right.  And you've never actually investigated an

13   officer-involved shooting, have you?

14   **A.**   Outside of expert witness work, no.

15   **Q.**   Outside of being paid as putting yourself out as an expert

16   recently, right?

17   **A.**   That's correct.

18   **Q.**   As an investigator, as a police officer, you never

19   investigated an officer-involved shooting, have you?

20   **A.**   No.

21   **Q.**   Now, compared to Officer Shipman's more than 800 hours of

22   California POST training after the academy, you have never

23   received any California POST training, have you?

24   **A.**   That's correct.

25   **Q.**   And POST is the exclusive agency that regulates all peace

1   officer training in this state, right?

2   **A.**   I believe in every state, yes.

3   **Q.**   California POST?

4   **A.**   In California, yes, yes.

5   **Q.**   You never taught any law enforcement classes in

6   California, right?

7   **A.**   No.

8   **Q.**   Maybe that was a bad question.  Your answer is you have

9   not, correct?  You said "no" to my question.  I want to make

10  sure it is clear.

11  **A.**   I have not, that's correct.

12  **Q.**   Okay, thank you.  Now, since there was a police dog

13  involved in this case, you've never been a canine handler,

14  have you?

15  **A.**   No, I have not.

16  **Q.**   In fact, on your little sheriff's department, they didn't

17  even have police dogs, did they?

18  **A.**   At that time, we did not.

19  **Q.**   You have never participated in a search like in this case,

20  where there was a police dog being deployed, have you?

21  **A.**   Yes, but it was not my department's canine.  I mean there

22  were times when the Illinois State Police would bring theirs

23  out, but, no, our department did not have a canine.

24  **Q.**   Page 12 of deposition, lines 17 through 19.

25          MR. GALIPO:  No objection.

1          THE COURT:  All right.

2          MR. PRAET:  (Reading:)

3          "Question:  Have you ever conducted a search with a

4          canine involved?

5          "Answer:  No."

6          THE WITNESS:  Well, I have not conducted a search

7     with a canine.  We didn't have one.

8     BY MR. PRAET:

9     Q.  And when you were searching for bad guys in your rural

10    county, you often did it by yourself, right?

11    A.  Yes.

12    Q.  Because you pretty much knew who were the bad guys in the

13    10,000 population, right?

14    A.  Well, sometimes.  Most of the time, probably.  The bigger

15    issue was I just simply didn't have anyone to back me up much

16    of the time.

17    Q.  You mentioned to Mr. Galipo about this deescalation

18    concept?

19    A.  Yes.

20    Q.  Deescalation, that concept, it requires two-way

21    communication, doesn't it?  In other words, a police officer

22    can't deescalate if another person is not receptive?

23    A.  Well, that's not the training.  The training is how to

24    attempt to deescalate someone, whether they are communicating

25    back.  Part of the goal of deescalation is to get rapport and

1    get them to communicate back.

2    **Q.**  How long does that take?

3    **A.**  There is no set answer.  It depends on the situation and

4    the individual and the factors involved.

5    **Q.**  Can you establish deescalation in two to three seconds?

6    **A.**  No.

7    **Q.**  You talked a lot about Tasers in this case.  You have

8    never been certified to use a Taser, have you?

9    **A.**  No.

10   **Q.**  And you never carried a Taser as a police officer, did

11   you?

12   **A.**  No.

13   **Q.**  You've never used a Taser and applied a Taser before, have

14   you?

15   **A.**  No.  We had no Tasers.

16   **Q.**  Right.  And the only thing you were certified to do is how

17   to download the data from the little chip, or pick up the

18   little things that come out when the Taser is fired, right?

19   **A.**  No.  That's a pretty simplistic description of it.  Can I

20   go through the training?  Or would you like me to?

21   **Q.**  You were certified in evidence recovery after the

22   application of a Taser, correct?

23   **A.**  Recovery and analysis, that's correct.

24   **Q.**  You have never been certified how to use a Taser.  You

25   have never used a Taser, right?

12

1    A.   That's correct.

2    Q.   But even in your limited capacity of post Taser

3    application analysis, I think you told us that oftentimes, a

4    Taser is not effective, right?

5    A.   There are times when it is not, yes.

6    Q.   And you talked about anything from 60 percent effective

7    rate up to I think you said Taser, because they are selling

8    these things, Axon, they say up to 94 percent, right?

9    A.   Correct.

10   Q.   When they say 94 percent, you said that was for target,

11   right?  That it will reach the target, not disable the person,

12   correct?

13   A.   That's correct.

14   Q.   So I think you cited a New York study at 70 percent

15   effective rate?

16   A.   Yes.

17   Q.   Meaning 30 percent of the time, even at New York, even if

18   they discharge the Taser, it didn't stop the person, right?

19   A.   Correct.

20   Q.   And you cited some that said 60 percent effective?

21   A.   Yes.

22   Q.   Meaning 40 percent of the time, even if they hit the guy,

23   it is not going to work; is that right?

24   A.   That's correct.

25   Q.   Okay.  You made mention of some -- was it a diagram or

1   something that was in the Taser material, with a crowbar?

2   A.   Yes.

3   Q.   And is that the little drawing thing that they include in

4   their material?

5   A.   Yes.

6   Q.   Now, that's got nothing to do with the manufacturer Axon

7   telling a police officer that they should use a Taser against

8   somebody with a crowbar, does it?

9   A.   No.  I believe I said it was just an image that's put in

10  their training manual.

11  Q.   Right.  And in fact, the caption below that image is,

12  "Don't shoot it at the groin or to the head"?

13  A.   That's correct.

14  Q.   And the individual with the crowbar in that image has it

15  down at his side, doesn't he?

16  A.   No.  I believe it is about in this area, pointing forward

17  or to the side.

18  Q.   Pointed horizontally?

19  A.   Yes.

20  Q.   It is not up like this, is it?

21  A.   No.

22  Q.   Okay.  And the person in that image, that little diagram,

23  is not advancing on the officer, is he?  He is standing

24  stationary?

25  A.   Well, it is a diagram.  I don't know.

1  **Q.**  There is nothing in the Taser material, diagram or

2  otherwise, that says Taser trains officers or instructs

3  officers to use the Taser against somebody with a crowbar,

4  does it?

5  **A.**  No.  There are things in the manual that tell you when not

6  to use a Taser, but I believe the rest is left to the training

7  module.

8  **Q.**  Right.  So to answer my question, nothing in any of the

9  Taser material tells officers to try to use the Taser with

10  somebody with a crowbar or baseball bat or similar, does it?

11  **A.**  No, I don't believe so.

12  **Q.**  Okay.  Getting to the incident why we are here today, I

13  know you don't have experience actually conducting searches

14  with canines, but would you at least agree that it was proper

15  for the canine officers in this case to give announcements to

16  a room before they searched telling anyone inside, "Come out

17  or you may be bitten by the dog"?

18  **A.**  Yes.

19  **Q.**  And should a trained police officer expect anyone inside

20  to come out with such a warning?

21  **A.**  Well, I don't know if they should expect it, but they

22  should certainly hope that they do, yes.

23  **Q.**  And again, I know you don't have any experience working

24  with police dogs, but we have heard from Officer Vincent, a

25  canine handler at Fresno, that as much as 85 percent of the

1    time, even when bad guys hear there is a police dog there,

2    they surrender.  Would you agree with that?

3          MR. GALIPO:  I'm going to object as lacks foundation.

4          THE COURT:  Sustained.

5    BY MR. PRAET:

6    **Q.**  Actually, I guess you don't have foundation, so.

7          If Mr. Casillas had complied with those canine

8    warnings to just come out, would it have been appropriate for

9    officers to just take him into custody and nobody gets hurt?

10   **A.**  Yes.

11   **Q.**  Okay.  I wrote it down, because when Mr. Galipo asked you

12   the questions when officers could use deadly force, you talked

13   about that.  You said only when there is an immediate threat.

14   Do you remember that?

15   **A.**  No.  But I -- what's your question?

16   **Q.**  Is that what your opinion is?

17   **A.**  I believe I said when there is a threat of death or great

18   bodily harm.

19   **Q.**  Okay.  So is it your opinion that a police officer can

20   only use deadly force when there is a threat of death or

21   immediate great bodily injury?

22   **A.**  To themselves or someone else, yes.

23   **Q.**  Aren't police officers trained that they have to just have

24   a reasonable belief that there is a deadly threat?

25   **A.**  Well, I believe that is a threat.

16

1   **Q.**  But you didn't include that when Mr. Galipo asked the

2   question, did you?

3   **A.**  I am confused by your question.

4   **Q.**  Well, I will try to make it more clear.  Is there a

5   reason, when Mr. Galipo asked you when a police officer could

6   use deadly force, you left out that a police officer is

7   trained they can use deadly force when they have a reasonable

8   belief that a potential of death or great bodily injury is

9   imminent?

10  **A.**  I don't know that I said that.  What I said -- I don't

11  disagree with that.  I believe that's a threat.  That's a

12  definition of a threat.

13          I believe what I said to Mr. Galipo was that it

14  requires more than just the fear of the officer.  There has to

15  be something in excess of that.

16  **Q.**  Okay.  So I just want to make sure we are clear then.  Is

17  it your understanding police officers are trained that they

18  have to have just a reasonable belief that there is an

19  imminent threat of death or serious bodily injury to

20  themselves or someone else?

21  **A.**  Yes.

22  **Q.**  Okay.  I don't know that you have actually seen the pipe

23  in this case.  Is this the first time you have seen it?

24  **A.**  Only in pictures.

25  **Q.**  Okay.  Here it is.  You talked about subjective fear is

1  not enough, right?

2  **A.**  Yes.

3  **Q.**  Okay.  Are you suggesting that any reasonable police

4  officer, seeing someone raising this, this pipe, within five

5  feet of that officer, and continuing to advance, even though

6  the officer has him at gunpoint, that the officer shouldn't be

7  scared?

8  **A.**  I don't believe I said that.  I wasn't talking about the

9  pipe.  I believe I was asked a general question about deadly

10  force.

11  **Q.**  Well, let me ask you a more specific question.  Do you

12  believe that any reasonable police officer seeing an

13  individual refusing to stop at gunpoint to a uniformed police

14  officer, and the person is advancing on the officer, with this

15  pipe, within five feet, that a reasonable police officer

16  should be scared?

17  **A.**  Well, it depends.  It depends.  And we have been through

18  this numerous times now.  I think there is more than just the

19  pipe.

20        If an individual is walking toward a police officer

21  with a pipe in their hand, and they have not been ordered or

22  commanded to do anything, they are not even making eye contact

23  with the officer, then I think what you have, if the officer

24  is in fear at that point, you have fear alone.

25        You don't have anything in support of that, which I

1    think is required under the sufficiency of fear.

2         I think if the officer is commanding the individual

3    to drop the pipe, to stop, to do other things, and they are

4    not complying, then I would agree with you.

5    **Q.**  Okay.  A police officer is pointing a gun at somebody.  Do

6    most people stop when a police officer points a gun at them?

7    **A.**  Well, I think if they see them.

8    **Q.**  Okay.

9    **A.**  If they are intelligent people and if they see them, I

10   think they would stop.

11   **Q.**  And do they continue to advance on the person with a

12   raised pipe, normal people?

13   **A.**  Normal people, if they see an officer pointing a gun at

14   them at a very close range, I think most people would stop.

15   **Q.**  Okay.  But it is not what the person with the pipe is

16   thinking.  It is what a reasonable police officer would

17   perceive; isn't that the standard?

18   **A.**  Well, you just asked me about what the person with the

19   pipe is thinking.

20   **Q.**  Nobody knows what they are thinking.  I'm asking you what

21   a reasonable police officer, holding a gun on somebody, would

22   think.  Would they be scared if the person continued to come

23   at them with this pipe raised?

24   **A.**  And I've answered that.  I think it requires more than

25   just an individual who is walking toward them with a pipe in

19

1  their hand.

2  **Q.**  And I'm hoping you are not leaving this out:  The guy

3  continues to come at the officer, even though the officer is

4  pointing a gun at them.

5  **A.**  I have already answered.  It assumes they have seen the

6  gun pointed at them.

7  **Q.**  So you are saying an officer shouldn't be scared unless he

8  knows the guy sees the gun?

9  **A.**  No.  I think you are saying that.  I think we are saying

10  two different things.

11       What I'm saying is if the individual is walking

12  toward a police officer, holding a pipe, the officer has not

13  given any commands to stop or to get down, then the officer

14  may be scared to death, for all I know.

15       The question is, does it require more than that to

16  use deadly force in the training?

17  **Q.**  Okay.  Let's first go to whether a reasonable police

18  officer should be scared.  Would you agree you should be

19  scared if you see somebody, you are pointing a gun at this

20  guy, and he continues coming at you, with this pipe raised at

21  chest level?  Should a reasonable police officer be scared?

22  **A.**  Well, you keep giving me the scenario that he's coming at

23  him with the pipe.  And I keep answering the question.

24       What is he doing with the pipe?  And give me more of

25  the scenario.  What's he doing with the pipe and what's the

1    officer saying to him?

2    **Q.**  Let's give you the whole scenario.  He has already run

3    from the cops in a high speed chase.

4    **A.**  Yes.

5    **Q.**  He's run on foot.  He has been confronted once at the car

6    stop.  Two more police officers have ordered him to drop the

7    pipe.  He takes it from down to horizontal to when he

8    confronts this officer now, five to seven feet, he has raised

9    it up to here, and the officer is pointing a gun at him.

10           Should that officer, any reasonable officer should be

11   scared, shouldn't they?

12   **A.**  I don't know.  I think there are officers that will be and

13   there are officers that would not be scared.  I don't know how

14   to answer that.

15   **Q.**  I guess unless you are facing it, right?

16   **A.**  Say that again?

17   **Q.**  Unless you are the officer facing that, with two to three

18   seconds to assess the situation, right?  You don't know if you

19   should be scared or not, do you?

20   **A.**  I don't think we can tell if an officer is scared or not.

21   I am confused by your question.  You are asking me to get into

22   the mind of a reasonable officer and talk about what they are

23   feeling in a particular situation.

24   **Q.**  You said that an officer's subjective fear is not enough.

25   So we do have to get into a mind of a reasonable officer,

1 don't we?

2 **A.** Well, I don't say that.  California POST says that.

3 **Q.** So I'm asking you, would a reasonable police officer --

4 and I don't want to go through it again, because I think

5 everybody else in this courtroom understands -- should a

6 reasonable police officer --

7           MR. GALIPO:  I'm going to object as argumentative as

8 phrased.

9           THE COURT:  Sustained.

10           MR. PRAET:  I will rephrase.

11 BY MR. PRAET:

12 **Q.** Should a reasonable police officer be afraid?  Would they

13 be scared when they are pointing a gun at somebody and they

14 continue to advance on them with this pipe?

15 **A.** I have no way of answering that.

16 **Q.** Okay.  You talked about eye contact.  You read all the

17 materials in this case, right?

18 **A.** Yes.

19 **Q.** Okay.  Did you read the deposition of his ex-wife, Beatriz

20 Catano?

21 **A.** I don't believe I did.

22 **Q.** Oh.  Before you got here, there was testimony -- you are

23 aware that he was under the influence of meth and alcohol at

24 the time?

25 **A.** Yes.

1  **Q.**  And there was testimony that when he used drugs and

2  alcohol, he would get trance-like.  Okay.  Is that something

3  that you talk about to police officers?  If somebody is in a

4  trance, does that make a difference?

5  **A.**  A "trance" is not a word I have ever used in police

6  training.

7  **Q.**  Okay.  What if a witness tells you when they are on drugs

8  and alcohol, they just become trance-like.  Is that something

9  that police officers should interpret as a factor to consider?

10        MR. GALIPO:  I'm going to object to the question as

11  vague, and assumes facts not in evidence, that Officer Shipman

12  was told that in this case.

13        THE COURT:  Sustained.

14  BY MR. PRAET:

15  **Q.**  Do you consider this, this two-foot pipe to be a deadly

16  weapon?

17  **A.**  No.  I consider it to be a two-foot pipe.

18  **Q.**  Do you think it should be viewed as a deadly weapon when

19  it is at chest level?

20  **A.**  Well, that's a different question.

21  **Q.**  I'm changing the question.

22  **A.**  My answer is, like any instrument, it could be used in a

23  deadly way, yes.

24  **Q.**  Just a few minutes ago, you said that when Officer Long

25  confronted Mr. Casillas, you said Officer Long was at the west

1   side of the detached apartment?

2   **A.**   I had that wrong.  On the east side.  I'm sorry.

3   **Q.**   Okay.  How much time have you spent reviewing this case?

4   **A.**   Mmmmm, quite a bit.

5   **Q.**   Okay.  Anything else you had wrong so far?

6   **A.**   Well, if you want to point it out, I will be more than

7   happy to correct it.

8   **Q.**   All right.  Was it proper for Officer Long to yell at

9   Mr. Casillas words to the effect of, "Stop, stop.  Put the

10  pipe down," when he first saw him?

11  **A.**   Yes.

12  **Q.**   If, as Officer Long has said, Mr. Casillas is holding this

13  pipe down towards the ground, should the officer have shot

14  him?

15  **A.**   No.

16  **Q.**   Okay.  As a uniformed police officer, pointing a gun at

17  Mr. Casillas, telling him to, "Stop, stop.  Drop the pipe,"

18  what should a reasonable police officer expect Mr. Casillas to

19  do?

20  **A.**   Drop the pipe and stop.

21  **Q.**   Of course, we know Mr. Casillas didn't do that.

22  **A.**   Correct.

23  **Q.**   So is it your understanding that Mr. Casillas then,

24  instead of dropping the pipe, raised it to horizontal level?

25  **A.**   I think that's what Officer Long stated, yes.

24

1   Q.   And then Officer Wright sees Mr. Casillas appear, coming

2   out of the breezeway, right?

3   A.   Yes.

4   Q.   And he, Officer Wright, at gunpoint, in uniform, again

5   yells, "Stop, stop.  Drop the pipe," right?

6   A.   Yes.

7   Q.   Good thing for him to say?

8   A.   Correct.

9   Q.   Okay.

10  A.   Right thing.

11  Q.   Right thing by Wright?

12  A.   Yes.

13  Q.   Even if Mr. Casillas raised the pipe to horizontal level

14  and is now walking away from Officer Shipman, should Officer

15  Shipman had shot him?

16  A.   No.

17  Q.   Okay.  If Mr. Casillas had simply obeyed and dropped the

18  pipe, and stopped, what should Officer Wright had done?

19  A.   Put him in handcuffs.

20  Q.   Okay.  Are you aware of any evidence in this case that

21  Officer Shipman has ever overreacted in his ten, 12-year

22  career?

23  A.   No.

24  Q.   You talked a little bit about lethal cover; you remember

25  that?

1   A.   Yes.

2   Q.   And you said that if an officer believes that they are

3   going to be dealing with somebody who is either suicidal or

4   known to be armed, that training is to have lethal cover there

5   if you are considering less than lethal, whether it be a dog,

6   beanbag, Taser, right?

7   A.   Well, I didn't say "armed."  It depends on what they are

8   armed with.  You would not do that against a firearm.

9   Q.   Okay.  A pipe?

10  A.   Yes.

11  Q.   So if an officer is expecting or going to confront

12  somebody with a pipe and going to try to deploy less than

13  lethal, be it a dog or Taser, they should have lethal cover in

14  case the previous option doesn't work, right?

15  A.   No.  That wasn't my testimony.

16  Q.   Is that what's recommended?

17  A.   No.

18  Q.   You don't have the training, though, do you?

19  A.   What training?  That's use of force training.

20  Q.   Taser training.  You don't have any Taser training?

21  A.   That's not Taser training.

22  Q.   Okay.  You don't know what Taser training is with respect

23  to lethal cover, do you?

24  A.   I know what deadly force, I know what force training is

25  with regard to deploying less lethal weapons and providing

WILLIAM HARMENING - X

26

1    contact and cover.

2    **Q.**   Do you know of any agency in the United States that allows

3    a police officer to have a Taser in one hand and a handgun in

4    the other at the same time?

5    **A.**   Yes.

6    **Q.**   Really?  What one is that?

7    **A.**   Fresno Police Department.

8    **Q.**   You can show me something in the Fresno Police Department

9    policy that says they can have a gun in one hand and a Taser

10   in the other?

11   **A.**   Well, if they -- I have to explain how they carry the

12   Taser, if I could, and why I believe that.

13   **Q.**   Okay.

14   **A.**   It used to be that police officers would carry the Taser

15   next to their firearm.  Easy access.  That, of course, became

16   a problem, and it became a problem not far from here, with the

17   BART shooting, in San Francisco.

18          Since that time, the training is you carry the Taser

19   on the opposite side or slightly to the front.

20          There is two ways to carry it.  One is in a

21   cross-draw configuration.  That keeps an officer from having

22   both in his or her hand at the same time.  You have to reach

23   across and pull it out.  You can't have your gun in your hand.

24          The other is a weak hand configuration, where you

25   simply carry the Taser just like your handgun on the other

1   side, at which case, you are trained to draw with your weak

2   hand, not your firearm hand, and use it that way.

3   **Q.**  You just told us, though, that you think there is

4   something at Fresno P.D. that allows an officer to have a

5   Taser in one hand and a gun in the other; is that what you

6   said?

7   **A.**  Well, yes.  I think we are saying two different things.

8   What I'm saying is there is no policy that I know of that

9   prevents it.  If they didn't want that, they wouldn't allow

10  them to carry the Taser the way they do.

11  **Q.**  Okay.  You haven't seen anything in the record that says

12  Fresno police officers can have one in one hand and one in the

13  other?

14  **A.**  I think a police officer can do whatever they need to do

15  under the situation at the level of force that's necessary.

16        My point is I don't believe there is anything

17  preventing them from holding both at the same time if they

18  were in the midst of a crisis and if it demands it.

19        If there is a Fresno Police Department policy that

20  says you cannot hold both at the same time, I'm not aware of

21  it.  If there is, I'm more than happy to look at it and agree

22  to it, but I have not seen it.

23  **Q.**  Are you familiar with the concept of sympathetic trigger

24  pull?

25  **A.**  I'm very familiar with it.

1   **Q.** Right.  So if you have two triggers in your hand and you

2   want to pull one, you might wrongfully pull the other, right?

3   **A.** Well, that's the purpose of training.  That's the purpose

4   of continuous training, is to prevent that.  That was the

5   problem in the BART shooting.

6   **Q.** Well, the BART shooting wasn't one in each hand; they drew

7   the wrong weapon?

8   **A.** Yes.

9   **Q.** And that's why they keep one on one side and one on the

10  other, is so they don't draw them at the same time or draw the

11  wrong one, right?

12  **A.** Yes, but they are trained to draw that Taser in one of two

13  ways, either in a cross-draw or with their weak hand.

14  **Q.** Since we know that Mr. Casillas refused to surrender when

15  guns were pointed at him at the initial car stop, we know that

16  he refused to surrender to the canine officers, we know he

17  ignored the commands of Officers Wright and Long to, "Stop,

18  drop the pipe," let's get into the part where he enters the

19  den.  Or I think we are calling it "den."

20  **A.** Breezeway, yes.

21  **Q.** Okay.  What is your understanding of the position he held

22  this pipe when he entered that room?

23  **A.** Well, there is two positions.  I believe when he entered

24  the room, just outside, we know from Wright and Long that he

25  had brought it to waist height, holding it horizontal.

29

1        I believe Mr. Shipman's testimony or his statement

2   was he was holding it upright, approximately two feet of it

3   above his hand, at chest level, to his side -- and to his

4   side.

5   **Q.**   Upright?

6   **A.**   Yes.

7   **Q.**   So the top of the pipe was at or above head level,

8   correct?

9   **A.**   It is -- he was no more specific than that.

10  **Q.**   So should a police officer interpret someone raising the

11  pipe from horizontal to perpendicular as a threatening

12  gesture?

13  **A.**   Well, I don't believe in his statement, I don't believe he

14  said he saw him raise it.  He simply said where he was holding

15  it.  It could be, but perhaps not.  It is one variable in a

16  number of circumstances that have to be weighed by the

17  officer.

18  **Q.**   I when I took your deposition, you told me you didn't

19  think the position of the top of the pipe was important.  Have

20  you changed that?

21  **A.**   In what context did I say that?

22  **Q.**   I asked you about the position -- I can read it for you

23  again, the pipe -- and you said it doesn't matter where the

24  top of it is?

25  **A.**   Again, I would have to look at the context, but I probably

1  did say that.  My point is what is important is what he is

2  doing with the pipe, how he is holding it, where his hand is

3  at.  That was my point.

4  **Q.**  We know what he is doing with the pipe, that he has raised

5  it from horizontal up at this level, right?

6  **A.**  Well, we don't know that Officer Shipman knew that.  We

7  know that Officer Shipman said he was holding it to his side

8  approximately chest level, with approximately two feet of it

9  extending above his hand.

10  **Q.**  It is your understanding Officer Shipman estimated that

11  Mr. Casillas was about five to seven feet in front of the

12  officer, continuing to advance, when the officer momentarily

13  considered his Taser; is that your understanding?

14          MR. GALIPO:  Object.  I'm going to object.  I believe

15  that mischaracterizes the testimony, in part.

16          THE COURT:  Okay.  Go ahead and rephrase it.

17          MR. PRAET:  I'm sorry?

18          THE COURT:  Rephrase.

19          MR. PRAET:  Okay.

20  BY MR. PRAET:

21  **Q.**  What's your understanding of where Officer Shipman

22  believed -- and I understand Mr. Casillas is moving this whole

23  time, I believe Mr. Casillas was.  When Officer Shipman

24  momentarily considered his Taser, where do you think Shipman

25  has him?

1   **A.** I don't believe. I would be open to hearing what his

2   statement was, but I don't recall. I mean we have a limited

3   number of feet inside that breezeway. I recall him saying

4   five, five feet numerous times for different things. I don't

5   recall.

6   **Q.** Are we back out in the breezeway? I'm talking about in

7   the room.

8   **A.** That's what I call the "breezeway." There are two

9   breezeways.

10  **Q.** Okay. Well, does it matter how close Mr. Casillas is when

11  Shipman momentarily considers his Taser?

12  **A.** In what regard?

13  **Q.** Whether he should use the Taser or not.

14  **A.** I'm not exactly sure I understand, but if the question

15  does -- if the question is did he have enough time to pull the

16  Taser out and deploy the Taser, given the distance of

17  Mr. Casillas, is that the question?

18  **Q.** Well, I guess you don't know how far Mr. Casillas was, do

19  you?

20  **A.** I believe he said five to seven feet.

21  **Q.** Okay. Let's use that number then. Is there time, if

22  Mr. Casillas continues to advance with this pipe, for Officer

23  Shipman to put his gun back in his holster, pull and activate

24  the Taser, and deploy it before Mr. Casillas gets to him with

25  the pipe?

1   **A.**   I don't believe he is going to put his gun back in his

2   holster.

3   **Q.**   You want him to have one in each hand?

4   **A.**   I believe he is going to pull his Taser and use it.

5   **Q.**   By the way, do you know what it takes to remove a Taser

6   from a Taser holster?

7   **A.**   Yes.

8   **Q.**   What?

9   **A.**   It depends on which holster, but there is a locking

10   mechanism.  There is two types of holsters I'm aware of.  One,

11   you disengage the locking mechanism with your finger as you

12   are pulling it out.

13          The other is you disengage the locking mechanism with

14   your thumb as you are pulling it out.  It is spring-loaded, so

15   there is a click.

16   **Q.**   Did you do any research since I took your deposition in

17   January?  Because you didn't know what kind of holster he had

18   at that point.

19   **A.**   Well, you didn't just ask me what kind of holster he had.

20   **Q.**   Do you know what kind of holster he had?

21   **A.**   No.  I told you the two types of Taser holsters I am aware

22   of.

23   **Q.**   When I took your deposition, you told me there was no

24   difference between a gun holster and a Taser holster?

25   **A.**   In terms of what?

1  Q.  Configuration and how they work.

2  A.  I don't believe --

3         MR. GALIPO:  Your Honor --

4         THE WITNESS:  I'm --

5         MR. PRAET:  I will read it, your Honor.  Page 68,

6  lines 19 -- I'm sorry, lines 10 through 20.

7         MR. GALIPO:  No objection.

8         MR. PRAET:  Okay.

9         "Question:  Do you have some knowledge of Taser

10         holsters?

11         "Answer:  Yes.  It's a holster.  He either unsnapped

12         it or there are particular types of holsters where

13         you can disengage by pressing a button.  It doesn't

14         matter.  He did something to disengage it, by his own

15         statement.  That's all I'm saying.

16         "Question:  You don't know what kind of holster he had

17         for his Taser?

18         "Answer:  Oh, I think I probably did because it is

19         shown in pictures, but I can't sit here today and

20         tell you."

21         THE WITNESS:  Yes.

22  BY MR. PRAET:

23  Q.  Does it make a difference in how much time it takes for

24  him to disengage or somehow get that Taser out of that

25  whatever holster he had?

34

1   **A.**  I'm confused what that has to do with the testimony you

2   just read.  Does it make a difference how long it takes?  Yes.

3   **Q.**  Okay.  And how long does it take?

4   **A.**  It depends on the officer.  I mean police officers are

5   trained.

6          And I might add that the firearms holsters, many of

7   them are the same way.  A Blackhawk holster --

8   **Q.**  You promised me a minute ago that if you understood my

9   question, you would stick to the question.

10  **A.**  I understand your question and I'm answering it.

11  Depending on -- it doesn't matter which one.  Police officers

12  are trained to do it all in one motion, to disengage and pull

13  it out at the same time.

14         I think the point I was making to you in my testimony

15  was he had already disengaged it.  That's what the click was.

16  And I think my point to you was if he had already reached that

17  point, it probably was no difference in time by going ahead

18  and pulling it out and pulling the trigger, compared to

19  reengaging it and then reorienting with his firearm.

20         I think my testimony was there would be essentially

21  no difference in the time it would take to do that.

22  **Q.**  So, again, I know you've never pulled a Taser out of a

23  holster, but how long do you think it would take for him to do

24  that?

25  **A.**  A split second.

1   **Q.**  Okay.  And how much distance is Mr. Casillas going to

2   cover with that pipe, when he is five to seven feet, in that

3   split second that it takes the officer to disengage and point

4   his Taser?

5   **A.**  I have no idea.

6   **Q.**  Oh.  By the way, do you just pull it out of the holster

7   and pull the trigger?

8   **A.**  No.

9   **Q.**  What do you have to do?

10  **A.**  No.  Part of the training is you do, essentially, two

11  things at the same time:  You disengage it, pull it out, and

12  take it off safe mode, and then you are ready to pull the

13  trigger.

14  **Q.**  Disengage, take it off safety, acquire the target, and

15  discharge the darts?

16  **A.**  Yes.

17  **Q.**  And what's the effective range, even if it is 60 percent

18  of the time, effective range of a Taser, do you know?

19  **A.**  Well, police officers carry 25-foot cartridges, so it's

20  effective anywhere from about four inches up to roughly 25

21  feet.

22       You have to have enough distance between you and the

23  target to get enough spread on the two probes for them to be

24  effective.  You have to have more than four inches of spread.

25  **Q.**  I know you haven't had the training, but is it your

1  testimony here, putting yourself out as an expert, that a

2  Taser can be effective over four inches?

3  **A.**   No.   When I said four inches, I mean the distance between

4  the two probes.   You have to have enough distance to get over

5  four inches of spread.

6  **Q.**   How much distance is that, to get at least a four-inch

7  spread between the probes?

8  **A.**   It spreads about one foot for every nine feet of distance.

9  **Q.**   So roughly, math, three feet at least, the person has to

10  be, in order to get at least four inches?

11  **A.**   Probably a little less, because there is some distance to

12  begin with between the two probes.   One of them is canted at

13  about four degrees.   So the minute they leave the cartridge,

14  they are going to be separating.

15        I would have to look.   It is a couple of feet,

16  certainly, it is going to be effective.

17  **Q.**   Would it surprise you, sir, if Axon, the manufacturer of

18  the Taser, actually trains officers that the effectiveness of

19  a Taser is drastically reduced at a distance of less than

20  seven to ten feet?

21  **A.**   I don't disagree with that.   It is reduced.

22  **Q.**   Okay.   So it is reduced from even maybe up to 60 percent

23  effective rate now to something less than that if the person

24  is closer than seven to ten feet, correct?

25  **A.**   No, no.   I think it is a little more complicated than

37

1    that.  I would have to see the study and what they took into

2    account.

3         I think what Axon, has when they publish their

4    results, they are getting their results from their own server

5    and the uploaded data from the Tasers.  So they are simply

6    looking at the number of shots compared to the number of shots

7    where there was actually a current.

8    **Q.** Okay.  If somebody is already five to seven feet, as in

9    the facts we have been discussing, then you are not -- even

10   Taser's recommended seven to ten feet, are you?

11   **A.** No.  What Taser says, less effective.  I don't disagree

12   with that.

13   **Q.** Less effective than as much as 60 percent?

14   **A.** No.  I think you are mixing two statistics that perhaps

15   aren't related.

16   **Q.** Okay.  We also know in this case Mr. Casillas was under

17   the influence of both methamphetamine and alcohol.  Are you

18   aware that that can also reduce the effectiveness of the

19   Taser?

20   **A.** There are a number of things.  That's one of them.

21   **Q.** Okay.  So now we have got less than seven to ten feet plus

22   alcohol plus meth, and a 60 percent effective rate under ideal

23   circumstances; is that right?

24   **A.** No.  I don't think there is any way to combine those

25   statistics.

1   **Q.** For you or a police officer, right?

2   **A.** Or for you.

3   **Q.** Right. Is it your opinion that Officer Shipman, under the

4   facts that we have gone over ad nauseam in this case, that

5   Officer Shipman should not have reasonably considered

6   Mr. Casillas to be a threat of serious bodily injury, with

7   this steel pipe, continuing to advance at a distance of five

8   to seven feet; is that your opinion?

9   **A.** What words did you use? Reasonable?

10  **Q.** Yes.

11  **A.** I think it is probably a legal term. My opinion is, was

12  it appropriate for Officer Shipman to have shot when he did,

13  given the circumstances? I don't believe it was.

14  **Q.** Let's not get to the discharge of the weapon yet. Should

15  a reasonable police officer consider, with their training,

16  under all these circumstances, five to seven feet, not

17  stopping, gun pointed at him, coming within five to seven

18  feet, with this pipe raised, should a reasonable police

19  officer consider that to be an imminent threat of death or

20  serious bodily injury?

21  **A.** Not necessarily. I think a reasonable police officer

22  would command him to stop, to put the pipe down. Keeping in

23  mind that I believe the shots rang out in exactly one second,

24  approximately one second.

25          So the question is, would a reasonable officer -- I

1    guess for me, would a reasonable officer have commanded him to

2    stop, put the pipe down, backed up, pulled his Taser out, all

3    of those things.

4    **Q.**  What you meant to say, would a reasonable police officer

5    have time to do all those things?

6    **A.**  No, that's not what I meant.

7    **Q.**  By the way, your two seconds that you came up with an

8    estimate, you don't know when, in the sequence of things, that

9    Officer Long put out that "He has got the pipe," on the air,

10   do you, on the radio?

11   **A.**  I never testified to that.  I said Officer Long got on the

12   radio and said, "He is going around front."

13   **Q.**  What's the next transmission?

14   **A.**  "Shots fired."

15   **Q.**  So you don't know when, in Officer Long's movement along

16   the south side or out to the garage, when Officer Long said,

17   "He is going around to the front"?

18   **A.**  No.  I just base that on experience.

19   **Q.**  He could have said that two seconds after Mr. Casillas has

20   already entered the room, couldn't he?

21   **A.**  He could have.

22   **Q.**  Okay.  And if Officer Long said, "He is going around the

23   front," two seconds after Mr. Casillas has already entered the

24   room, we have another two seconds until "shots fired" are put

25   out, right?

40

1       MR. GALIPO:  I'm going to object to -- I will

2  withdraw the objection.

3       THE COURT:  All right.

4       THE WITNESS:  No.  I don't believe so, because you

5  still have the statements of Officer Wright and Officer

6  Shipman themselves, and I believe they have both said one to

7  two seconds.

8  BY MR. PRAET:

9  Q.  Okay.  You would agree nobody had a stopwatch with them?

10  A.  I would agree.

11  Q.  Okay.  Has it been your experience that police officers

12  are precise in their estimates of time when they are facing

13  somebody coming at them with a steel pipe?

14  A.  In what regard?  Are you talking about Officer Long or

15  Officer Shipman?

16  Q.  Let's talk about Officer Shipman.

17  A.  Yes.

18  Q.  Okay.  Do you believe police officers are generally

19  precise in their time estimations when they are facing

20  somebody coming at them with a steel pipe?

21  A.  Well, it depends on what you mean by "precise."  I don't

22  believe anyone is ever 100 percent precise.  I think there are

23  times when they are not precise, and it is a function of how

24  much stress they are under, and that could impact it

25  certainly.

1    **Q.**  As much as a couple of seconds, right?

2    **A.**  Perhaps, yeah.

3    **Q.**  Okay.  You would agree that in order for -- well, Officer

4    Shipman doesn't have to wait for Mr. Casillas to actually

5    swing this pipe at him before he can consider it a deadly

6    threat, does he?

7              MR. GALIPO:  Objection.  Vague as phrased and

8    incomplete hypothetical as phrased.

9              THE COURT:  Sustained.

10   BY MR. PRAET:

11   **Q.**  Let me go to the exact question I asked you at your

12   deposition.  Under all the circumstances we are talking about,

13   Mr. Casillas is five to seven feet from Officer Shipman, he

14   has got his gun pointed at him, and Mr. Casillas is continuing

15   to advance.  Does Officer Shipman have to wait for

16   Mr. Casillas to actually swing the pipe before he considers

17   him to be imminent threat of deadly force?

18   **A.**  No.

19   **Q.**  Thank you.  And does Officer Shipman have to wait for

20   Mr. Casillas to verbally threaten him before should consider

21   him to be an imminent threat of deadly force?

22   **A.**  No.

23   **Q.**  Now, when I took your deposition earlier this year, you

24   told me that the officers shouldn't consider this to be an

25   imminent deadly threat until Mr. Casillas is at arm's length

42

1  | plus two feet, correct?

2  | **A.**  I would have to see in what context we were talking about

3  | that.

4  | **Q.**  Let's look.  Okay.  Well, put it into context.

5  |         Your Honor, page 95, line 7 through 23.

6  |         MR. GALIPO:  No objection.

7  |         THE COURT:  All right.

8  |         MR. PRAET:  (Reading:)

9  |         "Question:  And is -- at what point is someone capable

10 |         of using a two-feet steel pipe as a deadly weapon?

11 |         What distance?

12 |         "Answer:  Well, they got to be close enough to strike

13 |          them with it.

14 |         "Question:  What's that?

15 |         "Answer:  Arm's length.

16 |         "Question:  Plus two feet, right?

17 |         "Answer:  Yes, approximately."

18 |          Okay.

19 |         THE WITNESS:  Yes.

20 | BY MR. PRAET:

21 | **Q.**  So arm's length plus two feet, somebody can consider this

22 | a deadly weapon, deadly threat, right?

23 |         MR. GALIPO:  I object as vague and incomplete

24 | hypothetical as phrased, whether they are swinging it or not.

25 |         THE COURT:  Sustained to the form of the question.

43

1    BY MR. PRAET:

2    Q.  You just told us they don't have to wait for them to swing

3    it, do they?

4    A.  No.

5    Q.  Right.  So and I just read your testimony -- I can read it

6    again -- at what point should someone consider two-foot steel

7    pipe to be a deadly weapon?

8          You said two feet plus arm's length, right?

9    A.  I'm hearing two different things.  Can you read the

10   question again and my answer?

11   Q.  Sure.

12         "Question:  And is -- at what point is someone capable

13          of using a two-foot steel pipe as a deadly weapon,

14          what distance?

15         "Answer:  Well, they got to be close enough to strike

16          them with it.

17         "Question:  What's that?

18         "Answer:  Arm's length.

19         "Question:  Plus two feet, right?

20         "Answer:  Yes, approximately."

21   BY MR. PRAET:

22   Q.  Right?

23   A.  Yes.

24   Q.  Don't have to wait for them to swing it, right?

25   A.  That's correct.

WILLIAM HARMENING - X

44

1   **Q.** So when a person with this two-foot steel pipe is close

2   enough to the potential recipient of this pipe, two foot plus

3   arm's length, they can consider them to be a deadly threat,

4   correct?

5   **A.** That's not what I'm saying.  You are mischaracterizing it.

6   Can I tell you what I said?

7   **Q.** I think we read what you said.

8   **A.** But what you read is not what you just said.

9   **Q.** Okay.

10  **A.** You asked me in the deposition, correct me if I'm wrong,

11  at what point can he use it.  It is a contact weapon.  He is

12  not going to use it from ten feet away.  He is going to use it

13  when he is arm's length plus two feet.

14         That's all the question was, and that's how I

15  answered it.  That has nothing to do when they should consider

16  it a deadly threat.

17  **Q.** So if a person is within distance capable of inflicting

18  threat with this pipe, arm's length plus two feet, the officer

19  shouldn't consider him to be a deadly threat?

20  **A.** That wasn't the question.

21  **Q.** Well, that's my question now.

22  **A.** No.  They absolutely could, under certain circumstances,

23  consider it a deadly threat.  Your only question was when

24  could the pipe be used.  Please correct me if I'm wrong.

25  **Q.** When is someone capable of using a two-foot steel pipe as

1   a deadly weapon?  Two feet plus arm's length?

2   **A.**   Yes.

3   **Q.**   And I don't want to say "beat a dead horse," might be a

4   bad analogy, but someone is capable of inflicting deadly force

5   with this pipe once they get within two-foot length of the

6   pipe plus arm's length, aren't they?

7   **A.**   That's correct.

8   **Q.**   Okay.

9          THE COURT:  It's a little bit after 3:00 o'clock.  We

10  will take our afternoon recess, 15 minutes.

11         MR. PRAET:  Thank you, your Honor.

12      (The jury left the courtroom.)

13         THE COURT:  Anything before we take our break?

14         Plaintiffs' side, anything?

15         MR. GALIPO:  There is one issue, your Honor.  I think

16  counsel asked the witness whether or not he has any evidence

17  that Officer Shipman ever overreacted in his career, and there

18  is two incidents, at least we believe, he overreacted when he

19  shot unarmed people.

20         So I wasn't really expecting that question.  And I

21  think from our view, it may have opened the door to that

22  issue, and I didn't want to go there without bringing it up to

23  the Court and counsel.

24         But in light of our discussion, I thought it was his

25  suggesting on the record that this officer has never shot

1   anyone, he has never overreacted at any time, and that's

2   contrary to the evidence in this case.

3         So I think it was an inappropriate question which

4   opened the door to an area that I wasn't considering going

5   into, but now, based on this record, I think it would be fair

6   to the plaintiffs to get into it.

7         THE COURT:  Defense?

8         MR. PRAET:  Your Honor, I think that that's an

9   awfully big stretch.  Obviously, Mr. Galipo is aware of prior

10  instances.

11        The jury hasn't heard anything.

12        The witness said, "No, I don't know of any," and we

13  moved on.  Certainly not intending to say.  I never asked him

14  if he has ever been in a shooting, never shot somebody, simply

15  said is there any evidence that he overreacted.

16        MR. GALIPO:  But that's the implication.

17        THE COURT:  Okay.  For now, and I'm going to leave

18  the door open, I will go ahead, and to the extent that there

19  is a proffer now that testimony can be elicited with respect

20  to other incidences involving Officer Shipman, I'm going to go

21  ahead and sustain the objection for now, mainly because I'm

22  not sure that it totally opened the door.

23        Basically, it was more of this witness' knowledge.

24  There is an implication, of course, because this witness was

25  unaware of it, that it never happened.  I totally understand

1  that.

2       But it does open the door to areas which I think,

3  under 403, is problematic, because then we get into histories,

4  and I'm not aware of all the details, but I don't want too

5  many trials as to what might have occurred in prior instances

6  that justified it or not, whether or not there were internal

7  affairs investigations, lawsuits, et cetera.  And that is

8  problematic.

9       So at least at this point in time, it did not open

10  the door to a broader inquiry as to prior incidences, and to

11  the extent it might have under 403, I'm not going to allow it.

12       But as you consider and think about it, if there

13  needs to be a cautionary instruction or it is significant

14  enough that I would actually admonish the jury to disregard

15  that response, then I will certainly do that also.

16       MR. PRAET:  And I don't intend to inquire further or

17  bring it up in closing.  I will make that representation on

18  the record.

19       MR. GALIPO:  We may ask for some admonition.  We are

20  going to think about it.

21       THE COURT:  Absolutely.  That's fine.  Anything else?

22       I'm going to tell you folks now, because I'm sure you

23  are under internal pressure.  When I go out, I'm going to

24  reschedule whatever I had at 4:00.  We will still break at

25  4:00, if schedule wise.  I know you have been thinking about

48

1    it, but we can go after 4:00.  It is not an issue with me

2    anymore, so don't consider that.  We can go after 4:00 to

3    4:30, if necessary.  I leave that up to you, but I'm telling

4    you rescheduling, for me, is not an issue.

5         We will take our 15-minute break from now.  We will

6    tell the jury we have a couple of issues we needed to address.

7         You had a witness you wanted to bring on?

8         MR. PRAET:  I do.

9         THE COURT:  You can confer whether or not you want to

10   take her out of order or not after the break.

11        MR. PRAET:  We will do that at the break.

12        THE COURT:  15 minutes from now.

13   (Recess)

14        THE COURT:  All right.  Please be seated.  Anything

15   before we have the jury come in?  Plaintiffs' side?

16        MR. GALIPO:  Yes, your Honor.  Just one update.  What

17   we think we are going to do, after we finish with this

18   witness, I'm going to allow the defense to call their witness

19   they want to call, and I think that's going to bring us to the

20   end of the day, because I was going to call the last

21   plaintiff, who is the current wife of the decedent, but

22   because we are going, she is going to go first thing tomorrow

23   morning.  And she won't be very long.  And we have, I think,

24   the police practice expert of the defense.

25        MR. PRAET:  And Mr. Verduzco.

WILLIAM HARMENING X

49

1          MR. GALIPO:  Correct.

2          MR. PRAET:  Very short witness.

3          MR. GALIPO:  Two witnesses and then the expert, so we

4  clearly will conclude the testimony by noon, or close to it.

5  Just to give you an update.

6          THE COURT:  Great, okay.  If you want to work on the

7  jury instructions, the verdict form, if you want to do that

8  this evening.

9          MR. GALIPO:  Again, as I said yesterday, if it is

10  good for everyone to do the closings tomorrow afternoon, it's

11  fine and good with me.

12          I don't know whether you want to make an inquiry.

13  The juror had kind of worked out that issue, but if you want

14  to make further inquiry, I don't know, but if it is good with

15  court and counsel, I'm fine to do the closing tomorrow

16  afternoon.

17          MR. PRAET:  I think that would be good.  We can do

18  the jury instructions, get those finalized, and the special

19  verdict, and I think we are both prepared to do closings

20  tomorrow.

21          MR. GALIPO:  So long as it is okay with the juror.

22          THE COURT:  Got it.  We will have the jury come back

23  in.

24      (The following proceedings were had in the presence of the

25        jury, to wit:)

50

1    THE COURT:  Please be seated.  The jury has returned.

2    We will continue with testimony.

3    MR. PRAET:  Thank you, your Honor.

4    BY MR. PRAET:

5    Q.  Before the break we were talking about what you thought

6    was striking distance and I think we established arm's length

7    plus two feet of pipe, is that your recollection?

8    A.  Yes.

9    Q.  Of course, that would also take into consideration not

10   only the two feet plus the arm's length, but whatever forward

11   momentum the person had as well, right?

12   A.  It could.  Whatever it takes to make contact, yes.

13   Q.  Okay.  So is it your opinion that if we use Officer

14   Shipman's estimate of five to seven feet for Mr. Casillas

15   continuing to move towards him, with this pipe raised, chest

16   level, top of his head, that the officer should have holstered

17   his gun and deployed his Taser?

18   A.  Yes.  And I believe he had already started to deploy his

19   Taser by that point.  And no, I don't think he should have

20   holstered his gun.

21   Q.  You think he should have had one in each hand?

22   A.  I think he could have easily deployed his Taser, yes.

23   Q.  How long does it take for the officer to disengage the

24   holster, take the Taser safety off, acquire a target, and

25   deploy the darts?

1   **A.**   A matter of tenths of a second, probably.

2   **Q.**   Okay.  How much distance can Mr. Casillas cover from the

3   five to seven feet during that, I guess you think tenths of a

4   second?

5   **A.**   I don't believe that.  I believe at that point, he has

6   already shot.  I believe if we look at the distance from

7   Officer Shipman to the door, when he came in -- and the

8   question is, did he have time to deploy his Taser, take it off

9   safe mode, take it out of his holster -- yes, I believe that

10   was sufficient.  Plenty of time to do that.  I believe the

11   five to seven feet, he is already on the ground.

12   **Q.**   You think that Officer Shipman shot him when he saw him

13   come through the door?

14   **A.**   I believe within one second, within probably just two,

15   maybe three steps, I believe he started shooting, yes.

16   **Q.**   And that's based on Officer Long putting out, "He's going

17   to the front," to the shots ringing out?

18   **A.**   Based on that, and based on the location of the body or

19   what we have indicating the location of the body, which would

20   be the blood pools, which would be the evidence placard.  It

21   is based on the standard gait of a grown man, which is about

22   30 inches.  It is my opinion, yes, that he took two, maybe

23   three steps when the shots rang out.

24   **Q.**   You have no expertise.  That's just your lay opinion?

25   **A.**   Well, what expertise are you referring to?

52

1   **Q.**  Well, you are here as an expert.  You don't have any

2   expertise to a person's gait, their walking speed, crime scene

3   analysis, blood smear analysis, or anything like that?

4   **A.**  Yes, I do.

5   **Q.**  You didn't offer any opinions when you did your report on

6   that in this case, did you?

7   **A.**  No opinions regarding the blood spatter.

8   **Q.**  Or body position?

9   **A.**  But I will say that you did ask me about that in the

10  deposition, and I did answer that.

11  **Q.**  You told me you based that on what you thought was, what

12  did you say, two seconds between Long saying, "He is going

13  around the front," and --

14  **A.**  No.  I'm referring to the blood.  I think you asked me

15  about that in the deposition.

16  **Q.**  Could we pull up 102, please.  Do you see that on your

17  monitor there, sir?

18  **A.**  Yes.

19  **Q.**  Do you see the blood there?

20  **A.**  Yes.

21  **Q.**  And do you know how far that blood is from the bottom

22  step?

23  **A.**  Well, which spatter?

24  **Q.**  Take the larger one.

25  **A.**  Well, there is two different types there.  The larger one?

1    I believe was identified by the Fresno Police Department
2    investigators as being caused by the patch that was put on the
3    wound to stop the bleeding.  And I believe it is a smear.

4          I believe the other two are pools of blood that are
5    probably consistent with the location of the wounds.  And I
6    would suggest they are two to three feet back, maybe four
7    feet.  It is hard to tell with this.

8    **Q.**  And the main wound was to the upper abdomen, right?

9    **A.**  Correct.

10    **Q.**  Okay.  So is it your understanding from all the officers
11   who then entered the room that he was laying on his chest; we
12   have got what you are saying you think is the corresponding
13   blood two to three feet from the bottom step, right?

14   **A.**  There is two different pools.  And I think the testimony
15   of the officers in their statements was that he was flailing
16   around.  He was moving around, moaning, groaning.

17   **Q.**  You have some testimony he was flailing around?

18   **A.**  I think there is one of the statements one of the officers
19   said he was moving around.

20   **Q.**  All right.  And I don't want to take forever, but can you
21   tell me where you got that?

22   **A.**  No.  I would have to go back and look at the statements.

23   **Q.**  You are not aware of where that came from; you just think
24   that?

25   **A.**  Think what?

54

1   **Q.**  That he was flailing around.  That's the first I've heard.

2   **A.**  What's that got to do with where it came from?

3   **Q.**  Because you are putting his body position in respect to

4   these spots.

5   **A.**  That's one of the things I used.  I also used evidence

6   placard number 2, which is traditionally put at the head of

7   the subject.  Oftentimes, they will chalk mark an arrow

8   towards the feet.

9   **Q.**  You think that evidence placard number 2 is where his head

10  was?

11  **A.**  It is one of them.  The evidence placards aren't even in

12  this picture.

13  **Q.**  I know.  But you did --

14  **A.**  It may be the blood smear is number 2.  I would have to

15  take a look.

16  **Q.**  You did read the file in this case before you offered your

17  opinions, didn't you?

18  **A.**  Yes.

19  **Q.**  Why don't you take the white notebook there, the larger of

20  the two.  Joint Exhibit 108.  I don't think you are on 108.

21  **A.**  105.

22  **Q.**  I'm sorry, 106.  My apologies.  106.

23  **A.**  Yes.

24  **Q.**  Okay.  You see where placard number 2 is the blood --

25  **A.**  Yes.

55

1   **Q.**  Right?  It is not his head, is it?

2   **A.**  Well, I just said, it may also be the blood smear.  And it

3   is.

4   **Q.**  Okay.

5   **A.**  It is the control swab.

6   **Q.**  I just don't want to mislead the jury.  So number 2, the

7   blood smear is where his chest wound was, correct?

8   **A.**  No.  I don't believe so.

9   **Q.**  What is it?

10  **A.**  It is a control swab.

11  **Q.**  Okay.  Is there any indication where his head was?

12  **A.**  Well, in relation to the pool of blood, you can determine

13  that if the pool of blood matches up with the wounds.

14  **Q.**  Okay.

15  **A.**  We are in a very confined space.  I'm not sure how else to

16  answer that.

17  **Q.**  Okay.  If we assume one of those blood spots is from his

18  wound to his abdomen; is that fair?  That's the one that bled

19  the most, right?

20  **A.**  Yes, it could be.

21  **Q.**  And officers have testified that he was laying with his

22  head pretty much at Officer Shipman's feet, at the bottom of

23  the stairs.  Do you disagree with that?

24          MR. GALIPO:  I'm going to object to leading.  I

25  withdraw the objection.

WILLIAM HARMENING - X

56

1           THE COURT:  All right.

2           THE WITNESS:  How far away from the steps?  I don't

3    disagree.  In fact I put that on my chart, which you have.

4    BY MR. PRAET:

5    Q.  If you don't disagree, then we don't need to discuss.

6           You agree that Mr. Casillas fell with his head

7    essentially at Officer Shipman's feet, at the base of the

8    stairs, right?

9    A.  No, I don't agree with that.

10   Q.  Maybe I misunderstood you.

11   A.  No.  I think I am misunderstanding you.  Officer Shipman

12   is up on the platform.

13   Q.  Okay.  He has on one foot on one stair and one on the

14   other, right?

15   A.  I believe that was his statement.

16   Q.  Okay.  And where does Mr. Casillas' head come to red in

17   relation to those stairs?

18   A.  I believe right in front of those stairs.

19   Q.  Okay.

20   A.  Two to three feet, maybe.

21   Q.  Well, now we are two to three feet?

22   A.  What would you like it to be?

23   Q.  Whatever the evidence is, sir.

24   A.  And that's what I'm asking.

25   Q.  Would you agree that one of those blood spots is from the

1  abdomen wound?

2  **A.**  I would agree that the blood is certainly from the abdomen

3  wound, and, likely, yes, one of those is from that wound.

4  **Q.**  Okay.  Would you agree that the officers who arrived first

5  on scene said that Mr. Casillas was laying on his chest or

6  stomach, with his head at the base of the stairs, at Officer

7  Shipman's feet?

8  **A.**  I don't dispute that.

9  **Q.**  You don't.  So you agree with that?

10 **A.**  What do you mean by "at his feet"?  Can you give me a

11 distance?

12 **Q.**  No.  I'm going to move on.

13 **A.**  I think we agree then.

14 **Q.**  We could do this all day.

15        All right.  I took your deposition just last month.

16 You told me that Mr. Casillas -- well, let me back up because

17 we got sidetracked.

18        You think when Mr. Casillas is five to seven feet

19 from Officer Shipman, with the pipe in the position we have

20 all seen, that Officer Shipman should have deployed his Taser,

21 right?

22 **A.**  Yes.

23 **Q.**  Okay.  And then at what point does Mr. Casillas, how long

24 does it take him to become a deadly threat?

25 **A.**  Well, when there is some evidence of a deadly threat.

58

1          I would like to back up on that last answer, because

2   depending on his actions, it is questionable whether or not he

3   even should have used the Taser.

4          I repeat what I said at the very beginning.  If

5   Mr. Casillas walks into the room, and if he is demonstrating

6   no threatening behavior with the pipe, which I think that's

7   Officer Shipman's testimony, or at least his statement.  He

8   didn't swing it, he didn't raise it up above his head, he

9   didn't hold it like a baseball bat, he said nothing.

10         If he just walked in the direction of Officer

11  Shipman, and Officer Shipman gave no commands to put the pipe

12  down or get on the floor, I wouldn't agree that even the Taser

13  was appropriate at that point.

14  **Q.**  Okay.  You already testified before we took the break that

15  Mr. Casillas doesn't have to swing the pipe to become an

16  imminent threat of deadly force, right?

17  **A.**  That's correct.

18  **Q.**  It doesn't matter whether he has swung the pipe yet, does

19  it?

20  **A.**  Well, what matters is there are some actions that indicate

21  that he is a threat, whether it is swinging the pipe, whether

22  it is saying, "I'm going to kill you," whether it is looking

23  aggressive, clenching his fists.  It could be any number of

24  things.

25  **Q.**  So do you train police officers when somebody is clenching

1   their fists around a steel pipe two-feet long, coming at them,

2   and the officer is it pointing their gun, that the officer

3   say, "He is no threat to me"?

4   **A.**   No.   When I train them, I train them not to shoot the man.

5   Yep.   I train them to use their Taser.   If it rose to the

6   level of a threat, an intermediate level threat, and that

7   could happen in a couple of different ways, then they were

8   trained to use their Taser or pepper spray or some other

9   lesser form of force.

10   **Q.**   And then you told me in your deposition that -- well, you

11   did tell me in your deposition, you thought, at most, he

12   should use the Taser at five to seven feet under the

13   circumstances we have been over, right?   Right?

14   **A.**   I don't think that's exactly what I said.   I think what I

15   had said is what I keep saying.   Five to seven feet, yes.

16           If he is not complying with the commands or if he is

17   demonstrating some other behavior that shows some sort of a --

18   if we want to call it "pre-assaultive," some people call it

19   "pre-attack," others call it other things, then, yes, I

20   believe the Taser would have been appropriate.

21   **Q.**   And then you told me in your deposition that things change

22   in a split second, even in a tenth of a second, right?

23   **A.**   They do.

24   **Q.**   And then I asked you if things change in that split

25   second, what should the officer do?   Right?   I asked you that?

1          MR. GALIPO:  Your Honor, I think this is an improper
2    use of the deposition.
3          THE COURT:  Sustained.
4          MR. PRAET:  Okay.  Back up.
5    BY MR. PRAET:
6    **Q.**  You told us that at most, the officer should use the Taser
7    is when he is five to seven feet; we have been through that,
8    right?
9    **A.**  Yes.
10   **Q.**  If this is one of those 40, 50 percent times when the
11   Taser is not effective in stopping somebody under the
12   influence, and with a weapon and everything, and it doesn't
13   stop the guy, in that split second, then what's the officer
14   supposed to do?
15   **A.**  Well, he has got to react in some manner.  I don't think
16   you are going to find that in a book somewhere.  He is an
17   experienced police officer.  If he tries the Taser and it
18   doesn't work, he has to figure something else out.  And it
19   doesn't matter what he attempts to do, the amount of force
20   used has to meet the level of threat that he is presented
21   with.
22   **Q.**  In fact, when I gave you that same scenario, you told me,
23   quote, "He is a police officer.  He has got to figure out what
24   to do," right?
25   **A.**  Yes, but I wasn't as flippant as you are saying it.

1  **Q.**  I'm sorry if I appear flippant to you, sir.

2  **A.**  I was quite serious about it.

3  **Q.**  The officer has to figure out what to do in that split

4  second, right?

5  **A.**  Absolutely right.

6  **Q.**  And then even in your experience, you believe that a guy

7  coming at you within striking distance, with this pipe,

8  okay -- and let me make sure that I don't misquote you, okay.

9  Okay.  You know, I'm going to read it the exact same way I

10  asked you.

11          "But you would agree that at arm's length, whatever a

12           person's arm's length he is, plus the length of the

13           two-foot pipe, is capable of inflicting deadly

14           consequences, correct?

15          "Answer:  No, I don't agree with that.

16          "Question:  Why not?

17          "Answer:  Because he is going to get shot."

18          That's what you told me under oath at your

19  deposition, didn't you?

20  **A.**  Yes.

21          MR. PRAET:  Thank you.  I have no further questions.

22          *          *          *          *          *

23

24

25

62

1          I, PEGGY J. CRAWFORD, Official Reporter, do hereby

2    certify the foregoing transcript as true and correct.

3

4    Dated:  11th of March, 2019        /s/ Peggy J. Crawford
                                        PEGGY J. CRAWFORD, RDR-CRR
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25