1

2

3

4

5

6 **UNITED STATES DISTRICT COURT**

7 **EASTERN DISTRICT OF CALIFORNIA**

8

| | |
|---|---|
| 9 **ESTATE OF CASIMERO CASILLAS, et al.,** | **CASE NO. 1:16-CV-1042 AWI-SAB** |
| 10 **Plaintiffs** | **ORDER DENYING DEFENDANTS' MOTION FOR NEW TRIAL AND MOTION FOR DIRECTED VERDICT** |
| 11 **v.** | |
| 12 **CITY OF FRESNO, et al.,** | (Doc. No. 99) |
| 13 **Defendants** | |

14

15        After a five-day trial in February of 2019, a jury returned a verdict in favor of Plaintiffs on

16 their claims of Fourth Amendment excessive force and of California battery and negligence, as

17 against Defendants Officer Shipman and the City of Fresno. Doc. No. 88 (Jury Verdict).

18        Defendants filed a motion for new trial and for a directed verdict, contending: (I) two

19 jurors committed misconduct; (II) the jury's damages award for loss of enjoyment of life must be

20 voided; (III) the damages award for decedent's pain and suffering is excessive; (IV) the negligence

21 verdict is inconsistent; (V) the jury received improper instructions on the battery claim; (VI)

22 insufficient evidence exists to support the jury's verdict, and the verdict is against the weight of

23 the evidence; and (VII) Officer Shipman is entitled to qualified immunity. Doc. No. 99. Plaintiffs

24 oppose. Doc. No. 111. The Court will deny Defendants' motion, as:

25        (I)        There was no juror misconduct in either *voir dire* or deliberations;
26        (II)       The damage award for loss of enjoyment of life is valid under *Chaudhry*;
           (III)      The award for pain-and-suffering is within the range approved of by authority;
27        (IV)      The errant portion of the negligence verdict is disregarded as superfluous;
           (V)       The Court gave the proper jury instruction for the battery and § 1983 claims;
28        (VI)      The verdict is supported by substantial evidence and is not against its clear weight;
           (VII)     Officer Shipman is not entitled to qualified immunity on the § 1983 claim.

## **BACKGROUND**[1]

On September 7, 2015, officers with the Fresno Police Department attempted a traffic stop of a vehicle driven by Casimero Casillas. Casillas instead drove to a residence in Fresno, exited the car, and hid from the officers. Later, Casillas was spotted on foot exiting a detached apartment, while carrying a large metal pipe, as he attempted to evade officers and K-9 units. *See* Ex. J111, the "Diagram of property Photo 001047," below (Doc. No. 85 at p. 1). Casillas entered a small and cluttered room where Officer Shipman was stationed, and moved toward the opposite door. Within seconds, Officer Shipman shot Casillas three times without a warning that he was going to shoot. According to Officer Shipman, Casillas carried the pipe in a "pre-assaultive" manner and never made eye contact with the Officer. Casillas audibly moaned as paramedics attempted to stabilize



---

[1] All facts relevant to the issues raised in the motion for new trial are presented with the movant's burden in mind. *See Malhiot v. S. Cal. Retail Clerks Union*, 735 F.2d 1133, 1137 (9th Cir. 1984). All facts relevant to the motion for a directed verdict are presented in a light most favorable to Plaintiffs, the non-moving party. *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001).

him; he died from his injuries six hours later at the hospital.

After a five-day trial, the jury found that Officer Shipman's use of force was excessive, as alleged in Plaintiffs' Fourth Amendment and California battery causes of action.[2] Doc. No. 88. The jury determined Casillas did not pose an immediate threat of death or serious bodily injury to Officer Shipman at the time of the shooting (as queried via a special interrogatory designed to address the issue of qualified immunity). *Id*. at p. 2. As to Plaintiffs' negligence claim, the jury found Officer Shipman to be both negligent and a substantial factor in causing Casillas's death. *Id*. at p. 3. The jury also determined Casillas was negligent, but that his own negligence was not a contributing cause of his death. *Id*. at p. 4. The jury then apportioned fault, in contravention of the instructions on the verdict form, at 60% for Officer Shipman and 40% for Casillas.[3] *Id*. For damages, the jury awarded $250,000 for Casillas's "mental, physical, and emotional pain and suffering experienced prior to death," $2,000,000 for Casillas's "loss of enjoyment of life," and $2,500,000, divided equally between Casillas's five children, for their loss of Casillas's love, companionship, and the like. *Id*. at p. 5-6.

Two weeks after the entry of judgment, Defendants filed the instant motion for new trial, asserting numerous legal challenges to the verdict form and jury instructions, as well as renewed arguments for a directed verdict and for a finding of qualified immunity. Doc. No. 99. In addition, Defendants contend that two jurors committed serious misconduct during their service as jurors. *Id*. Defendants allege that one juror, a former city manager of the nearby city of Tulare, was fired from his job over an officer-involved shooting in Tulare a year prior. Doc. No. 99-2. Defendants alleged the other juror, the foreperson, knew the decedent in the same Tulare incident, and that both of these jurors were associates of the former mayor of Tulare, whom Defendants characterize as anti-police. *Id*.; Doc. No. 114-5. Finally, Defendants presented the affidavit of a third juror in

---

[2] During the jury instruction conference, the Court determined that to avoid the risk of inconsistent verdicts between the Fourth Amendment and Battery claims, the verdict form would present a single question on excessive force liability, which would control both causes of action. The Court also determined that the jury instructions should be streamlined by only giving one instruction on the excessive-force claims, taken from the Ninth Circuit Model Instruction 9.25 (as modified). Defendants objected to the omission of an instruction for California battery (proposing CACI 1305), as they wished to have the jury hear a portion of that model instruction concerning an officer's duty to retreat. After lengthy consideration, the Court omitted the "duty to retreat" language, and CACI 1305 in total, from the jury instructions.

[3] Defendants were present during the reading of the verdict and did not object to this seeming inconsistency.

this case, who stated that these two jurors discussed the Tulare incident with the jury panel during deliberations. Doc. No. 114-4. Defendants argue these contentions constitute evidence of bias against police officers, including Officer Shipman, and contend these jurors should have disclosed their biases when questioned by the Court during *voir dire*. Doc. No. 99. Because the alleged biases were not disclosed, Defendants question the fairness of the proceedings. *Id.* Defendants also contend "external prejudicial information" infected the jury's deliberations. Doc. No. 126.

In response, Plaintiffs submitted declarations from the foreperson-juror and city-manager-juror; both jurors stated they had no bias against police officers generally or against Officer Shipman or the City of Fresno P.D., and otherwise disputed Defendants' specific contentions regarding the Tulare officer-involved shooting. Doc. Nos. 118-1 and -2. Plaintiffs also submitted declarations from the mother of the decedent in the Tulare incident, stating she did not know the juror foreperson, as well as various legal documents regarding the city-manager-juror. Doc. Nos. 111-2 and 121-1.

On May 29, 2019, the Court held an evidentiary hearing on the juror misconduct issue, where the parties cross-examined the three jurors who submitted affidavits. *See* Doc. No. 126–1 (transcript). The parties filed supplemental briefing, and the Court took Defendants' motion under submission.

**DISCUSSION**

*Legal Standard for a Rule[4] 59(a)(1)(A) Motion for New Trial*

"The court may, on motion, grant a new trial . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Rule 59(a)(1)(A). Historically recognized grounds include claims "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)); *see also Crowley v. Epicept Corp.*, 883 F.3d 739, 747-48 (9th Cir. 2018) ("[A] new trial may be warranted if the district court has given erroneous jury instructions or failed to give adequate instructions."); *Pope v. Man-Data,*

---

[4] Citations to the "Rule" or "Rules" are to the Federal Rules of Civil Procedure, unless otherwise noted.

*Inc.*, 209 F.3d 1161, 1163 (9th Cir. 2000) (issue of juror misconduct appropriate for Rule 59 motion for new trial); *Vaughan v. Ricketts*, 950 F.2d 1464, 1470 (9th Cir. 1991) (resolving "irreconcilably inconsistent" jury-verdict issue under motion for new trial standards). The district court has broad discretion in deciding whether to grant a new trial but should use this "extraordinary remedy . . . sparingly in the interests of finality and conservation of judicial resources." *Wood v. Ryan*, 759 F.3d 1117, 1121 (9th Cir. 2014). In considering a motion for a new trial on any of these grounds—including that the verdict is against the weight of the evidence—the trial court may assess the credibility of the witnesses and weigh the evidence. *See Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010); *see also Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1372 (9th Cir. 1987) ("The court need not view the evidence in the light most favorable to the prevailing party."). "The burden of showing harmful error rests on the party seeking the new trial." *Bos. Sci. Corp. v. Johnson & Johnson*, 550 F. Supp. 2d 1102, 1110 (N.D. Cal. 2008) (*citing Malhiot v. S. Cal. Retail Clerks Union*, 735 F.2d 1133 (9th Cir. 1984)); *see also Madrigal v. Allstate Ins. Co.*, 215 F. Supp. 3d 870, 907 (C.D. Cal. 2016), *aff'd sub nom. Madrigal v. Allstate Indem. Co.*, 697 Fed. App'x 905 (9th Cir. 2017).

<u>*Legal Standard for a Rule 50(b) Motion*</u>

A renewed judgment as a matter of law is proper only when "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 455 (9th Cir. 2018) (quoting *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006)); Rule 50(b). All evidence should be "construed in the light most favorable to the nonmoving party." *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016); *see also Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000) (holding that in ruling on a motion for judgment as a matter of law, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). Thus, "[t]he verdict will be upheld if it is supported by substantial evidence, 'even if it is also possible to draw a contrary conclusion.'" *Rookaird*, 908 F.3d at 455 (quoting *First Nat'l Mortg. Co v. Fed. Realty*

*Inv. Tr.*, 631 F.3d 1058, 1067 (9th Cir. 2011)).

I.      **Defendants have not demonstrated the jurors committed misconduct.**

*Defendants' Arguments*

Defendants contend that a new trial under Rule 59 is warranted because of "the extreme bias of two jurors who withheld critical information during *voir dire* which would have absolutely disqualified both of them from sitting on this jury." Doc. No. 99 at p. 1.

Defendants allege one juror withheld information about his prior work as a city manager for the City of Tulare, his firing of Tulare's police chief during a time when Tulare residents were protesting an officer-involved shooting factually similar to Casillas's, and Tulare City Council's firing of this city-manager-juror because of his firing of the police chief. *See Id.* Defendants also allege this juror was in a conspiratorial relationship with the former mayor of Tulare, who Defendants characterize as "an outspoken critic of police." Doc. No. 114 at p. 2. Defendants thus argue this juror harbored and hid his "extreme bias" against police officers, Officer Shipman included. *Id.* In support of their contentions, Defendants have submitted a) a number of news articles from local publications noting the city-manager-juror's firing and his relationship with the ex-mayor (Doc. No. 99-2); b) deposition testimony from witnesses in the police chief's lawsuit against the City of Tulare (that, Defendants allege, demonstrates the conspiracy) (Doc. No. 114-2, 114-3); and c) a declaration from another juror in Casillas's case describing how the city-manager-juror discussed the Tulare shooting with other members of the jury panel during deliberations, in order to persuade the panel that all officers (not just Officer Shipman) "need to handle these situations differently and that officers need to be trained better." (Doc. No. 114-4).

For the other juror, the foreperson, Defendants contend she had "personal familiarity with the family of the individual killed" in the same Tulare incident, as well as a friendship with the same Tulare city ex–mayor. *Id.* at p. 6. Thus, Defendants contend the foreperson-juror also harbored anti-police sentiments that she did not disclose during *voir dire*. In support, Defendants provided a) screenshots of the foreperson's social-media pages (Doc. No. 114-5); and b) a declaration from the third juror describing how, during deliberations, the foreperson stated she was familiar with the Tulare-shooting decedent and describing how the foreperson-juror engaged in the

discussions with the city-manager-juror about this other incident (Doc. No. 114-4).

Defendants maintain both of these jurors should have disclosed these alleged biases during *voir dire* when asked by the Court whether "[they], a family member, or a close friend [had] any exposure to law enforcement that you would consider negative, adverse or whatever", and when asked if they "had any dealings or exposure with the City of Fresno, not just the Police Department, but the City of Fresno itself, any of its employees, or whatever." *Id.* at pp. 2-3. Defendants then conclude that these biases would have provided a basis for striking these two jurors for cause—and because these individuals were allowed on the jury, the fairness of the trial has been affected (under *McDonough Power Equipment v. Greenwood*, 104 S.Ct. 845 (1984)).

### *Plaintiffs' Arguments*

Plaintiffs counter that "there is no evidence of juror misconduct[,] [t]here is absolutely no evidence that any of the jurors ever answered any of questions untruthfully or that they intentionally withheld material information in response to any question," or that "any jurors' responses would rise to establish cause." Doc. No. 111 at p. 1.

In support, Plaintiffs submitted a declaration from the foreperson-juror, wherein she states she did not withhold information during jury selection and does not harbor bias against police officers generally or, specifically, Officer Shipman or the City of Fresno. Doc. No. 118-1. She denied Defendants' allegations that she has close ties to the Tulare decedent's family or the ex-mayor of Tulare. *Id.* at ¶¶ 5-9. She provided more detail about a negative incident with Tulare P.D. eluded to during *voir dire*, which she stated concerned a bicycle incident with her father and not the Tulare officer-involved shooting (as Defendants alleged). *Id.* at ¶ 8. Plaintiffs also provided a declaration from the mother of the deceased in the Tulare incident (whom Plaintiffs' Counsel also represents), wherein she stated she does not know the foreperson-juror and is not related to her. Doc. No. 113. In sum, Plaintiffs contend Defendants' allegations of bias for this juror are merely speculative, and argue this juror answered all *voir dire* questions truthfully.

For the city-manager-juror, Plaintiffs argue the news reports merely show that he knew the mayor and ex-police chief, which they contend is not uncommon given the juror's duties as city manager. Doc. No. 111. Plaintiffs submitted a declaration from this juror as well, wherein he also

7

stated that he harbors no bias against the police, Officer Shipman, or the city of Fresno, that he does not have "a personal campaign to reform law enforcement," and that he otherwise did not withhold information during *voir dire*. Doc. No. 118-2. The juror denied any conspiratorial relationship with the ex-mayor of Tulare, and asserts this ex-mayor actually voted in favor of firing him. *Id*. at ¶¶ 5-7. The juror also declared his firing of the Tulare police chief had nothing to do with the Tulare officer-involved shooting, that this chief had been on administrative leave for a separate incident, and that he believed the officers in the Tulare incident acted appropriately. *Id.* at ¶ 9. Based on this declaration, Plaintiffs contend Defendants' arguments here are also speculative.

Finally, Plaintiffs point out both jurors stated in *voir dire* they would remain fair and impartial, did not answer any of the Court's questions untruthfully. Further, Plaintiffs argue that had Defendants believed these two jurors were biased, they could have questioned either of them after the Court finished its initial examination. Plaintiffs contend that the foreperson-juror mentioned a negative experience with Tulare police, and the city-manager-juror stated he had "business relationships" with Tulare as the former city manager. Plaintiffs thus conclude Defendants have not shown that either juror answered a material question dishonestly during *voir dire*, or that any of these factual allegations would have provided a basis for a cause strike.

### *Legal Standard – Juror Misconduct*

The Constitution guarantees all defendants a verdict by impartial and indifferent jurors, and as the Ninth Circuit has stated, "[t]he bias or prejudice of even a single juror would violate [a litigant's] right to a fair trial." *Dyer v. Calderon*, 151 F3d 970, 973 (9th Cir. 1998) (*en banc*). The presence of a biased juror is structural error, mandating a new trial. *Estrada v. Scribner*, 512 F.3d 1227, 1235 (9th Cir. 2008).

The Ninth Circuit recognizes three forms of juror bias: (1) actual bias, which stems from a pre-set disposition not to decide an issue impartially; (2) implied (or presumptive) bias, which may exist in exceptional circumstances where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury; and (3) so-called *McDonough*-style bias, which turns on the truthfulness of a juror's responses on *voir dire* where a truthful response would have provided a valid basis for a challenge

for cause." *United States v. Olsen*, 704 F.3d 1172, 1189 (9th Cir. 2013). Here, Defendants proffer their arguments under the *McDonough* framework, which requires the movant to show (1) the juror failed to honestly answer a *voir dire* question, and (2) a correct response would have provided a valid basis for a challenge for cause. 464 U.S. at 556.

The first prong of *McDonough*—whether a juror was dishonest—"is a question of fact." *Fields v. Brown*, 503 F.3d 755, 767 (9th Cir. 2007) (*en banc*) (citing *Dyer*, 151 F.3d at 973); *Patton v. Yount*, 467 U.S. 1025, 1038 (1984) ("The assessment of juror bias is essentially one of credibility[.]"); *see also Skilling v. United States*, 561 U.S. 358, 386 (2010) (describing a trial judge's appraisal to be "ordinarily influenced by a host of factors . . . [including] inflection, sincerity, demeanor, candor, body language, and apprehension of duty."). Thus, the Supreme Court has often stated that "[t]he remedy for allegations of juror partiality is a hearing in which the [moving party] has the opportunity to prove [] bias." *Smith v. Phillips,* 455 U.S. 209, 215; *but see United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993) ("An evidentiary hearing is not mandated every time there is an allegation of jury misconduct or bias. Rather, in determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source.").

As for the second *McDonough* prong, "[t]he central inquiry in determining whether a juror should be removed for cause is whether that juror holds a particular belief or opinion that will 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *United States v. Hayat*, 710 F.3d 875, 885 (9th Cir. 2013); *see also Young v. Gipson*, 163 F.Supp.3d 647 (N.D. Cal. 2015) (framing the second prong of the *McDonough* test as whether the juror's failure to answer honestly "undermined the impartiality of the petitioner's jury.") (citing *Dyer*, 151 F.3d at 973). "To disqualify a juror for cause requires a showing of either actual or implied bias—'that is . . . bias in fact or bias conclusively presumed as a matter of law.'" *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000). Actual bias is defined as "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Mitchell*, 568 F.3d 1147, 1151 (9th Cir. 2009); *Gonzalez*, 214 F.3d at 1112. "Actual bias is typically found when a prospective juror states that he cannot be

impartial or expresses a view adverse to one party's position and responds equivocally as to whether he could be fair and impartial despite that view." *Fields*, 503 F.3d at 767. While actual bias may be revealed by a juror's explicit admissions, more typically it is demonstrated through circumstantial evidence. *Gonzalez*, 214 F.3d at 1112. Implied bias, on the other hand, is found "in those extreme situations 'where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Fields*, 503 F.3d at 770.

Despite these three ways to examine juror misconduct, only concealment for "reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *McDonough,* 464 U.S. at 556.

<u>Analysis</u>

**A. Statements from jurors concerning deliberations cannot be considered for purpose of whether any jurors lied during *voir dire*.**

The Court will first take up issues with the declarations made by the three jurors. Doc. Nos. 114-4, 118-1, and 118-2. Both Defendants and Plaintiffs have lodged these declarations in apparent support of their contentions that two of the jurors did/not attempt to hide their bias during *voir dire*. Also, during the evidentiary hearing, the parties at times questioned the three jurors about discussions during deliberations. The main thrust of these statements/questions concerns whether the two allegedly-biased jurors discussed the Tulare officer-involved shooting during deliberations. However, by the plain command of the Supreme Court, these statements cannot be considered by the Court in deciding whether the two jurors lied during *voir dire*. *Warger v. Shauers*, 135 S. Ct. 521, 525 (2014) ("We hold that Rule 606(b) applies to juror testimony during a proceeding in which a party seeks to secure a new trial on the ground that a juror lied during *voir dire*.") (*abrogating Hard v. Burlington Northern Railroad*, 812 F.2d 482 (9th Cir. 1987), which stood for the now-defunct proposition that juror affidavits about a juror's conduct in deliberations could be used to question that juror's *voir dire* answers); *see also U.S. v. Leung*, 796 F.3d 1032, 1036 (9th Cir. 2015) ("[P]arsing how jurors considered the evidence or their mental states while hearing testimony is exactly what [] the plain text of Rule 606(b) seek to prevent.").

Having disposed of this issue, the Court turns to the remaining evidence and testimony

10

concerning the two allegedly-biased jurors' *voir dire* answers.

**B. The Foreperson-Juror did not answer *voir dire* questions dishonestly.**

Under the first *McDonough* prong, Defendants must show the foreperson-juror failed to answer honestly a material question during *voir dire*. 464 U.S. at 556. The Ninth Circuit has held that "a *voir dire* question is material when the honest response would reflect bias, prejudice or partiality against a party." *See Coughlin v. Tailhook Ass'n*, 112 F.3d 1052, 1061 (9th Cir. 1997). "Under *McDonough*, a new trial is warranted only if the district court finds that the juror's *voir dire* responses were dishonest, rather than merely mistaken, and that her reasons for making the dishonest response call her impartiality into question." *Pope*, 209 F.3d at 1164. Dishonesty is akin to being intentionally untruthful, not mere forgetfulness or misunderstanding. *Hamilton v. Ayers*, 583 F.3d 1100, 1107 (9th Cir. 2009) (omissions on *voir dire* were inadvertent, not intentional); *see also Price v. Kramer*, 200 F.3d 1237, 1254-55 (9th Cir. 2000) (no *McDonough*-style bias where a juror's omissions "constituted an innocent oversight."); *Gonzales v. Thomas*, 99 F.3d 978, 984 (10th Cir. 1996) (emphasizing that first prong of the *McDonough* test "is directed at intentionally incorrect," rather than mistaken, responses); *United States v. Edmond*, 43 F.3d 472, 474 (9th Cir. 1994) (no juror misconduct where district court found juror's testimony—that he forgot about being victim of armed robbery—truthful).

Here, as to the foreperson-juror, the Court finds Defendants have not met their burden on the first element of *McDonough*-style bias. On the first day of trial, the Court questioned the jurors extensively about their backgrounds, general knowledge about the case, and any potential predispositions that would affect their service. *See* Doc. No. 99-3. The foreperson-juror stated she did not know anything about the case (*Id*. at 83), and while she generally knew several police officers and had discussed their experiences with them, it would not affect her service as a juror (*Id*. at 114 and 119). The Court then asked whether "[each juror], a family member, or a close friend [had] any exposure to law enforcement that [they] would consider negative, adverse or whatever." *Id* at 85-86. The following exchange then occurred:

> **Foreperson-Juror**: Yes. I have experienced some negative, I guess, contact with police officers personally and with family members, but I don't believe it would

affect my decision-making.

**The Court**: Okay. Did that involve the Fresno Police Department?

**Foreperson-Juror**: One of them did, and the other was the Tulare Police Department.

**The Court**: On the Fresno Police Department, how long ago was that?

**Foreperson-Juror**: Probably 12 years ago.

**The Court**: Okay.

**Foreperson-Juror**: I'm sorry. It was not the Fresno Police Department. It was the California Highway Patrol.

**The Court**: All right. And, again, I don't want any detail on this next question, but did any of those ever wind up in the court system?

**Foreperson-Juror**: No.

**The Court**: Anything about that experience that would affect your service as a juror here today?

**Foreperson-Juror**: No, but I will say that there was a formal complaint that I filed against that police officer.

**The Court**: Do you know how that followed up, if at all?

**Foreperson-Juror**: They called me and apologized for how he acted, told me they were investigating. And then about six months later, I received a letter in the mail that said they couldn't find anything that he had done wrong.

**The Court:** Did that concern you, bother you, or upset you to the extent that it would affect your service as a juror here today?

**Foreperson-Juror**: No, because I don't know what happened. So I wouldn't make a decision before hearing any evidence.

*Id*. at 86-87. This exchange, as well as others with the foreperson-juror during *voir dire*, demonstrate she was not attempting to conceal any negative experiences with the police. She was forthcoming in her responses concerning the Fresno P.D., and mentioned the Tulare P.D. incident. Further, the foreperson-juror stated in her declaration (and reiterated at the evidentiary hearing) that the Tulare P.D. incident she referred to concerned her father being handcuffed while on his

12

bicycle—and not the recent officer-involved shooting in Tulare. Doc. No. 118-1 at ¶ 8. The foreperson-juror forcefully denied Defendants' allegations that she was a close friend of the deceased in the Tulare shooting, stating she only knew of him as her deceased-brother's friend and through news articles. See Doc. 118-1 at ¶¶ 5-6. *Patton*, 467 U.S. at 1038 (The assessment of juror bias is "essentially one of credibility, and therefore largely one of demeanor."); *Elmore v. Sinclair*, 799 F.3d 1238, 1253 (9th Cir. 2015) (juror believed responses to *voir dire* questions were accurate, thus no claim of juror bias under *McDonough* existed); *Smith v. Swarthout*, 742 F.3d 885, 893 (9th Cir. 2014) (juror's explanation of why he didn't mention a particular issue was credible, thus the *McDonough* bias claim fails); *see also U.S. v. Nava-Arellano,* 639 Fed. Appx. 512 (9th Cir. 2016) (finding claim of juror bias failed where it was "purely speculative").

Additionally, Defendants assert the foreperson-juror should have disclosed her relationship with the ex-mayor of Tulare—as evinced by her status as "friends" on her social media page (*See* Doc. No. 114-5)—when the Court asked whether any of the jurors "had any dealings or exposure with the City of Fresno, not just the Police Department, but the City of Fresno itself, any of its employees, or whatever?". 99-3 at 88:2-5. At the evidentiary hearing, however, this juror acknowledged her acquaintance with the ex-mayor of Tulare, but stated she only knew him through her late brother and through news reports of his being the first African-American mayor of that city. *See* Doc. No. 126-1 at 52:17-20; 53:15-22; 54:5-9; 55:5-9; 55:25-56:2; 60:1-5. The Court finds this juror's testimony about her relationship with the ex-mayor to be credible, and finds the social-media friendship to be too tenuous a connection to find that this juror lied. Simply, the Court asked if she knew any Fresno city employees, but there is no evidence the juror knew the ex-mayor as a Fresno firefighter—and the Court is hesitant to say that being social-media friends implies that one person knows the details of another's life; this is especially true where the social-media friendship was as tenuous as it was here. Thus, the Court finds the juror's assertions as to the ex-mayor credible, and finds Defendants' contentions on these issues to be speculative. *Patton*, 467 U.S. at 1038 (regarding credibility); *Elmore*, 799 F.3d at 1253 (juror believed responses to *voir dire* questions were accurate, thus no claim of juror bias under *McDonough* existed); *Swarthout*, 742 F.3d 885, 893 (9th Cir. 2014) (juror's explanation of why he didn't

mention a particular issue was credible, thus the *McDonough* bias claim fails); *see also Nava-Arellano,* 639 Fed. Appx. 512 (finding claim of juror bias failed where it was "purely speculative").

Even assuming *arguendo* that the foreperson-juror should have disclosed her familiarity with the Tulare incident when the court asked about "negative, adverse" interactions with the police, the Court finds this alone was no basis to strike this juror for cause. The foreperson-juror, in her declaration (and again at the evidentiary hearing) stated she made no connection between the Tulare incident and this case, did not harbor any bias toward police officers, and otherwise reaffirmed that she answered all *voir dire* questions truthfully, honestly, and accurately. Doc. No. 118-1 at ¶¶ 12-14. These assertions, which the Court finds credible, do not provide a basis for a finding of actual bias—even despite the foreperson-juror's knowledge and discussion of the Tulare incident. *See Fields*, 503 F.3d at 766 (Actual bias "stems from a pre-set disposition not to decide an issue impartially."); *see also Roybal v. Davis*, 148 F. Supp. 3d 958, 1038 (S.D. Cal. 2015) (juror's personal experiences about issues similar to those in the case not a basis for a finding of actual bias, where no evidence existed that these discussions impacted his ability to act as a fair and impartial juror). Further, the foreperson-juror's knowledge of another officer-involved shooting, coupled with her now-deceased older brother's high-school relationship with the ex-mayor of a nearby city, is not nearly of the kind where the Court can imply bias. *See Olsen*, 704 F.3d at 1192-95 (describing the line between those "incontrovertible" instances where the juror lied during *voir dire* and those where a juror was mistaken in his answers to a couple questions); *Tinsley v. Borg*, 895 F.2d 520, 528-29 (9th Cir. 1990) (collecting cases where "courts have declined to find implied bias when a juror personally acquainted with a witness provided no actual bias existed.").

Finally, the Court notes that had Defendants been suspicious of the foreperson-juror's experiences with Tulare police, they could have inquired further, as this juror did indicate a negative experience with Tulare P.D. This line of questioning would not have proven fruitful, given the foreperson-juror's explanation of what happened with her father and a Tulare officer, but the Court mentions it to remind Defendants of their burden to root out issues in *voir dire*. *Sanders*

*v. Lamarque*, 357 F.3d 943, 947-50 (9th Cir. 2004) ("[T]he record demonstrates that any failure by the prosecution to discover information regarding [juror's background] was due to its own lack of diligence and not any concealment or deliberate withholding of information by [the juror]."); *see also United States v. Santos*, 501 F.App'x 630, 633 (9th Cir. 2012) ("The record shows that the jurors who were related, albeit distantly, to some of the witnesses answered the questions asked of them honestly. The defense attorneys could have requested further inquiry, but they did not.").

The Court finds the foreperson-juror's testimony on these issues credible, and so denies Defendants motion for new trial on the allegations of juror misconduct for the foreperson-juror.

## C. The city-manager-juror did not divulge the information about his former employment because it was irrelevant to the questions asked.

Defendants also allege the city-manager-juror harbors extremely prejudicial views against police officers, such that his impartiality was affected. In support, Defendants supplied the court with news articles from local publications detailing an officer-involved shooting in Tulare in the spring of 2018. Doc. No. 99-2. The articles detail the city-manager-juror's firing of the Tulare police chief during the time when people were protesting the city and police over the officer-involved shooting. *See Id*. The articles also note the Tulare city council's firing of the city-manager-juror hours after he fired the police chief. *See Id*. Defendants also submitted excerpts from depositions in an employment discrimination suit brought by the fired police chief against the city, detailing two individual's perspectives on the allegedly-conspiratorial-and-collusive relationship between the city-manager-juror and ex-mayor of Tulare. *See* Doc. Nos. 114-2 and -3. If true, this evidence could have provided a basis for striking the city-manager-juror for cause, as it could demonstrate his unwarranted bias against police officers. *Gipson*, 163 F.Supp.3d at 731 (finding implied bias where juror in question has had some personal experience that was "similar or identical to the fact pattern at issue."); *Dyer*, 151 F.3d at 979 (lying during jury selection proceedings gives rise to an inference of implied juror bias); *U.S. v. Allsup*, 566 F.2d 68 (9th Cir. 1977) (prospective jurors who worked for a bank should have been excused for cause in bank robbery trial because of "the substantial probability that these prospective jurors, despite their disclaimers, could not become the 'indifferent jurors which the Constitution guarantees a criminal

defendant."); *see also McDonough*, 464 U.S. at 554 ("Demonstrated bias in the responses to questions on *voir dire* may result in a juror being excused for cause . . . The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious."). There were numerous times where the Court inquired as to the jurors' relationships and experience with law enforcement or Fresno City personnel.[5] These questions should have prompted any negative experiences such as the ones Defendants allege. The question is, then, under the first prong of *McDonough*, should this juror have disclosed his alleged-experiences as a city manager, his relationship with the ex-mayor of Tulare, his firing of the Tulare police chief, and his own firing, when asked during *voir dire* about negative experiences with police? Unfortunately for Defendants, upon examining the issues closely, their allegations of this juror's bias appear speculative and argumentative.

In the city-manager-juror's declaration, he stated (and reiterated at the evidentiary hearing) that he "did not release the chief of police for the City of Tulare because of the [] officer involved shooting. In fact, there was an interim police chief that was assigned at the time [of the shooting]. The chief that I released was actually already on administrative leave [for unrelated reasons] for several months when the shooting [] occurred[.]" Doc. No. 118-2 at ¶ 9. The juror stated he harbors no bias against police officers generally, against Officer Shipman, or against the City of Fresno. *Id*. at ¶ 3; Doc. No. 126-1 at 10:13-22; 28:15-17; 30:22-31:3; 41:25-42:3. The Court finds the juror's assertions about his background and experiences as a city manager—that the firing had no connection to the Tulare shooting—to be credible, and finds Defendants' allegations on this juror's bias to be speculative. *Swarthout*, 742 F.3d at 893 (upon further questioning of a juror who initially remained silent during *voir dire*, the district court determined the juror's explanation for remaining silent was credible—credibility finding upheld on appeal); *Price*, 200 F.3d at 1254

[5] For example, when asked whether he knew anyone in law enforcement (99-3 at 76), this juror replied: "I have had some business relationships with top staff for the City of Tulare" (99-3 at 81). When the Court asked "whether or not you, a family member, or close friend, have had what you consider to be a bad experience relating to law enforcement", and stated "this is not the chance for anybody to exact revenge, if you will. Saying, 'I got a bum deal, and this is my only chance to rectify that.'" (99-3 at 86-87), this juror remained silent. When asking if any of the jurors "had any dealings or exposure with the City of Fresno, not just the Police Department, but the City of Fresno itself, any of its employees, or whatever?" (99-3 at 88), this juror again remained silent. The juror indicated he was self-employed in "utility management" (99-3 at 29) and did not disclose that he was once employed as a city manager for Tulare until after the lunch recess, when Plaintiffs' Counsel questioned him (99-3 at 121).

(upholding credibility determination of district court in post-trial juror-bias hearing, where juror's failure to mention relationship and prior experiences with issue was an "innocent oversight."); *see also United States v. Chandler*, 658 Fed. Appx. 841 (2016) (affirming court's credibility determination of juror—weighing in favor of non-movant); *Hurtado v. Sherman*, 669 Fed. Appx. 410 (2016) (same).

Additionally, this juror also stated at the evidentiary hearing that sometime after he was chosen for the panel, he reflected on his surprise that he was picked because of the firings. *See* Doc. No. 126-1 at 39:7-10. This testimony does not affect the Court's credibility determination and holding concerning whether this juror lied during *voir dire*. Simply, the Court reads the juror's testimony as indicating a later reflection on his selection to the panel; his candor does not directly evince an active attempt on the juror's part to deceive during *voir dire*, nor does it circumstantially evince a bias that would have provided either party cause to strike (given that the underlying issue—the police chief's firing after extended administrative leave—shared no connection with the facts of Casillas's case). *See Skilling*, 561 U.S. at 386 (describing a trial judge's appraisal to be "ordinarily influenced by a host of factors . . . [including] inflection, sincerity, demeanor, candor, body language, and apprehension of duty."); *see also Jackson v. City of Pittsburg,* 518 F.App'x 518, 521 (9th Cir. 2013) (no new trial was warranted on 'failure to answer honestly a *voir dire* question' where juror's non-disclosed experiences were dissimilar from the facts of the case and where the juror's prior experiences with police were neither "particularly good" or "particularly bad").

As to the city-manager-juror's relationship with the ex-mayor of Tulare, the Court agrees with Defendants that a reasonable juror would have mentioned the relationship. The Court asked the jurors if they had any dealings with Fresno employees (Doc. No. 99-3 at 88:2-5), and the juror testified at the evidentiary hearing that he knew the ex-mayor of Tulare was also a Fresno firefighter. Doc. No. 126–1 at 24:7-9. However, this juror's relationship with the ex-mayor would not have provided a basis to strike for cause. In the juror's declaration (and throughout the evidentiary hearing), he roundly rejected Defendants' characterization of his relationship with the ex-mayor as "conspiratorial"—in fact declaring that the ex-mayor was among those voting to

terminate him. Doc. No. 118-2 at ¶¶ 5-7. Nothing in the juror's declaration or testimony leads the Court to doubt the juror's characterization of his relationship as a prior working relationship, and so any questioning of the juror about this issue would have led to a dead-end during *voir dire*. *Swarthout*, 742 F.3d at 893 (regarding credibility determinations; *Price*, 200 F.3d at 1254 (same); *see also Chandler*, 658 Fed. Appx. 841 (same).

Finally, the Court again cautions that had Defendants been suspicious of this juror's answers, or had they wished to probe his past employment with the City of Tulare, they could have questioned him further in *voir dire*. To Defendants' assertion that the juror was being evasive, Defense Counsel (or any of his assistants) could have conducted a simple web search on this juror—including searching for the very news reports they submitted as evidence in the post-trial proceedings—at any point before concluding *voir dire*. In fact, at the end of the first day of trial, prior to the jury being selected, the Court discussed waiting to select jurors—which would have given Defendants another sixteen hours to investigate the jurors for additional issues they felt were relevant to their strikes for cause. *See* Doc. No. 99-3 at 134-145. However, Defendants stated they were "fine with the 14" jurors in the box. *Id.* at 143:10. Defendants' attempts to now impeach the jury's adverse verdict cannot be countenanced.

For these reasons, the Court denies Defendants motion for new trial on the juror misconduct issue as to the city-manager-juror.

### D. No new trial is warranted on an "extraneous prejudicial information" argument

In Defendants' reply brief, and again in their supplemental brief (filed after the evidentiary hearing), Defendants raise an additional issue regarding the jury's conduct: [6] whether the two allegedly-biased jurors improperly introduced "extraneous prejudicial information" by discussing the Tulare officer–involved shooting (*See* Section I.C, pp. 6–8, *supra*) during deliberations; they argue this is highly prejudicial given the similarity in the two cases. Defendants rely mainly upon the testimony of a third juror for support. See Doc. No. 114-4.

Plaintiffs object to the admissibility of the jurors' statements, arguing that they are not

---

[6] Defendants assert that the issue did not come to light until after they began investigating the *voir dire* issue, and the record supports this. Plaintiffs do not object to the raising of the issue itself, having responded to it in their supplemental brief. Therefore, the Court will treat the issue as having been properly raised under Rule 59.

"extraneous information" that is prejudicial to the verdict under Fed. R. Evid. 606.

*Legal Standard –Rule 606(b) and "Extraneous Prejudicial Information"*

Federal Rule of Evidence 606 states:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b)(1). This bar "ensures that jurors will not feel constrained in their deliberations for fear of later scrutiny by others[, and] guarantees that jurors cannot manipulate the system when their views are in the minority by repudiating an earlier verdict and obtaining a mistrial." *Shoen v. Shoen*, 933 F. Supp. 871, 876 (D. Ariz. 1996), aff'd, 113 F.3d 1242 (9th Cir. 1997) (*quoting In re Beverly Hills Fire Litigation*, 695 F.2d 207, 213 (6th Cir. 1982)), *cert. denied*, 461 U.S. 929 (1983). Simply, jurors may not impeach their own verdict. *United States v. Weiner*, 578 F.2d 757, 764 (9th Cir. 1978), *cert. denied*, 439 U.S. 981 (1978).

However, courts may receive juror testimony about whether "extraneous prejudicial information was improperly brought to the jury's attention." Fed. R. Evid. 606(b)(2)(A). Juror testimony is admissible only concerning facts bearing on extraneous influences on the deliberation, in the sense of overt acts of jury misconduct. *United States v. Pimentel*, 654 F.2d 538, 542 (9th Cir. 1981); *see also* Fed. R. Evid. 606 Note to Subdivision (b) ("Under the federal decisions the central focus has been upon insulation of the manner in which the jury reached its verdict, and this protection extends to each of the components of deliberation, including arguments, statements, discussions, mental and emotional reactions, votes, and any other feature of the process. . . . [However], a juror is recognized as competent to testify to statements by the bailiff or the introduction of a prejudicial newspaper account into the jury room[.]").

In *Warger*, the Supreme Court described "extraneous" in the following way:

> Generally speaking, information is deemed 'extraneous' if it derives from a source 'external' to the jury. 'External' matters include publicity and information related specifically to the case the jurors are meant to decide, while 'internal' matters include the general body of experiences that jurors are understood to bring

with them to the jury room.

135 S. Ct. at 529 (*citing Tanner v. United States*, 483 U.S. 107, 117 (1987)); *see also United States v. Navarro-Garcia*, 926 F.2d 818, 821 (9th Cir. 1991) ("[A] juror's past personal experiences may be an appropriate part of the jury's deliberations, [since] [j]urors must rely on their past personal experiences when hearing a trial and deliberating on a verdict.").[7] Courts "ordinarily assume that instructing the jury to disregard extraneous evidence sufficiently ensures that inadmissible evidence will not influence the jury." *Dickson v. Sullivan*, 849 F.2d 403, 408 (9th Cir. 1988).

If information deemed "external" does in fact reach the jury's ears during deliberations, the court must then determine whether there is a "reasonable possibility" that the external material could have affected the verdict. *United States v. Vasquez*, 597 F.2d 192, 193 (9th Cir. 1979). The Ninth Circuit has identified multiple factors relevant to this inquiry: "(1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the extrinsic material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the introduction of extrinsic material affected the verdict." *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986). The circuit court has also held that the potential prejudice of any extrinsic information may be diminished where the information "was ambiguously phrased" or "was insufficiently prejudicial given the issues and evidence in the case." *Jeffries v. Wood*, 114 F.3d 1484, 1491 (9th Cir. 1997) (en banc), *overruled on other grounds by Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) *and by Gonzalez v. Arizona*, 677 F.3d 383, 389 (9th Cir. 2012). Jurors "may not be questioned about the deliberative process or subjective effects of extraneous information, nor can such information be considered by the trial or appellate courts." *United States v. Bagnariol*, 665 F.2d 877, 884-85 (9th Cir. 1981).

/ / /

---

[7] These standards derive mostly from criminal cases, but the Ninth Circuit states the same should be applied for civil cases. *Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Serv. Co.*, 206 F.3d 900, 906 (9th Cir. 2000) (*citing Rinker v. County of Napa*, 724 F.2d 1352, 1354 (9th Cir. 1983) (stating that reliance on criminal cases is appropriate because the "integrity of the jury system is no less to be desired in civil cases.").

2 **a. Internal vs. External Information**

3    In this case, the Court ordered an evidentiary hearing primarily to resolve the factual issues

4 raised in the jurors' affidavits concerning the jurors' answers given during *voir dire*. See Sections

5 I.A–C, *supra*. The Court was aware that Defendants might raise the instant alternative argument,

6 and so at the start of the hearing reminded both parties about the preclusive effect of Fed. R. Evid.

7 606. *See* Doc. No. 126-1 at 5:12-8:7 (*citing Warger*, 574 U.S. 40). The Court discussed with the

8 parties its concerns as to the admissibility of any statements from the jurors about deliberations,

9 and while the Court overruled Plaintiffs' 606 objections on much of this testimony at the

10 evidentiary hearing, the testimony remained subject to strike. *See Id.*

11    Now that the evidentiary hearing is complete, and the parties have fully briefed the 606

12 issue, it is clear that the bulk of this testimony is inadmissible under Fed. R. Evid. 606(a) and does

13 not fall under the "extraneous prejudicial information" exception of section (b). Such "internal"

14 issues includes:

15 –  A juror's belief that Defendant City of Fresno could "afford to pay in this case" *See* Doc.

16     No. 126-1 at 74:1-16; *see also* Advisory Committee Notes to Fed. R. Evid. 606 ("Thus

17     testimony or affidavits of jurors have been held incompetent to show . . . speculation as to

18     insurance coverage[.]" (*citing Holden v. Porter*, 405 F.2d 878, 879 (10th Cir. 1969) and

19     *Farmers Co-op. Elevator Ass'n v. Strand*, 382 F.2d 224, 230 (8th Cir. 1967));

20 –  A juror's belief that "[s]omething needed to be done about the number of officer-involved

21     shootings of 'innocents.'" *See* Doc. No. 126-1 at 74:1-16; *see also Morgan v. Woessner*,

22     997 F.2d 1244, 1261 (9th Cir. 1993) ("The juror's observations about sending messages to

23     City Hall . . . simply do not constitute the sort of "extraneous prejudicial information" that

24     falls within the scope [606(b)].");

25 –  The fact that the city-manager-juror was upset for losing his job and that he solicited

26     donations for the family of the Tulare shooting, and that the foreperson-juror knew the

27     family of the Tulare shooting decedent. *See* Doc. No. 126-1 at 65:2-9; 66:21-24; and 68:1-

28     12; *see also United States v. Garrett*, 237 F.3d 631 (5th Cir. 2000) ("[J]uror discussion of

1       personal past experience is not "extrinsic" evidence that requires a new trial."); and

2   &ndash;  The jurors' beliefs about the evidence in the case. *See* Doc. No. 114-4 at ¶ 2; *see also*

3       *Abatino v. United States*, 750 F.2d 1442, 1446 (9th Cir. 1985) ("[J]urors may not be

4       questioned about the deliberative process or subjective effects of extraneous information,

5       nor can such information be considered by the trial or appellate courts." (*quoting*

6       *Bagnariol*, 665 F.2d 877, 884-85).

7 To the extent Defendants rely on this testimony to argue that a new trial is warranted due to the

8 introduction of "extraneous prejudicial information," the motion is denied.

9       Further, the Court is not convinced that the jurors discussion of the Tulare shooting during

10 their deliberations qualifies as "extraneous," given the strong command of the Supreme Court in

11 *Warger*. There, the Court reviewed, for "extraneous prejudicial information" purposes, the fact

12 that during deliberations, a juror related details of her daughter's motor vehicle collision to other

13 jurors while they considered the defendant's liability in that traffic-collision case. 135 S.Ct. at

14 529-30. The Supreme Court characterized this information as "internal," and stated that the

15 accident "may well have informed her general views about negligence liability for car crashes, but

16 it did not provide either her or the rest of the jury with any specific knowledge regarding [the

17 defendant's] collision with [the plaintiff]." *Id.* at 529. Thus, the Court deemed this information

18 inadmissible under 606(b). A review of other "extraneous prejudicial information" cases comports

19 with Justice Sotomayor's characterization of this kind of evidence. *See Sea Hawk Seafoods, Inc. v.*

20 *Alyeska Pipeline Serv.* Co., 206 F.3d 900, 906 (9th Cir. 2000) (characterizing "extraneous

21 information" as "when papers bearing on the facts get into the jury room without having been

22 admitted as exhibits, or when a juror looks things up in a dictionary or directory . . . ."); *see also*

23 *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1223 (10th Cir. 2005) (an "expert juror" who

24 held herself out as a dog training expert and conveyed her knowledge to the jury in a police dog

25 training case did not introduce "extraneous prejudicial information" where she did not discuss

26 "specific extra-record facts relating to the defendant creating a significant possibility of

27 prejudice"); and *Navarro-Garcia*, 926 F.2d at 821 ("Indeed, '50% of the jurors' time [is] spent

28 discussing personal experiences.'") (*quoting* Kessler, "The Social Psychology of Jury

Deliberations," in The Jury System in America 69, 83 (R. Simon ed. 1975)); *Mancuso v. Olivarez*, 292 F.3d 939, 953 (9th Cir. 2002) ("Juror misconduct cases . . . often involve the <u>jury's receipt of information excluded from trial</u> as unduly prejudicial <u>such as evidence of the facts surrounding a defendant's prior conviction, bad reputation, or propensity to violate the law</u>.") (emphasis added).

However, the Court also recognizes other authority has characterized a juror's discussion of other similar instances as "external." These authorities, when discussing a juror's recounting of an occurrence separate-and-apart from the evidence adduced at trial, focus on the <u>facts</u> of the other occurrence themselves, and not the juror's imparting of those facts via their own experiences. *See, e.g., Jeffries*, 114 F.3d at 1490 (juror's communication of the defendant's past criminal record was external <u>because it was based on extrinsic facts</u>); *see also Smith v. Brewer,* 444 F. Supp. 482, 490 (S.D. Iowa), *aff'd*, 577 F.2d 466 (8th Cir. 1978) ("To the extent the evidence may show that the jurors had an opportunity to <u>use the facts in another case</u> as a measuring rod for petitioner's guilt, it would appear that [the affiant juror's] testimony relates to a question of whether extraneous information was improperly brought to the jury's attention.") (emphasis added).

Here, the testimony of a third juror (whom the Court finds credible) indicates:

– At some point after the Court submitted the case to the jury for deliberations, a discussion about the Tulare shooting took place when the city-manager-juror "brought up" the <u>fact that there had been a shooting in Tulare</u> <u>near a church</u> about a year prior in the context of losing his job, and when he said he had some familiarity "with the young man who had been shot by the police." Doc. No. 126-1 at 63:5-15 and 69:16-17;

– The foreperson-juror "brought up the details of . . . the boy[—that] he <u>was schizophrenic and mental illness</u> [sic]" and that <u>everyone knew of his mental illness because "Tulare was a small community</u>." *Id.* at 64:2-3 and 9-23;

– These two jurors discussed "the details of the <u>remains of the [decedent's] body</u>", how the decedent's body <u>remained at the coroner's office for a month because the family could not afford the fees or funeral expenses</u>. *Id.* at 64:11-12 and 65:10-15;

– No specific facts of the shooting itself were discussed, nor did the jurors discuss the legal aspects of that incident. *Id.* at 9-13; 74:17-24;

23

– This discussion happened over a period of 10-15 minutes, mostly while the jury was on a break, but while they were still in the jury room. *Id.* at 66:16; 70:2-5 and 70:14-19;

– The topic of the shooting came up "once" during deliberations, but in contexts separate and apart from any details of the shooting. *Id.* at 73:11 and 73:21-74:16;

The Court takes the third juror's testimony to indicate that much of what was discussed by the city-manager-juror and foreperson-juror concerning the Tulare shooting were those jurors' personal reflections about that incident. Under *Warger*, this testimony would also be inadmissible as "internal" experiences that jurors bring with them. 135 S.Ct. at 529-30; *Sea Hawk Seafoods, Inc.,* 206 F.3d at 906; *Morgan*, 997 F.2d 1244; *Garrett*, 237 F.3d 631. However, the Court recognizes that the third juror also detailed certain specific factual information about the Tulare shooting. Thus, out of an abundance of caution and respect for prior precedent, the Court will analyze whether those specific facts demonstrate any reasonable possibility of affect.

### b. Reasonable Possibility of an Affect

"There is no bright line test for determining whether a defendant has suffered prejudice from an instance of juror misconduct" but "great weight" is placed on "the nature of the extraneous information that has been introduced into deliberations." *Sassounian v. Roe*, 230 F.3d 1097, 1109 (9th Cir. 2000). Courts in this circuit will consider a number of factors, including:

(1) whether the extrinsic material was actually received, and if so, how;
(2) the length of time it was available to the jury;
(3) the extent to which the jury discussed and considered it;
(4) whether the extrinsic material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced;
(5) any other matters which may bear on the issue of the reasonable possibility of whether the introduction of extrinsic material affected the verdict;
(6) whether the information "was ambiguously phrased"; and
(7) whether the material "was insufficiently prejudicial given the issues and evidence in the case."

*Jeffries*, 114 F.3d at 1491; *Bayramoglu*, 806 F.2d at 887. When finding reversible prejudice, courts have found "a direct and rational connection between the extrinsic material and a prejudicial jury conclusion, as distinguished from a connection that arises only by irrational reasoning." *Bagnariol*, 665 F.2d at 885; *see also Navarro-Garcia*, 926 F.2d at 823 (finding

prejudice and granting a new trial where two jurors discussed their extra–record knowledge of the specific case at bar, and where the extrinsic evidence was directly related to the central issue in the case).

For clarity, the Court reiterates the specific facts about the Tulare shooting that were actually discussed by the jury, as recounted by the third juror:

– The fact that there had been a shooting in Tulare near a church about a year prior. Doc. No. 126-1 at 63:5-15 and 69:16-17;

– The fact that the decedent was a boy with a mental illness of which the Tulare community was aware given that it is a small community. *Id.* at 64:2-3; 9-23; and

– The fact that the decedent's body remained at the coroner's office for a month because his family could not afford the fees or funeral expenses. *Id.* at 64:11-12 and 65:10-15.

These facts are not remotely prejudicial to Defendants, as the only rational commonality between those facts and the facts of the instant case is that the individuals who killed the decedents were police officers. *Jeffries*, 114 F.3d at 1491. The lack of a reasonable possibility of an affect on the proceedings is particularly evident from the final lines of Defendants' cross-examination of the third juror:

> **Defendants**: Did the jurors "bring up anything about the fact that the boy in Tulare had a club or a stick?
>
> **Third Juror**: No.
>
> **Defendants**: Did it come up as to whether the shooting had been justified or not?
>
> **Third Juror**: Not to my knowledge, no.").

Doc. No. 126-1 at 74:17-24; *see also Id.* at 70:9-13 (where the third juror agrees that "the specific details of that shooting were not discussed."). Thus, the Court places "great weight" on the fact that the nature of this information shares no rational connection to the instant case. *Sassounian*, 230 F.3d at 1109.

Additionally, it appears that most of the juror's discussion occurred during a break, and the one time the shooting was discussed during actual deliberations, the topic concerned city-

manager-juror's personal experiences having been fired by Tulare (which the Court has already excluded as an "internal" matter). The jury did not linger on the Tulare shooting during deliberations, and it is ambiguous when this discussion took place. Doc. No. 126-1 at 66:16; 70:2-5; 70:14-19; 73:11; and 73:21-74:16. The Court finds certain other of the jurors' statements to be ambiguously phrased, including the two statements made by the third juror in her declaration. [8] See Doc. No. 114-4 at ¶ 2 (stating the city-manager-juror "went into quite a bit of detail about the Tulare shooting[,]" and ¶ 3 the foreperson-juror "engaged the jurors in discussions about the Tulare police shooting."). Finally, there was ample evidence to support the jury's conclusion on the excessive force and negligence questions (as detailed in Section VI, *infra*). Thus, an examination of these facts under the Ninth Circuit's proffered framework does not indicate a reasonable possibility of an effect on the verdict. *Jeffries*, 114 F.3d at 1491; *Bayramoglu*, 806 F.2d at 887; *cf. United States v. Montes*, 628 F.3d 1183, 1189 (9th Cir. 2011) (where the jurors in a marijuana possession case were exposed to information in a newspaper article discussing the federal government's approach to marijuana regulation, the court found such information "insufficiently prejudicial" to support a "reasonable possibility" it affected the verdict); *United States v. Saya,* 247 F.3d 929, 938 (9th Cir. 2001), amended, No. 00-10004, 2001 WL 476942 (9th Cir. May 8, 2001) (where the information discussed by the jury—a shooting unrelated to the underlying crime—had no connection to the issues the jury was required to consider in the case, no prejudice existed); *Brewer*, 444 F. Supp. at 491 (where juror compared the murder case at bar to an unrelated murder incident, the court found no prejudice, as it was "no more than a general qualitative comparison.").

For these reasons, the Court denies Defendants' motion for new trial on the allegation that "external prejudicial information" affected the verdict.

/ / /

---

[8] Defendants forcefully argue the discussion lasted 10–15 minutes, took place during deliberations, and was introduced when jury was deadlocked. The record does not support these contentions and is at best ambiguous about the timing of the discussions in relation to their individual votes. The Court appreciates that Defense Counsel has a duty to zealously pursue their clients' interests, but the Court cannot characterize the jurors' testimony in such a broad and weighted manner. Defense Counsel may be intimately aware of the facts surrounding the Tulare shooting, given their firm's representation of the City of Tulare in that case, but the record indicates the jurors did not discuss these details during deliberations.

**II.      The damages for loss of enjoyment of life are supported by law.**

*Parties' Arguments*

Defendants contend that under Rule 59, the jury's award of $2 million for decedent's "loss of enjoyment of life" must be voided because the law does not authorize such an award. They maintain that under Ninth Circuit precedent and California Code of Civil Procedure, the only damages allowed under § 1983 are those for pre-death "pain and suffering."

Plaintiffs counter that "loss of enjoyment of life" damages are clearly allowed in the Ninth Circuit, as demonstrated by Ninth Circuit Model Jury Instruction 5.2 and as supported by *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1103 (9th Cir. 2014). Plaintiffs also point to numerous post-*Chaudhry* excessive-force cases where the district court allowed these damages.

*Analysis*

Section 5.2 of the Ninth Circuit's Model Civil Jury Instructions list a number of types of damages (stated in brackets) that juries may consider in civil cases. *See* Ninth Circuit Model Jury Instruction No. 5.2 (2019). These include:

> [The [disability] [disfigurement] [loss of enjoyment of life] experienced [and that
> with reasonable probability will be experienced in the future];]
>
> [The [mental,] [physical,] [emotional] pain and suffering experienced [and that
> with reasonable probability will be experienced in the future];] . . . .

*Id*. Thus, the Court finds support in the Ninth Circuit's instructions for the "loss of enjoyment of life" (so called "hedonic") damages. The Court is cognizant of Defendants' argument that the model instruction is set up in such a way that bracketed clauses should be chosen based on what is allowed for the particular cause of action. Section 1983 is silent on the measure of damages, and so the Court is to look to state law "unless it is inconsistent with the policies of § 1983." *Chaudhry*, 751 F.3d at 1103.

In *Chaudhry*, the Ninth Circuit confronted the question of whether pre-death pain and suffering damages were allowed in § 1983 suits brought in California. *Id*. The defendants in that case argued that since Cal. Code Civ. Proc. § 377.34 barred a decedent's estate to recover for the decedent's pre-death pain and suffering, these damages should similarly be barred under § 1983. The Ninth Circuit disagreed, reversing the district court's striking of the jury's $1,000,000 verdict

27

in favor of the estate. *Id*. In so doing, the court reasoned that "[o]ne of Congress's primary goals in enacting § 1983 was to provide a remedy for killings unconstitutionally caused or acquiesced in by state governments." *Id*. (citing *Monroe v. Pape*, 365 U.S. 167, 172-76 (1961). The court concluded that since the "practical effect of § 377.34 is to reduce, and often eliminate, compensatory damage awards for the survivors of people killed by violations of federal law, . . . a prohibition against pre-death pain and suffering awards for a decedent's estate has the perverse effect of making it more economically advantageous for a defendant to kill rather than injure his victim." *Id*. at 1103-04. Thus, pre-death pain-and-suffering awards are allowed for § 1983 cases where the victim died from the unconstitutional conduct of the defendant. *Id*.

Here, the reasoning of *Chaudhry* supports the jury's award of damages for "loss of enjoyment of life." The Court recognizes the split amongst California federal district courts, as cited by the parties. Federal district courts in the central and northern districts have long allowed for "loss of enjoyment of life" damages, finding the exclusion of such damages to be inconsistent with the purposes of Section 1983. *See T.D.W. v. Riverside County*, 2009 U.S. Dist. LEXIS 69189, *21-22 (C.D. Cal. July 27, 2009); *Garcia v. Whitehead*, 961 F.Supp. 230, 233 (C.D. Cal. 1997); *Williams v. County of Oakland*, 915 F.Supp. 1074 (N.D. Cal. 1996); *Guyton v. Phillips*, 532 F. Supp. 1154, 1167-68 (N.D. Cal. 1981). Conversely, courts in the eastern district, including this very Court, have found hedonic damages barred under California law. *Provencio v. Vazquez*, 2008 U.S. Dist. LEXIS 73255 (E.D. Cal. 2008) (Ishii, J.) ("This court respectfully declines to follow the reasoning of the Northern District [in *Guyton*] and Central District [in *Garcia*], and this court agrees with the holding reached by other courts in this District and the California Court of Appeal. . . . this court finds that the Estate's claims for pain and suffering damages and hedonic damages are precluded by Section 377.34."); *but see Duenez v. City of Manteca*, 2011 U.S. Dist. LEXIS 124524, * (E.D. Cal. Oct. 27, 2011) (Karlton, J.) (disagreeing with *Provencio* but declining to award pain-and-suffering damages because "it would inappropriate to have the results of an issue turn upon whichever judge happens to be assigned to a case[.]"). Critically, the Court notes that the cases in California federal district courts denying survival damages, including "loss of enjoyment of life" damages, are pre-*Chaudhry*; and courts in this district have authorized hedonic

28

damages in the post-*Chaudhry* landscape. *See Dominguez v. County of Kern*, 2014 WL 2574798, *4 (E.D. Cal. June 9, 2014) (Thurston, M.J.) (recommending approval of "pain and suffering" damages and "hedonic" damages post-*Chaudhry*) (adopted by *Dominguez v. County of Kern*, 2014 WL 2919157 (E.D. Cal. June 26, 2014) (O'Neill, J.)). The Court's decision is further buffeted by Plaintiffs' exhibits showing such damages being approved of by other post-*Chaudhry* courts in California. *See* Doc. No. 111-5 to -8 (verdict forms from five § 1983 cases in the central, eastern, and northern district courts where the "loss of enjoyment of life" damages were awarded by the jury).

For these reasons, Defendants' motion to void the "loss of enjoyment of life" damages awarded under 42 U.S.C. § 1983 is denied.

**III.    The award of $250,000 for Casillas's pain and suffering is not excessive.**

*Parties' Arguments*

Defendants contend the jury's award of $250,000 for decedent's pain and suffering is contrary to the evidence. They argue that the jury should have considered the amount of time the decedent was conscious after injury. They also argue analogous cases demonstrate awards about one-tenth the amount in situations where the decedent was conscious for a longer period.

Plaintiffs counter that ample evidence existed to support the jury's award, including testimony from the medical examiner regarding Casillas's injuries (and the pain one might experience from them), testimony from the paramedic regarding her struggle with Casillas during her on-scene treatment of him, and evidence that Casillas did not die until about 6 hours after being shot.

*Analysis*

An important principle of damages in § 1983 actions is that compensatory damages may be awarded only for the actual injuries suffered as a result of the violation of constitutional rights. Compensatory damages awarded under § 1983 must be based on the actual injuries caused by the deprivation of the constitutional right. *Carey v. Piphus*, 435 U.S. 247, 264 (1978) (§ 1983 actions are a "species of tort liability" intended to "compensate persons for injuries that are caused by the deprivation of constitutional rights."). Pain-and-suffering damages, like any other damages, must

be proved—even in a § 1983 action. *Id*. (no compensatory damages could be awarded for violation of that right absent proof of actual injury).

Pain and suffering damages cannot be supported entirely by rational analysis, but is inherently subjective, involving experience and emotions, as well as calculation. *See Dixon v. International Harvester Co.*, 754 F.2d 573, 590 (5th Cir. 1985). Whatever the injury, "damages must always be designed to compensate injuries caused by the [constitutional] violation." *Carey*, 435 U.S. at 265.

In *Cook v. Ross Island Sand & Gravel Co.*, 626 F.2d 746, 750 752 (9th Cir. 1980), a decedent's estate was awarded $35,000 for 2.5 minutes of suffering while the decedent—conscious for most of it—drowned. In *Willis v City of Fresno*, the Court found an award of $25,000 to be just given the decedent's pain and suffering lasting 15-30 seconds—from multiple gunshot wounds. 2017 WL 5713374, at *7-8 (E.D. Cal. Nov. 28, 2017). In *Hambrook v. Smith*, the Court found the one-to-two-and-a-half-minutes that elapsed while decedent was conscious supported an award of $50,000. 2016 WL 4408991, at *36 (D. Haw. Aug. 17, 2016) ("[W]hile the decedent's pre-death pain and suffering may have been relatively short, it was agonizing and frightful."). In *Randall v. Chevron U.S.A., Inc.*, the Fifth Circuit found that an award of $500,000 was appropriate for a seaman who drowned after falling into the water when attempting to evacuate a vessel during high seas. 13 F.3d 888, 901 (5th Cir. 1994) (*overruled on other grounds Bienvenu v. Texaco, Inc.*, 164 F.3d 901 (5th Cir. 1999)). He managed to swim to the leg of a platform, clung as best he could in rough water for twenty-five minutes. *Id*. Efforts to save him were unsuccessful and he eventually drowned. When his body was recovered his legs were lacerated from being thrown against the barnacle encrusted leg of the platform by the rough waves. On appeal, the Fifth Circuit reduced a jury award for pre-death pain and suffering from $1,000,000 to $500,000 for the twenty-five minutes of pain and suffering. *Id*.

Here, the Court finds substantial evidence to support the award of $250,000 for pain-and-suffering damages, and given the authorities above, does not find it to be against the weight of the evidence. The jury heard testimony from multiple witnesses who observed Casillas struggling for at least 10 minutes after he was shot, as well as testimony that he did not die at the hospital until six hours after the incident. Paramedic Robin Anderson testified the call for medical services came

in at 5:38pm, she arrived ten minutes later, and by 5:59pm she and her team were able to stabilize Casillas enough to transport him to the hospital. Doc. No. 108 at 120:12 to 124:25. She testified Casillas "kept kind of fighting" when she tried to apply "bag valve ventilations." *Id*. at 124:16-20. She also testified after receiving some medical treatment, Casillas showed "dramatic improvement" and was able to even take breaths on his own and ended up having a stronger pulse after receiving such treatment. *Id*. at 124:9-13. Paramedic Anderson stated Casillas's lung had collapsed, making breathing difficult and that he had about 6-8 inches of lung tissue protruding through the opening of the gunshot wound on his abdomen. *Id*. at 123:14-21, 125:5-14. Additionally, Dr. Gopal, Casillas's post-mortem medical examiner, testified how Casillas's three gunshot wounds and knee wounds would have been painful. Doc. No. 108 at 34:3-25; 37:13 to 38:9; 43:4 to 45:2. Dr. Gopal also confirmed that Casillas did not die until the following day, after surgery and a short period of survival in the hospital. *Id*. at 22:14-18. Thus, the evidence indicates Casillas spent 21 minutes bleeding out on the floor—while being conscious for most of it—and spent an additional six hours at the hospital before dying. This not only supports the jury's determination that Casillas experienced pain and suffering, but also supports a finding that an award of $250,000 is not outside of the bounds of reason. Compare *Cook*, 626 F.2d at 750 ($35,000 for 2.5 minutes of suffering); *Willis*, 2017 WL 5713374 at *7-8 ($25,000 for 15 seconds of pain); *Hambrook,* 2016 WL 4408991 at *36 ($50,000 for 2.5 minutes of conscious suffering); *Randall*, 13 F.3d at 901 (reducing jury's award to $20,000 per minute of pain and suffering).

Thus, Defendants' motion for new trial on the basis that the jury's "pain and suffering" damages was excessive is denied.

### IV.     The issue with the negligence verdict is one of harmless surplusage.

*Parties' Arguments*

Defendants contend the jury returned an inconsistent verdict on Plaintiffs' negligence claim, requiring a new trial. Defendants point to the fact that, despite the clear instructions on the verdict form to ignore the comparative-negligence-apportionment question, the jury apportioned fault at 40% to Casillas and 60% to Shipman—even though the jury also found Casillas not to be a substantial cause of his own death.

Plaintiffs counter that clear Ninth Circuit authority requires the Court to reconcile any inconsistencies in any reasonable way—only ordering a new trial "when all such efforts fail." Plaintiffs maintain that the Court need not reach a conclusion that an inconsistency exists simply because the jury answered the first two comparative-negligence questions properly (Was Casillas negligent? Yes. Was he a substantial cause of his own death? No.). Even if the jury's answering of the apportionment question is inconsistent, Plaintiffs argue that because the jury found for them on the battery claim—which contains no comparative fault provision—they are entitled to 100% of their wrongful death damages (see Question 11, concerning the survivors' losses).

Defendants reply that because the battery and negligence damages were not separated, it would be impossible to distinguish between these two causes for the damages allotment.

<u>Analysis</u>

The United States Supreme Court has held that, when confronted by seemingly-inconsistent answers to the interrogatories of a special verdict, the district court has a duty under the Seventh Amendment to harmonize those answers, if such be possible under a fair reading of them. *Gallick v. Baltimore & O.R.R. Co.*, 372 U.S. 108, 110, 119 (1963). A court is also obligated to try to reconcile the jury's findings by exegesis, if necessary. *Id*. Only in the case of fatal inconsistency may the court remand for a new trial. *Id*. at 119-20.

In *Floyd v. Laws*, the Ninth Circuit was confronted with a situation where the jurors rendered seemingly-inconsistent verdicts. 929 F.2d 1390 (9th Cir. 1991). One such inconsistency involved two questions presented to the jurors on liability and damages. *Id*. at 1394-1400. Question 13 read: "Was plaintiff [] damaged as a result of any of the actions of defendant[?]"—to which the jurors answered "no." *Id*. at 1392-93. The verdict form then instructed that "If your answer to question 13 is 'No,' do not answer any further questions, but proceed to the end of this form and sign the verdict. If you answered 'Yes' to question 13, proceed to question 14." *Id*. at 1393. Question 14 read: "What amount of money will reasonably compensate plaintiff [] for any of the actions of defendant[?]" In contravention of the instructions on the form, the jury responded: "$7,500.00." *Id*. The district court (O'Scannlian, J.) disregarded the $7,500 award, and the Ninth Circuit affirmed. In so doing, the circuit court first deemed the verdict to be a "special

32

verdict" form ("simply because that is what the trial court declared them to be."). *Id*. at 1396. The circuit court then determined that under *Gallick*, the district court had a duty to harmonize any inconsistencies, and should not award the appellants with a new trial unless the court determined an inconsistency was "fatal." *Id*. However, the circuit court found no such inconsistency, as the jury was not supposed to answer question 14—rendering the answer to this question a surplusage. Id. at 1398-1400. The circuit court based its holding on the logic of a prior Ninth Circuit case, holding that a trial court must ignore parenthetical comments as surplusage (*see Tanno v. S.S. President Madison Ves*, 830 F.2d 991, 993 (9th Cir. 1987)), as well as the persuasive authority of a Fifth Circuit case holding that trial court must ignore subsequent answers, given in violation of instructions, as surplusage (*White v. Grinfas*, 809 F.2d 1157, 1161 (5th Cir. 1987)). Thus, the Ninth Circuit held that when the jury "violate[s] the district court's express written instructions contained on the special verdict form itself[,]" the trial court is "bound by law to disregard any [subsequent, dependent] answer as surplusage." *Id*. at 1398-1399.

As in *Floyd*, the Court here finds the jury's response to Question 8 to be surplusage. Questions 4 and 5 required the jury to determine whether Officer Shipman was negligent, and whether his negligence was a substantial factor in causing Casillas's death; the jury answered yes to both of these questions. Doc. No. 88 at p. 3. The jury was then asked whether Casillas himself was negligent, and the jury answered yes. *Id.* at p. 4. The verdict form then asked: "Was Casimero Casillas'[s] negligence a cause of his own death?", and the jury answered "No." *Id*. The verdict form then instructed "If you answered yes [to this question], proceed to Question 8", (the apportionment of fault question), but "If you answered no, proceed to Question 9," (the damages question for excessive force). *Id*. Instead of moving to Question 9, the jury answered Question 8, apportioning fault at 60% for Officer Shipman and 40% for Casillas. *Id*. Despite this error, the Court is "bound to disregard" the jury's answer to Question 8 under *Floyd*, as damages can only be apportioned under California law where the victim's negligence caused his injuries. *See Pfeifer v. John Crane, Inc.* 220 Cal. App. 4th 1270, 1285-1288 (finding no error in jury's refusal to apportion percent of damages to plaintiff where jury determined plaintiff was negligent, but that his negligence was not a substantial factor in causing his harm); *see also* Cal. Prac. Guide Pers.

Inj. (Rutter), Ch. 3-D "Mitigating Factors in Reduction of Damages" ("Indeed, even where plaintiff was negligent, the trier of fact may be justified in assigning zero fault to plaintiff if it finds plaintiff's negligence was not a substantial factor in causing the injury."). Thus, Defendants' motion for a new trial on the issue of the jury's apportionment of negligence is denied.[9]

## V. The Court properly instructed the jury on the Battery and Fourth Amendment causes of action.

### *Parties' Arguments*

Defendants contend the Court committed reversible error by folding together the § 1983 excessive force claim with the state law battery claim, contending that despite the similarities in these claims, the standards are no longer the same. The California model instruction for battery includes a "no duty to retreat" provision that, from Defendants' perspective, should have been given to the jury. They also contend the absence of a battery claim precludes them from resolving the forthcoming dispute over attorneys' fees (whether they are awarded under federal or state law).

---

[9] Plaintiffs also contended, without citation to authority, that Defendants waived their right to submit a motion for new trial on the faulty-apportionment issue, arguing that "after this error was discovered [at trial when the Court published the jury's verdict], defense counsel never asked the Court to have the jury clarify the error on the verdict form." The Court recognizes there is some authority for Plaintiffs' argument. *See Duk v. MGM Grand Hotel, Inc.*, 320 F.3d 1052, 1056 (9th Cir. 2003) ("The practice of resubmitting an inconsistent verdict to the jury for clarification is well-accepted. Federal Rule of Civil Procedure 49(b) provides that general verdict sheets may be 'return[ed] to the jury for further consideration of its answers and verdict' when the answers to interrogatories are inconsistent with each other or with the general verdict. Although Rule 49(a), dealing with special verdicts [], does not explicitly provide for resubmission in case of an inconsistency, we have held that, because the rule does not prohibit it, special verdicts are also subject to the practice.") (cleaned up). However, the authorities in the Ninth Circuit appear somewhat conflicted as to when a court should deem a failure to object to an errant jury verdict as a waiver of the party's right to raise the issue in a motion for new trial. *Cf. Kode*, 596 F.3d at 611 (stating that argument as to alleged inconsistency between damages and liability findings are waived when "the moving party argues that the jury has rendered a verdict that contains two legal conclusions that are inconsistent with one another, and the moving party does not object before jury discharge.") (citing *Philippine Nat'l Oil Co. v. Garrett Corp.*, 724 F.2d 803, 805-06 (9th Cir. 1984)); *with Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1037 (9th Cir. 2003) (commenting on out-of-circuit cases that have noted how waiver does not apply to special verdicts); *see also Floyd*, 929 F.2d at 1396 (deeming the interrogatories—which broke up the plaintiffs' legal claims into elements—to constitute a special verdict "simply because that is what the court declared them to be."). Here, it is not completely clear which authorities governs the verdict in this case, and given the paucity of briefing on this issue, the Court believes it would not be proper to rule on Defendants' motion for new trial based on their apparent waiver. Further, a ruling on this issue is obviated by the clear instruction of *Floyd*—that the Court is to disregard the jury's answer to the apportionment question as "superfluous." Nevertheless, the Court believes that the parties (and future litigants) should take heed of *Duk*—by requesting the court to resubmit the verdict to the jury for clarification *prior* to their being excused—lest a future court deem the failure to object a waiver of their right to argue the issue on a motion for new trial. *See Zhang*, 339 F.3d 1030-37 (warning against 'sandbagging' and the undermining of judicial economy when considering a movant's inconsistent-verdict argument); *see also Brode v. Cohn*, 966 F.2d 1237, 1239 (8th Cir. 1992) ("[If] trial counsel fails to object to any asserted inconsistencies and does not move for resubmission of the inconsistent verdict before the jury is discharged, the party's right to seek a new trial is waived."); *Golub v. J.W. Gant & Associates*, 863 F.2d 1516 (11th Cir 1989) (finding party's failure to challenge consistency of special verdict before jury was excused to be waiver of the argument on appeal).

Plaintiffs counter that the jury was properly instructed, as the § 1983 and battery claims in this case were identical, and because the jury answered "yes" to the excessive force question, it is easy to determine the jury found for Plaintiffs on both claims. They contend the Court did not otherwise err in excluding the "duty to retreat" language because Defendants could argue their theory of the case (that Officer Shipman had no time to pull his Taser) under the 9.25 instruction.

*Analysis*

Jury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading. *White v. Ford Motor Co.*, 312 F.3d 998, 1012 (9th Cir. 2002). Prejudicial error results from jury instructions that, when viewed as a whole, fail to fairly and correctly cover the substance of the applicable law. *Id*.

Courts in both the Ninth Circuit and California have long held that excessive force claims under 42 U.S.C. § 1983 are the same as those brought under a cause of action for battery. *Saman v. Robbins*, 173 F.3d 1150, 1157 (9th Cir. 1999) ("[Plaintiff's] battery claim must fail along with his § 1983 claim because we hold that no reasonable jury could have found that [the officer's] actions were objectively unreasonable under the circumstances."); *see also Harding v. City & Cty. of San Francisco*, 602 F. App'x 380, 384 (9th Cir. 2015) ("Appellant did not establish an excessive force claim under section 1983 against any Appellee, and her state-law battery claims fail for the same reasons."); *Garlick v. Cty. of Kern*, 167 F. Supp. 3d 1117, 1177 (E.D. Cal. 2016) ("State law claims for battery are coextensive with claims for excessive force under the Fourth Amendment.") (*citing Sanders v. City of Fresno*, 551 F.Supp.2d 1149, 1179 (E.D. Cal. 2008) aff'd, 340 Fed. Appx. 377 (9th Cir. 2009); *Yount v. City of Sacramento*, 43 Cal. 4th 885, 902 (2008) ("Section 1983 creates a species of tort liability and has been described as the federal counterpart of state battery or wrongful death actions. Indeed, [plaintiff's] common law battery cause of action, like his section 1983 claim, requires proof that [the officer] used unreasonable force.") (cleaned up); *Susag v. City of Lake Forest*, 94 Cal. App. 4th 1401, 1413 (2002) ("To avoid jury confusion and to ease judicial administration, it makes sense to require plaintiff to prove unreasonable force on both claims."). Under this authority and guidance, the Court determined that Plaintiffs' battery claim should be folded into their § 1983 claim, to prevent the risk of inconsistent verdicts. The Court

informed the parties that it would be submitting one instruction in the verdict form as to Officer Shipman's use of excessive force, and the jury's determination on this question would control both the § 1983 and battery claims. *See* Doc. No. 108 at p. 122.

Defendants argue that the Supreme Court's decision in *Hayes v. County of San Diego* has changed this landscape. 57 Cal. 4th 622 (2013). They quote *Hayes* for the proposition that "state and federal standards are not the same," they extrapolate from this statement that § 1983 and California battery are different. *Id.* at 639. However, the analysis in *Hayes* concerns the differences between § 1983 and *negligence* and not, as Defendants contend, § 1983 and battery. *See Id.* ("[S]tate *negligence* law, which considers the totality of the circumstances surrounding any use of deadly force, is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used.") (internal citations omitted). Thus, *Hayes* is inapposite.

Defendants also point to CACI 1305 for support that Plaintiffs' battery claim in this case differs from their § 1983 claim, and therefore renew their arguments (first made during the jury instruction conference) that the Court's folding of the battery instruction into the § 1983 claim was prejudicial error. This model instruction includes the following bracketed section:

> [[A/An] [insert type of peace officer] who makes or attempts to make an arrest is not required to retreat or cease from his or her efforts because of the resistance of threatened resistance of the person being arrested.]

*See* CACI 1305 "Battery by Peace Officer" (2019). Defendants argued at the jury instruction conference that by omitting the battery instruction completely, they would be precluded from arguing against the Plaintiffs' theory that Officer Shipman should have retreated instead of using deadly force, given that the Ninth Circuit model instruction (9.25) does not contain similar language. However, the Court found this bracketed excerpt to be inapplicable to Plaintiffs' case and would not have included it even if it had given a separate battery instruction. Plaintiffs did not argue that Officer Shipman should have retreated from the room instead of affecting an arrest of Casillas. Instead, Plaintiffs contended throughout trial that Officer Shipman could have used less-lethal force to affect Casillas's arrest, by using his Taser or the like. *See Estate of Lopez by &*

*through Lopez v. Gelhaus*, 871 F.3d 998, 1011 (9th Cir. 2017) (describing the standard for the use of deadly forces as whether the decedent posed an "immediate threat to the safety of the officers or others[.]") Plaintiffs' theory of negligence was also partially predicated on Officer Shipman's pre-shooting tactical conduct, that had the Officer set up properly, he could have had time to take a step back in order to deploy his Taser. *Hayes*, 736 F.3d 1223, 1236 (9th Cir. 2013) ("[A]n officer's pre-shooting conduct is properly included in the totality of circumstances surrounding [his] use of deadly force, and therefore the officer's duty to act reasonably when using deadly force extends to pre-shooting conduct"). After listening to the testimony, the Court determined that Defendants' proffered bracketed instruction for the battery claim was inapposite and declined to provide it— either by giving CACI 1305 or by modifying the Ninth Circuit's Model Instruction 9.25. Thus, the Court also determined that Defendants' citations to *Hernandez v. City of Pomona* were inapposite. *See* 46 Cal. 4th 501, 519 (2009) ("Long ago, we explained that an officer with probable cause to make an arrest is not bound to put off the arrest until a more favorable time and is under no obligation to retire in order to avoid a conflict. Instead, an officer may press forward and make the arrest, using all the force reasonably necessary to accomplish that purpose. Consistent with these principles, Penal Code section 835a provides that a peace officer with reasonable cause to make an arrest may use reasonable force to effect the arrest and need not retreat or desist from his efforts to make an arrest by reason of the resistance or threatened resistance of the person being arrested.").

Instead, the Court determined that 9.25 allowed Defendants plenty of space to argue their theory that Officer Shipman did not use excessive force, that he had no time to deploy his Taser, and that he was not negligent in his tactical decisions prior to the shooting. The instruction ultimately given provided the jury with the Ninth Circuit's model language on excessive force and objective reasonableness, and informed the jury to consider "all of the circumstances known to the officer on the scene," including:

1. The nature of the crime or other circumstances to which the officer was responding at the time the force was applied;

2. Whether Casimero Casillas posed an immediate threat to the safety of the officer or others;

3.    Whether Casimero Casillas was actively resisting arrest or attempting to evade arrest by flight;

4.    *The amount of time the officer had to determine the type and amount of force that reasonably appeared necessary, and any changing circumstances during that period;*

5.    *The type and amount of force used;*

6.    *The availability of alternative methods to take Casimero Casillas into custody;*

7.    Whether it was practical for the officer to give warning of the imminent use of force, and whether such warning was given;

8.    Whether it should have been apparent to the officer that the person he used force against was emotionally disturbed[.]

Doc. No. 108 at pp. 146-47 (emphasis added). Thus, when the jury found Officer Shipman used excessive force, this decided liability in Plaintiffs' favor under both 42 U.S.C. § 1983 and California battery (as the Court described during the jury instruction conference). Doc. No. 108 at pp. 146-147. Given that the Court did not misstate the law on this issue, and given the jury was not mislead, no grounds exist to award a new trial on the battery claim. *White*, 312 F.3d at 1012.

**VI.    Substantial evidence exists to support the jury's verdict, and the verdict is not against the clear weight of the evidence.**

*Parties' Arguments*

Defendants contend the verdict is not supported by substantial evidence, and so renew their request for a directed verdict under Rule 50(b). They also contend the jury's verdict is not supported by "the clear weight of the evidence," and so request a new trial under Rule 59. In support, Defendants point to certain evidence that would support a defense verdict, including Officer Shipman's testimony and the testimony of Plaintiffs' police-practices expert.

Plaintiffs counter that, given the "abundance of evidence presented at trial to support the jury's verdict" on the § 1983, battery, and negligence claims, a directed verdict would be inappropriate. They further contest the idea that the verdict is against the weight of the evidence. In support, they point to the affirmative evidence supporting the verdict as well as the discrepancies in Officer Shipman's testimony.

*Legal Standard*

2        When tasked with reviewing the verdict under both Rule 50(b) and Rule 59, the Court is

3 faced with competing standards that it must apply. Under Rule 50(b), a court is not to reweigh the

4 evidence, and may only grant a renewed motion for a directed verdict if no substantial evidence

5 exists to support the jury's findings. *See Landes*, 833 F.2d at 1371. Substantial evidence is that

6 which "reasonable minds might accept as adequate to support a conclusion even if it is possible to

7 draw two inconsistent conclusions from the evidence." *Id.* Under Rule 50, the court "may not

8 substitute its view of the evidence for that of the jury." *Winarto v. Toshiba Am. Elecs.*

9 *Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001). Instead, the evidence is viewed "in the

10 light most favorable to the nonmoving party". *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1036

11 (9th Cir. 2018); *Harper v. City of L.A.*, 533 F.3d 1010, 1021 (9th Cir. 2008) (all evidence

12 favorable to the moving party that the jury is not required to believe must be disregarded); *see also*

13 *Krechman v. Cty. of Riverside*, 723 F.3d 1104, 1110-11 (9th Cir. 2013) (reversing a grant of a

14 Rule 50 motion where the court's analysis of the § 1983 claim "weighed evidence" and was

15 "infected by impermissible credibility assessments").

16        Conversely, when parties requests a new trial under Rule 59 because they contend the

17 jury's verdict is against the clear weight of the evidence, the Court is permitted to weigh the

18 evidence and assess the credibility of witnesses, and "need not view the evidence from the

19 perspective most favorable to the prevailing party." *Landes*, 833 F.2d at 1371. This more lenient

20 standard exists under Rule 59 because the remedy (a new trial) is much less drastic than that of

21 Rule 50 (ending the proceedings). *See Id.* at 1371-72; *see also* Wright and Miller, 9B Fed. Prac. &

22 Proc. Civ. § 2531 (3d ed.) ("On a motion for new trial, the district court has a wide discretion to

23 order a new trial whenever prejudicial error has occurred.").

24 *Analysis*

25        The Supreme Court has instructed that in Fourth Amendment excessive force cases, the

26 officer's use of force is to be viewed "in light of the facts and circumstances confronting [the

27 officers] without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S.

28 386, 397 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable'

under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396. Because this balancing nearly always requires a jury to sift through disputed factual contentions and to make credibility determinations—and draw inferences therefrom, "judgment as a matter of law . . . should be granted sparingly" in excessive force cases. *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003).

### A.    Rule 50(b) Renewed Motion for a Judgment Notwithstanding the Verdict

Taking the facts in a light most favorable to the verdict for Rule 50(b) purposes, the Court finds the jury's determination—that Officer Shipman's use of force was excessive—to be supported by substantial evidence. Considerable testimony demonstrated Casillas's attempts to avoid capture, first by fleeing from officers in his vehicle (Doc. No. 107 at 129:6-20; 130:15-20), then by hiding in a detached apartment behind Casillas's friends' house (*Id.* at 34:6) for 15 to 20 minutes (*Id.* at 28:1-10; 131:7-9). The search team included multiple officers and K-9 units (*Id.* at 32:12-22), and Casillas was likely aware of the dogs due to the officers' continued announcements (*Id.* at 36:21-37:1; 136:18-23). Since there also was testimony indicating Casillas was afraid of dogs (Doc. 105 at 27:6-8), the jury could have inferred Casillas carried the pipe to protect himself (Doc. 107 at 136:24-137:4) and not, as Defendants contend, attack Officer Shipman or others (*see Id.* at 137:22-138:22 and 150:3-4, testimony of Officer Long that Casillas "lackadaisical[ly]" walked away from him; *see also Id.* at 170:4-21 and 177:1, testimony of Officer Wright that Casillas was not threatening and was on a "Sunday stroll").

As to Officer Shipman's encounter with Casillas, the Officer testified he had no information Casillas had verbally threatened or attacked any of the officers during their search for him (Doc. 107 at 34:16-24). Critically, Officer Shipman stated that, during the time he and Casillas were alone in the room together, Casillas never made eye contact with him (*Id.* at 67:21-23, 109:3-11, and 124:25-125:4), nor was Casillas running while in the room (*Id.* at 51:2-4). The Officer testified that at no time did Casillas strike at, verbally threaten, or otherwise swing the pipe at him (*Id.* at 51:5-16), and that only a "couple seconds" passed between when Casillas entered the room and when the Officer fired his weapon (*Id.* at 94:17-22 and 111:13-15; *see also Id.* at

40

174:21-24, testimony of Officer Wright that the shots happened right after, one or two seconds, after Casillas entered the room). Officer Shipman testified that he gave no verbal warning that he was going to shoot before firing (*Id.* at 10:17-23 and 77:14-15), and that his alleged shouts to "stop" were given almost simultaneous with his firing of his weapon (*Id.* at 68:12-15). Based on this testimony, reasonable jurors could infer a) Casillas was attempting to continue evading officers by escaping through the open door leading to the frontage road (*Id.* 107 at 37:15-16 and 43:1-8, indicating the "escape" door was open), b) that Officer Shipman fired on Casillas almost immediately after spotting him in the room, despite Casillas's attempts to escape, and c) that the officer fired three successive shots in a fraction of a second (*Id.* at 105:11-14) despite his failure to provide any warning that deadly force was going to be employed. *See Harris v. Roderick,* 126 F.3d 1189, 1204 (9th Cir. 1997) ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed."); *cf. Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005). ("[W]here a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force.").

Defendants forcefully argue, as they have since summary judgment, that Officer Shipman shouted "at the top of his lungs" for Casillas to stop, but that Casillas instead closed the distance to within a few feet with a raised metal pipe with the intent to attack the officer. However, there were significant discrepancies in Officer Shipman's testimony that could have led a jury to discredit Officer Shipman's version of events. For example, Officer Shipman previously testified in deposition that he never considered taking a step back to increase the distance between he and Casillas, despite his testimony at trial to the contrary (Doc. 107 at 119:10-14, impeachment testimony). In deposition, Officer Shipman could not recall if the pipe was raised above Casillas's head, despite testifying in court that it was (*Id.* 119:24-120:2). Officer Shipman also testified that Casillas was in a "pre-assaultive" stance (*Id.* at 56:3-13), and his training was that deadly force cannot be used on a "resistive" or "assaultive" individual (*Id.* at 55:23-56:2). Further, Officers Long and Wright, who were both near the room where Officer Shipman was stationed, testified they did not hear any shouts or commands (*Id.* at 139:15-17; )—contrary to Officer Shipman's

testimony that he shouted "at the top of his lungs" (*Id.* at 68:12-15).[10] This is the exact reason why the Ninth Circuit has cautioned against the use of judgments as a matter of law in excessive force case, especially in situations where "the person most likely to rebut the officers' version of events—the one killed—can't testify[.]" *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079-80 (9th Cir. 2014) (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). Thus, to force through Officer Shipman's version of the events—after a jury has found for Plaintiffs on the exact claims Defendants now seek to overturn—would be to disregard both a) the alternatively-plausible scenario that Casillas had to navigate the cluttered room to reach the "escape" door (*Id.* at 54:21-22), and b) the jury's *explicit* factual determination that Casillas did not pose an immediate threat of death or serious bodily injury to Officer Shipman at the time of the shooting (Doc. No. 88 at p. 2, Verdict Form, Question 2). Under Rule 50, the Court has no authority to override the jury's factual determinations. *Castro*, 833 F.3d at 1066 (all evidence should be "construed in the light most favorable to the nonmoving party.").

As to Plaintiffs' negligence claim, additional testimony supports an inference that Officer Shipman made poor tactical decisions prior to his encounter with Casillas—decisions that ultimately led to the Officer's unwarranted use of deadly force; this includes:

- Officer Shipman's testimony that he was assigned to cover the door leading to the back yard (107 at 39:2-4), his awareness that Casillas was likely in the detached apartment behind the house (107 at 40:10-13), his awareness that the house had been cleared (107 at 40:2-5), his decisions to position himself on raised steps with his back to the door leading to the back yard (107 47:13-48:17);

- Officer Shipman's testimony that he was "surprised" when he spied Casillas in the room (107 at 56:22-25), despite the fact that the sole reason he was dispatched was to search for Casillas;

- The Officer's testimony that he momentarily unclipped his Taser had no time to deploy it (107 at 22:14-18), as well as his testimony that his positioning on the steps would not have allowed him to "back-pedal" (107 at 55:6-12)—despite his training to keep distance from a person with an object if possible (107 at 22:19-22); and

---

[10] This also includes the testimony of Officer Shipman concerning the dictates of a supposed procedures manual, which Defendants never produced and which the Officer Shipman appeared to rely upon regarding the Taser. *See* Doc. No. 107 at 15:18-22:7 (wherein Officer Shipman testified that department procedures allowed for the use of a Taser only if he had coverage). Whether this is true or not is not for the Court to decide; rather, Defendants' failure to offer this exculpatory "procedures manual" could have caused the jury to discredit much of Officer Shipman's testimony.

- Officer Shipman's testimony that he fired his weapon "almost simultaneous" with his alleged commands—despite his training that commands should be given so as to allow for compliance (107 at 68:12-18 and 108:17-109:2).

This testimony reasonably supports inferences of poor tactical decisions on Officer Shipman's part—including that his positioning did not allow him to see Casillas enter the room from the back yard (107 at 49:10-15). Poor tactical decisions can be considered under Plaintiffs' negligence claim. *See Hayes*, 736 F.3d at 1236 ("[A]n officer's pre-shooting conduct is properly included in the totality of circumstances surrounding [his] use of deadly force, and therefore the officer's duty to act reasonably when using deadly force extends to pre-shooting conduct").

Prior to submitting the case to the jury for deliberations, the Court denied Defendants' motion for a directed verdict, stating there was "obviously [] sufficient evidence in this case for the jury to find for the plaintiffs [requiring] the jury to make factual findings." Doc. No. 105 at 137:8-12. Nothing has changed since this ruling, and so the Court denies Defendants' renewed motion under Rule 50(b). *Georges v. Novartis Pharm. Corp.*, 988 F. Supp. 2d 1152, 1156 (C.D. Cal. 2013) ("The Court conducts the same analysis for an initial motion for JMOL before the verdict and for a renewed motion for JMOL after a verdict is returned.") (citing Rule 50).

### B. Rule 59 Motion for New Trial Based on the Clear Weight of Evidence

Despite the Court's denial of Defendants' motion for a directed verdict under Rule 50(b), the Court can also grant a new trial under Rule 59 where the verdict was against the clear weight of the evidence. *Molski*, 481 F.3d at 729. Under this standard, the Court may assess the credibility of the witnesses and weigh the evidence. *See Kode*, 596 F.3d at 612. However, the Ninth Circuit has cautioned that this "extraordinary remedy" should be granted "sparingly," with an eye toward "the interests of finality and conservation of judicial resources." *Wood*, 759 F.3d at 1121; *see also S.E.C. v. Todd*, 642 F.3d 1207, 1225 (9th Cir. 2011) (stating that new trials should be granted only where "it is quite clear that the jury has reached a seriously erroneous result.").

In *Tortu v. Las Vegas Metro. Police Dep't*, the Ninth Circuit reversed the district court's grant of a new trial in an excessive force case, deeming the jury's verdict against one officer not "unreasonable." 556 F.3d 1075, 1083 (9th Cir. 2009). At trial, the jury heard conflicting testimony

43

as to whether a police officer injured the plaintiff while the latter was handcuffed and seated in the police car. *Id*. at 1084. Multiple officers denied the plaintiff's account of the events, but other conflicting evidence supported plaintiff's account, and the jury ultimately found in plaintiff's favor against one officer. *Id*. The district court, however, granted this defendant-officer a new trial on the basis that the jury's verdict was "against the clear weight of the evidence." The district court based its decision on conflicting testimony, but the Ninth Circuit stated the court "took its own view, in place of the jury's, of certain medical evidence and testimony—an "impermissible practice." *Id*. (*citing Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001) ("[A] district court may not grant a new trial simply because it would have arrived at a different verdict."). Thus, the Ninth Circuit reversed, reinstating the jury's original verdict against the officer. *Id*. at 1087; *see also Id*. at 1087 (Smith, J, dissenting) ("The majority[] holds that the district court abused its discretion by granting a new trial. In making that decision regarding the motion for a new trial, the majority fails to accord the trial judge's decision the appropriate deference when applying an abuse of discretion standard."); *see also Estate of Elkins v. Pelayo*, 737 Fed. Appx. 830, 833 (9th Cir. 2018) ("[S]hooting a suspect simply to stop him from running away was not a legitimate law enforcement objective.").

Here, the Court cannot say that the jury's verdict is against the clear weight of the evidence. While true that Officer Shipman provided his account of the incident that, if believed, would support a defense verdict. However, the Court cannot simply set aside the jury's verdict on the possibility that a different result may have manifested. *See Wallace v. City of San Diego*, 479 F.3d 616, 630 (9th Cir. 2007) ("Although the district court noted the possibility that it may have reached a different conclusion if it were sitting as fact-finder, the court may not grant a new trial simply because it would have arrived at a different verdict."). Portions of Defendants' own proffered testimony supported Plaintiffs' theory that Casillas was not intending to attack Officer Shipman (or others) but was merely trying to escape capture. *See Section VI.A, supra*. This includes the testimony of Officers Wright and Long, whose encounters with Casillas were non-threatening (that Casillas was on a "Sunday stroll" and walking "lacksidasical[ly]"), as well as the inference that Casillas carried the pipe to protect himself from K-9 bites. Critically, Officer

Shipman himself testified that Casillas never made eye contact with him, strongly suggesting Casillas's intent was to escape through the door leading to the frontage road—not to attack Officer Shipman. Additionally, the Court cannot ignore the multiple inconsistencies in Officer Shipman's testimony, including that he "shouted at the top of his lungs" (despite no other officer hearing such shouts), that he considered taking a step back but could not (despite his deposition testimony that he never considered stepping back), and that he was barred by department procedure from using his Taser (despite the utter failure of Defendants to produce such exculpatory evidence at any point prior to trial). Much of this same evidence, in addition to the evidence of poor tactics detailed in Section VI.A above, supports the jury's negligence verdict. Finally, if there was any doubt as to the jury's determination on excessive force, it should be put to rest by their answer to Question 2 of the verdict form:

> **Q**: Did Casimero Casillas pose an immediate threat of death or serious bodily injury to Officer Shipman at the time of the shooting?
> **A**: No.

*See* Doc. No. 88 at p. 2. Thus, the Court finds the jury's verdict was not against the clear weight of the evidence, and so Defendants' motion for new trial on this ground is denied. *Wood*, 759 F.3d at 1121; *Todd*, 642 F.3d at 1225; *Tortu*, 556 F.3d at 1083.

**VII.    Officer Shipman is not entitled to qualified immunity.**

*Parties' Arguments*

Defendants contend that the Court must finally rule on the issue of qualified immunity, which they contend must issue for Officer Shipman, given the facts Defendants contend were established at trial and the lack of clearly established precedent (on the specific facts of this case).

Plaintiffs counter that the law was clearly established on the use of deadly force in this situation—thereby giving Officer Shipman sufficient notice that his conduct was unconstitutional—such that qualified immunity would be inappropriate. Plaintiffs reiterate facts supporting the verdict, detail factually-similar cases in the Ninth Circuit, and point to the jury's finding that Casillas did not "pose an immediate threat of death or serious bodily injury to Officer Shipman at the time of the shooting."

*Analysis*

The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Clearly established law should not be defined at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 662. Rather, it "must be particularized to the facts of the case." *Id*. Thus, for a right to be clearly established, the law "must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (*citing White v. Pauly*, 137 S. Ct. at 551). While a case need not be "directly on point" to show that a right is clearly established, it must make the question "beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). "It is the plaintiff who bears the burden of showing that the rights allegedly violated were clearly established." *Shafer*, 868 F.3d at 1118.

In *Tennessee v. Garner*, the Supreme Court deemed the use of deadly force against a fleeing suspect to be unreasonable "if the suspect does not pose a significant threat of death or serious physical injury to the officer or others." *Id*. at 3. Factors relevant to assessing whether an officer's use of force was objectively reasonable include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The immediacy of the threat posed by the suspect is the most important factor. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc). These factors are not exclusive, and a court must consider the totality of the circumstances. *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). In general, an officer must give a warning before using deadly force "whenever practicable." *Harris*, 126 F.3d at 1201 (citing *Garner*, 471 U.S. at 11-12). Also relevant to reasonableness are the "alternative methods of capturing or subduing a suspect" available to the officers. *City of Hemet*, 394 F.3d at 703.

/ / /

In the excessive-force case of *Cruz v. City of Anaheim*, multiple officers were attempting to apprehend Cruz during a traffic stop, and Cruz attempted to evade them by driving away. 765 F.3d 1076, 1078 (9th Cir. 2014) (citing *Garner*, 471 U.S. at 9-12). Cruz eventually exited his vehicle, and the officers ordered him to get on the ground. *Id*. Multiple officers then stated Cruz reached for the waistband of his pants—though no non-officer witnesses confirmed this. *Id*. The officers (having heard a report that Cruz possessed a firearm) took Cruz's movement as a sign that Cruz was going for his gun. *Id*. The officers fired twenty shots, killing Cruz. *Id*. The circuit court described the critical question as "whether the police [saw] Cruz reach for his waistband . . . If they did, they were entitled to shoot; if they didn't, they weren't." *Id*. at 1079. The circuit court reasoned:

> It would be unquestionably reasonable for police to shoot a suspect in Cruz's position if he reaches for a gun in his waistband, or even if he reaches there for some other reason. Given Cruz's dangerous and erratic behavior up to that point, the police would doubtless be justified in responding to such a threatening gesture by opening fire. Conversely, if the suspect doesn't reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him after he stopped his vehicle and opened the door. At that point, the suspect no longer poses an immediate threat to the police or the public, so deadly force is not justified.

*Id*. at 1078-79 *see also Estate of Elkins v. Pelayo*, 737 Fed. Appx. 830, 833 (9th Cir. 2018) (reversing this Court's grant of qualified immunity on summary judgment where there remained a question of whether the suspect was reaching for his waistband for a gun or merely running away) (citing *Cruz,* 765 F.3d at 1079); *George v. Morris*, 736 F.3d 829 (9th Cir. 2013) (denying the defendants' interlocutory appeal as to the district court's denial of qualified immunity, where issues of fact existed as to whether the suspect made furtive movements with a gun).

Similarly, in *Hayes*, the circuit court examined the reasonableness of an officer's use of deadly force (albeit in a negligence case, but where the issues and facts closely align). 736 F.3d at 1236. There, officers were called to a residence, and began searching for Hayes. *Id*. at 1227. When the officers confronted him, they ordered him to show his hands, and Hayes revealed a large knife. *Id*. at 1228. Hayes then took a few steps toward the officers, putting them six to eight feet apart; the officers shot and killed Hayes. *Id*. The officers testified that they did not believe they had time

to tell Hayes to stop. *Id*. However, other evidence indicated that Hayes was not charging at the officers, but instead appeared clueless. *Id*. The Ninth Circuit held that "reasonable jurors could conclude the [officers'] use of deadly force was not objectively reasonable." *Id*. at 1232. The circuit court reiterated that "the mere fact that a suspect possesses a weapon does not justify deadly force." *Id*. at 1233 (citing *Haugen v. Brosseau*, 351 F.3d 372, 381 (9th Cir. 2003)). Critically, the court also indicated to the parties that if it was established that Hayes wasn't charging the officers (despite his being six to eight feet away from them brandishing a knife), an immediate threat of death or serious bodily injury could not be shown. *Id*. at 1234.

In *Gonzalez v. City of Anaheim*, officers contended Gonzales quickly accelerated his vehicle, which posed an immediate threat to their safety. 747 F.3d 789 (9th Cir. 2014). During the encounter, two officers scuffled with Gonzalez in the front seat of his van. *Id*. The two officers contended Gonzalez "violently accelerated" his vehicle, so they shot and killed him. *Id.* at 793. The en banc panel reversed the district court's grant of summary judgment, concluding that a reasonable jury could discredit the officers' stories, as competing circumstantial evidence indicated the car was not travelling at a high rate of speed. *Id*. at 795. Thus, it would be unreasonable for the officers to "perceive an immediate threat of death or serious bodily injury." *Id*.; *see also Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011) (finding the officers' decision to shoot an individual holding a pocket knife "which he did not brandish at anyone" to be excessive); *Curnow By and Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 323, 325 (9th Cir. 1991) (affirming district court's denial of officer's motion for summary judgment on qualified immunity grounds where the non-moving plaintiff's evidence showed that the plaintiff had not presented an immediate threat of death or serious bodily injury; the evidence suggested the suspect did not point his gun at officers and he was not facing the officer who opened fire).

Here, the Court determined at summary judgment that the issue of qualified immunity turned on whether it was reasonable for Officer Shipman to perceive an imminent threat of death or serious bodily injury. Since Officer Shipman was the only person still alive that witnessed the shooting, Ninth Circuit precedent required the jury to judge Officer Shipman's credibility and weigh it against all circumstantial evidence. By deciding the excessive force question in favor of

Plaintiffs, and by answering the special interrogatory in the negative, the jury has thus set the facts on which the Court must base its qualified immunity decision. As described in Section VI above, substantial evidence (on which the jury based its determination) indicates Casillas was attempting to escape through the door leading to the frontage road, carried a pipe to protect himself from the K-9 units, and was not moving to attack Officer Shipman. Critically, Officer Shipman testified Casillas never made eye contact with him. As in C*ruz, Gonzalez, Hayes, George, Glenn,* and *Curnow,* Officer Shipman's conduct demonstrates an unreasonable use of force—given the jury's determination that Casillas presented no imminent threat. Since these opinions all existed prior to the day of the shooting (September 7, 2015), the Court finds Officer Shipman was given sufficient notice of the situations where deadly force would be appropriate. In fact, there is no doubt Officer Shipman was aware of this standard, given this was *his exact testimony on how he was trained in the use of force. See* Doc. No. 107 at 55:23-56:2:

> **Plaintiffs' Counsel**: And do you recall that the teachings of POST was that you cannot use deadly force against someone who is in the resistive category or the assaultive category; it has to be life threatening?
>
> **Officer Shipman**: Correct.

Defendants believe qualified immunity is justified, but their arguments are unpersuasive. Much of Defendants' argument is premised on an alternate read of the facts—a scenario the jury has now rejected. *See* Doc. No. 88 at p. 2 (the jury's determination that Casillas did not pose an immediate threat of death or serious bodily injury to Officer Shipman at the time of the shooting). Further, the Court finds Defendants' cases inapposite. Recently, in *Reese,* the Ninth Circuit held that qualified immunity was appropriate for officer who shot a suspect brandishing a knife during an altercation. 888 F.3d at 1038. The Court read the evidence as demonstrating how the suspect answered the door brandishing a knife, which was elevated, very close to two officers. *Id.* The first officer fired a shot at the suspect, missing, and the suspect fled, dropping the knife in the process. *Id.* The second officer entered the room and, not seeing the suspects hands (and therefore unaware that he had dropped the knife), shot him. *Id.* The plaintiff had not identified any sufficiently analogous cases showing clearly established precedent, so qualified immunity applied. *Id.*

However, the critical distinction between *Reese* and this case is that here, Officer Shipman had ample evidence to indicate Casillas posed no immediate threat, including Casillas's lack of eye contact (107 at 67:21-23, 109:3-11, and 124:25-125:4), Casillas's pre-assaultive (and not life-threatening) posture (107 at 55:23-56:2), and Casillas's lack of any threatening statements or gestures to him or other officers (107 at 51:5-16). *Kisela* is similarly distinguishable. There, the Supreme Court held an officer should be granted qualified immunity for the shooting of a suspect based on the suspect's "hacking a tree with a large kitchen knife," her close proximity to a potential victim-bystander, and her failure to acknowledge commands to drop the knife. 138 S. Ct. at 1153. Here, however, the testimony at trial indicates Casillas was moving toward the exit, that he made no threatening gestures toward Officer Shipman (much less eye contact), and that Officer Shipman provided no warning to Casillas before using deadly force.

For these reasons, Defendants' request for qualified immunity is denied.

### **ORDER**

Accordingly, IT IS HEREBY ORDERED that Defendants' motion for a directed verdict or for a new trial is DENIED in its entirety.

IT IS SO ORDERED.

Dated: __July 2, 2019__        _____

              SENIOR DISTRICT JUDGE